**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | |
|---|---|
| **KOSTAS GIANNOULIAS,**<br>*Petitioner,*<br>v.<br>**FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,**<br>*Respondent.* | **No. 26-____**<br>*(to be assigned)* |

**EMERGENCY MOTION FOR IMMEDIATE ADMINISTRATIVE STAY, STAY PENDING REVIEW, AND EXPEDITED PROCEEDINGS**

*Immediate administrative relief and expedited proceedings requested*

Petitioner Kostas Giannoulias, appearing individually and pro se, moves under Federal Rules of Appellate Procedure 18 and 27 for an immediate administrative stay and a stay pending review of the Federal Motor Carrier Safety Administration's July 9, 2026 Waiver of Warning Device Requirements ("Waiver No. 4"). The order is operative now, expires October 9, 2026, authorizes new carriers to opt in after one business day, and states that it "will be reissued." Petitioner also requests an expedited FMCSA response, an expedited record and merits-briefing schedule, and waiver of bond.

**RELIEF REQUESTED**

1. Enter an immediate administrative stay of Waiver No. 4, including its email opt-in authority, while this motion is considered.

2. After an expedited response, stay Waiver No. 4 pending disposition of the petition for review.

3. Direct FMCSA promptly to identify every current opt-in carrier, lodge the materials before the Administrator when Waiver No. 4 was signed—or at least a certified index sufficient to test jurisdiction, standing, and the asserted safety finding—and establish an expedited record and merits-briefing schedule.
4. Alternatively, preserve the underlying warning-device rules and prohibit additional opt-ins or successor waivers while review proceeds; and, if this Court concludes Petitioner is not a "party aggrieved," transfer rather than dismiss the petition under 28 U.S.C. § 1631.

**PRELIMINARY STATEMENT**

This petition challenges FMCSA's July 9, 2026 order ("Waiver No. 4") as ultra vires: it exceeds 49 U.S.C. § 31315(a)'s three-month, person-specific limits and evades the public procedures required by § 31315(b). Congress limited a waiver to "a person" for a nonemergency, unique event lasting no more than three months. FMCSA instead maintained an uninterrupted 365-day commercial program through four serial orders; promised reissuance; allowed qualifying Level 4 carriers to self-enroll by email; and used continued relief to "gather critical data." Those are characteristics of class relief and regulatory experimentation governed by exemption and pilot-program safeguards.

Each successor decision also preceded the most complete report for the prior term. Waiver No. 4 was signed July 9, 2026; the complete Waiver No. 3 report was

not due until August 8. FMCSA nevertheless relied on studies it had found insufficient in December 2024 without identifying public evidence that a Level 4 truck can complete the essential autonomous sequence: detect the need to stop, stop safely, and activate the flashers and beacons. A condition requiring that outcome is not evidence that the system can reliably achieve it.

## JURISDICTIONAL POSTURE

Waiver No. 4 is a final order under Chapter 313: it grants presently operative regulatory relief, fixes the rights and obligations of covered carriers, and marks FMCSA's consummated decision. The Hobbs Act gives the courts of appeals exclusive jurisdiction over final orders issued under Chapter 313. 28 U.S.C. § 2342(3)(A). Venue lies here because Petitioner resides in Illinois. Id. § 2343. The September 8 petition is timely. The sixtieth day after the July 9 order was Labor Day, September 7, so Federal Rule of Appellate Procedure 26(a)(1)(C) extends the deadline through September 8.

Section 2344 authorizes review by a “party aggrieved.” Petitioner qualifies in this less-formal FMCSA proceeding. Unlike the Atomic Energy Act in *Nuclear Regulatory Commission v. Texas*, neither § 31315(a) nor Part 381 creates an intervention procedure or limits party status to the applicant. The Supreme Court made party status depend on the governing scheme and recognized that less than intervention may suffice in certain less-formal adjudications. 605 U.S. 665, 677

(2025). Before filing here, Petitioner requested an immediate stay, rescission or revocation, and participation as an interested, adversely affected person in reconsideration or any successor-waiver process.

FMCSA cannot eliminate every pre-issuance avenue for participation and then use the resulting nonparticipation to defeat review. It provided no notice, docket, hearing, intervention mechanism, or other means for Petitioner to participate before issuance. Upon learning of the order, he promptly presented his injury and objections and requested agency relief before seeking judicial intervention—the only participation FMCSA's procedure allowed. A contrary construction would reserve direct review to the waiver recipient and undisclosed opt-in carriers while denying it to those adversely affected by the alleged misuse of § 31315(a). Section 2344 should not produce that self-insulating result.

*Matson Navigation* held that limited comments did not confer Hobbs Act party status in an authorized bilateral vessel-replacement proceeding with no third-party intervention. 77 F.4th 1151, 1158–61 (D.C. Cir. 2023). It also held that, absent Hobbs jurisdiction, the APA claims belonged in district court. Id. at 1161. Here, the absence of participation results from the statutory classification Petitioner challenges: FMCSA allegedly used § 31315(a) to provide exemption or pilot-program relief for which Congress required public procedures. At minimum,

*Matson* identifies district court—not insulation from review—as the alternative forum if this Court finds Petitioner was not an agency party.

To preserve review while the forum question is resolved, Petitioner is concurrently filing a protective Administrative Procedure Act action in the U.S. District Court for the Northern District of Illinois. If this Court concludes that § 2344 party status is absent, Petitioner requests transfer under 28 U.S.C. § 1631 rather than a disposition that could prejudice timely review.

## RULE 18 REQUEST AND EMERGENCY

Rule 18(a)(1) ordinarily requires a stay request first be made to the agency. On September 3, 2026, at 12:50 p.m. CDT, Petitioner emailed FMCSA the attached Emergency Request for Immediate Administrative Stay and Rescission/Revocation of Waiver No. 4 to MCPSV@dot.gov and sent a signed paper copy that afternoon by USPS Priority Mail Express, tracking no. 9581 7137 0201 6246 3948 68. The request did not assert that FMCSA had a statutory duty to answer within 48 hours. It gave the agency the first opportunity to preserve the status quo and stated all principal grounds now presented.

As of September 8, 2026, the requested 48-hour window has expired and FMCSA has neither responded to the request nor afforded the requested relief.

The need for interim relief is immediate. Carriers may enter under the order after FMCSA acknowledges an email or one business day elapses; the order says

only that FMCSA "may" publish participants; Petitioner continues to drive the same Texas freight corridors; and the order's short life and announced reissuance threaten to move the dispute faster than ordinary briefing. Petitioner notified the Clerk's Office at the earliest practicable time under Circuit Rule 27 and served or gave reasonable notice to FMCSA and the identified beneficiary carriers. The agency request, transmission proof, any response, challenged order, and supporting declaration accompany this motion as Rules 18(a)(2)(B) and 27(a)(2)(B) require.

Notice was provided to the Clerk of the Court and the identified recipients on September 8, 2026, at [INSERT ACTUAL NOTICE TIME] CDT, before or concurrently with filing this motion.

## BACKGROUND

A. Congress established three distinct forms of relief. A waiver may relieve "a person" only upon findings that it is in the public interest and likely to achieve safety equivalent to or greater than compliance. It may last no more than three months, must be limited in scope and circumstances, and must concern a nonemergency, unique event. 49 U.S.C. § 31315(a). FMCSA's regulation is more specific: the unique event must itself "take no more than three months to complete." 49 C.F.R. §§ 381.200, 381.205(a). A written request must identify the covered person, event and period, regulations, estimated vehicles and drivers, and

safety method. Id. § 381.210. FMCSA staff review the request and recommend a decision; the Administrator grants or denies it. Id. § 381.215.

An exemption, by contrast, may cover "a person or class of persons," last up to five years, and be renewed. Congress required Federal Register notice, public access to the safety analysis, comment, monitoring, and a published decision. 49 U.S.C. § 31315(b)(1), (2), (6), (8); 49 C.F.R. §§ 381.300-381.315. For a pilot program evaluating alternatives or innovative safety approaches, Congress required public description and comment; a specific data-collection and safety-analysis plan; a comparison method; statistically useful participation; oversight; safeguards; participant identification; and a report to Congress. 49 U.S.C. § 31315(c); 49 C.F.R. §§ 381.400, 381.500-381.520.

The agency's implementation history confirms those boundaries. In 1998, FHWA—FMCSA's predecessor—adopted Part 381 and explained that TEA-21 made a "clear distinction" among short unique-event waivers, longer public exemptions, and controlled pilot evaluations. 63 Fed. Reg. 67,600, 67,601–02 (Dec. 8, 1998). After motor-carrier functions were transferred from FHWA to the newly created FMCSA, FMCSA adopted those interim regulations without change. 69 Fed. Reg. 51,589, 51,589 (Aug. 20, 2004). Responding to *Advocates* for Highway and Auto Safety and the Teamsters, FMCSA declined to publish waiver dispositions because few waivers were expected, they could last only hours, and

each would likely cover only a small number of drivers or carriers. Id. at 51,594. That premise bears no resemblance to a year-long, open-enrollment commercial program.

B. The certified record must establish the Chief Counsel's authority to execute Waiver No. 1. That order bears Chief Counsel Jesse Elison's signature, although 49 C.F.R. § 381.215 assigns the final waiver decision to the Administrator. Section 390.4 permits written delegation, but none effective October 9, 2025 appears publicly. Petitioner does not presume that none existed; FMCSA should produce the contemporaneous instrument authorizing the Chief Counsel's decision. If the record contains none, FMCSA cannot establish that Waiver No. 1 was issued by an authorized decisionmaker. That authority bears directly on the first order in the uninterrupted four-waiver sequence challenged here.

The orders also imposed a repeating evidentiary lag. Each complete term report was due thirty days after the term ended, while each successor was signed on or before expiration and took effect the next day. Waiver No. 2 was signed January 8, No. 3 on April 8, and No. 4 on July 9. The No. 3 complete report was due August 8—a month after No. 4 was approved. The precise point is that FMCSA designed the sequence so the most complete standardized evidence from the latest term necessarily followed the decision to continue.

C. Waiver No. 4 establishes open enrollment and relies on contested safety evidence. The opt-in mechanism appeared in Waiver No. 1 and remained in all four orders. The operative terms extend relief to "any other motor carrier" using qualifying Level 4 vehicles. A carrier need only email a certification concerning conforming beacons and future compliance; authority begins upon acknowledgment or after one business day, whichever comes first. No. 2 identifies Kodiak Robotics as having joined; No. 4 identifies Kodiak and Waabi Logistics. No. 4 also says a carrier that notified FMCSA under an earlier waiver need not notify it again. Yet its letter says FMCSA "may publish" a participant list. The operative text of Waiver No. 4 establishes an open-ended opt-in mechanism that grants immediate regulatory relief one business day after email transmission, creating a self-expanding class without mandatory public docketing or contemporaneous agency review.

In December 2024, FMCSA denied Waymo and Aurora's broader exemption because the evidence did not demonstrate likely equivalent safety and the proposed unspecified carrier class obscured the equipment, vehicles, and operations to be covered. 89 Fed. Reg. 105,675, 105,678-81 (Dec. 27, 2024). Waiver No. 4 relies on the same empirical studies FMCSA previously deemed insufficient in December 2024, without placing new baseline testing or end-to-end autonomous activation data in the administrative record. Its letter says continued waivers will

let FMCSA "gather critical data" and will "enable commercial deployment." Those statements matter because the required safety finding must precede the relief, not be generated by it.

## STANDARD

A stay turns on likelihood of success, irreparable injury, injury to other parties, and the public interest; the first two are most critical, and the last two merge when the government is respondent. *Nken v. Holder*, 556 U.S. 418, 426, 434-35 (2009). Section 706 requires a reviewing court to set aside action that is arbitrary or capricious, exceeds statutory authority, or was taken without required procedure. 5 U.S.C. § 706(2)(A), (C), (D).

## ARGUMENT

### I. Petitioner is likely to succeed on the merits.

1. One year of continuous commercial deployment is not a three-month unique event. The statutory limit applies to substance, not stationery. Congress confined a waiver to a limited nonemergency unique event for no more than three months, and § 381.205(a) requires that event to be completable in that period. Here nothing completed at a quarterly boundary. Trucks continued the same operations the next day under the same substitute-warning concept, while the terms accumulated data and promised another renewal. Reading § 31315(a) to permit unlimited consecutive waivers would make the three-

month and unique-event limitations ineffective and duplicate the express renewal mechanism Congress included only in subsection (b). Courts should give effect to every clause rather than adopt a construction that makes limitations surplusage.

Waiver No. 4's stated rationale confirms the mismatch. Each of the four letters calls the event unique because operation without a driver able to deploy warning devices "has never occurred previously." By July 2026, however, FMCSA had authorized exactly that activity continuously for nine months, multiple carriers participated, and operational results had been reported. FMCSA failed to identify a discrete, nonemergency 'unique event' under 49 U.S.C. § 31315(a), instead granting serial three-month authorizations to maintain a continuous, year-long commercial deployment. Repetition cannot remain unprecedented merely because FMCSA issues a new letter every ninety days.

The preset reissuance rule creates a second defect. Section 31315(a) requires an affirmative, contemporaneous public-interest and equivalent-safety determination for the waiver being granted. Waiver No. 4 instead announces continued relief as the default unless specified violations or safety deficiencies emerge. An absence of known disqualifying information is not the statutory finding, especially where the complete latest-term report was not yet due. The

record must show a new exercise of judgment on a new event; the face of the order shows a continuing program.

2. Under *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), this court owes no deference to FMCSA's statutory construction of 49 U.S.C. § 31315. Applying traditional tools of statutory interpretation, the plain text of subsection (a) restricts waivers to 'a person', while subsection (b) explicitly reserves class-wide exemption relief for 'a person or class of persons'. The opt-in text creates class relief that subsection (a) does not authorize. Congress used materially different words in adjacent subsections. When Congress includes language in one provision but omits it next door, courts presume the difference intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983). The Dictionary Act does not collapse that distinction: a singular may include plural only "unless the context indicates otherwise." 1 U.S.C. § 1. Here the adjacent express reference to a class, coupled with different duration, renewal, notice, comment, analysis, and publication requirements, is the decisive context.

Waiver No. 4 creates a prospective category—every qualifying Level 4 carrier with specified beacons—and gives each member a standing right to enter by email. Eligibility follows from class membership. No new request describes that carrier's unique event; no carrier-specific staff recommendation is public; and no Administrator-signed order evaluates its platform, fleet, operational design domain,

mounting configuration, or safety showing. Silence for one business day activates relief, and membership carries forward without recertification. FMCSA claimed its specifications "resolve potential ambiguity" and permit no outside configuration flexibility. Yet Kodiak, already identified as operating under No. 2, later asked for clarification of III(B)(6)'s "redundant power sources," including the definitions of sources and supplies—a condition it had certified itself able to satisfy. No. 4 repeated the term without addressing the question. Kodiak AI Comment at 1, FMCSA-2026-0958-0281 (May 4, 2026).

FMCSA itself framed the question in class terms. The July 9 letter quotes the 2024 denial's concern with an "unspecified class of carriers" and says advance identification and certification cure it. They do not convert a class grant into individual adjudication. Identity tells FMCSA who joined; it does not supply the individualized information § 381.210 requires or the Administrator decision § 381.215 assigns. And because participant publication is discretionary under the order, the public cannot know the class's complete membership even as operations begin. Reading subsection (a) to authorize this device would erase "or class of persons" from subsection (b) and let email enrollment bypass every public safeguard attached to class relief.

3. FMCSA cannot use serial waivers as the experiment needed to justify the waiver. Its regulations define a pilot program as temporary regulatory relief

for a person or class to collect data evaluating regulatory alternatives or innovative safety approaches. 49 C.F.R. § 381.400(a), (b). This series has those elements: temporary relief, expanding participation, an innovative substitute device, operational monitoring, recurring data submissions, promised continuation, and a stated purpose to "gather critical data."

Waiver No. 4, Section IV.B mandates post-term data on the frequency, duration, location, and reason for beacon activations to assess "overall performance and reliability." Four consecutive terms, open enrollment, promised reissuance, and evidence generation establish a pilot program in substance. FMCSA cannot obtain the benefits of pilot experimentation while avoiding § 31315(c)'s public-notice, control-group, statistical-oversight, and reporting safeguards.

Congress did not prohibit experimentation; it regulated it. A pilot requires advance public notice and comment, a defined data and safety-analysis plan, comparison against compliant operations, enough participants for statistically valid findings, oversight, countermeasures, public identification, and a final report. 49 U.S.C. § 31315(c); 49 C.F.R. §§ 381.500(d), 381.505, 381.520. The waiver series discloses no comparison group, sampling plan, statistical-power rationale, exposure denominator, or final public reporting protocol.

*Advocates for Highway & Auto Safety v. FHWA* supplies persuasive anti-circularity reasoning. It rejected a vision-waiver program because the agency simultaneously asserted the prerequisite safety finding and said the program was needed to produce the empirical basis for that finding. 28 F.3d 1288, 1294-95 (D.C. Cir. 1994). Its logic applies here: FMCSA cannot treat future evidence generated under relief as the evidence that had to support relief when granted. If the evidence was not yet sufficient, subsection (c) provided the structured way to test it.

4. The record must show compliance with FMCSA's mandatory request-and-review rules, and the report lag undermines a fresh decision. Sections 381.210 and 381.215 are mandatory. An applicant "must" send a written request containing the specified carrier, event, period, fleet, regulatory, and safety information; FMCSA "will" review it and make a recommendation; and the Administrator makes the final decision. Under *United States ex rel. Accardi v. Shaughnessy*, an agency must follow regulations governing its own decision process. 347 U.S. 260, 266-68 (1954). A promise in Waiver No. 1 that relief would later be reissued cannot itself substitute for a compliant request and a new recommendation concerning each later event.

Petitioner's public-record review found the April 2026 application for a five-year exemption in Docket No. FMCSA-2026-0958, but no separate waiver request under § 381.210 or staff recommendation for Waivers Nos. 2, 3, or 4. Waiver No. 4

violates 5 U.S.C. § 706(2)(D) by expressly abandoning mandatory agency procedures. While 49 C.F.R. § 381.210 strictly requires a written request for relief, Section II(B) of Waiver No. 4 unlawfully exempts existing carriers from this mandate, stating they 'need not send an additional notification.' FMCSA cannot lawfully re-authorize regulatory relief while simultaneously waiving the regulatory requirement to request it. The certified record is therefore critical. If qualifying requests and recommendations exist, they should identify the supposedly new event, planned completion within three months, fleet, safety evidence, and information presented to the Administrator. If they do not, the later waivers failed FMCSA's own procedure and are invalid under *Accardi*.

The known chronology independently supports arbitrary-and-capricious review. Every successor was signed before the prior complete term report was due. Most starkly, the Administrator signed No. 4 on July 9, while the No. 3 report covering the full term was due August 8. Interim crash reporting does not cure that structural choice: a crash report, if any, is not the same as the required full account of activation performance, reliability, malfunctions, and safety experience. The sequence was continuation first, complete evaluation later.

Later information cannot retroactively supply the grounds for the July 9 order. Judicial review must stand on the contemporaneous reasons and record before the decisionmaker. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Nor

does the no-problem default equal an affirmative finding. The Court should require at least a certified record index now; the agency should not obtain emergency deference by withholding whether the mandatory decision materials exist.

5. FMCSA did not adequately explain why evidence it found insufficient now supports equivalent safety. An agency may change policy and reassess evidence, but it must acknowledge the change and give good reasons; a more detailed explanation is required when the new decision rests on factual findings contradicting those underlying the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). Unexplained inconsistency is a hallmark of arbitrary action. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016). FMCSA's minor operational alterations fail to resolve the fundamental factual deficiencies identified in its 2024 denial.

First, neither 2022 study tested the full autonomous sequence. FMCSA found in 2024 that the Waymo truck apparently began stopped; a human apparently stopped the Aurora truck; humans apparently activated the warning equipment in both studies; and the reports did not establish activation timing. 89 Fed. Reg. at 105,680. Waiver No. 4 requires activation as soon as practicable and within ten minutes, but a condition is not validation. The July letter identifies no new end-to-end test showing a Level 4 system reliably detects the event, reaches a

safe stop, activates both flashers and beacons, verifies operation, and responds to a failure without a human.

Second, the human-factors evidence remains mixed. FMCSA found beacon response lower than triangle response in five of eight scenarios. Among the ten respondents who answered which device better indicated a stopped truck, eight selected triangles. Id. at 105,678-79. FMCSA also found no baseline stopped-truck condition without either device, leaving uncertainty whether participants reacted to the warning or simply saw the truck. Familiarity is not cosmetic: a warning device succeeds only if an approaching motorist recognizes and acts on it. The new letter's reliance on overall response rates does not explain the adverse scenario results or the absence of a baseline.

Third, geometry and visibility remain unresolved. The denial observed that a driver approaching from behind may see the trailer before a beacon mounted on the cab and found evidence about viewing distance and time inconclusive, especially around curves and crests. Id. at 105,679-80. Waiver No. 4 answers that operations are "primarily" on Interstates and calls straight-location response differences of less than four-tenths of one percent immaterial. But Interstates contain curves, crests, grades, weather, varied shoulders, work zones, and nighttime conditions; the order also permits other public roads when operationally necessary. It identifies no validated safety threshold for "immaterial," no quantified sight-distance analysis,

and no reason primarily-Interstate operation eliminates the acknowledged adverse scenarios.

Fourth, the accumulated numbers use mismatched exposure measures. Aurora's April 2026 exemption materials reported 34 vehicles and more than 500,000 general operating miles during the first waiver period, but only "nearly 10 hours" of beacon activation. 91 Fed. Reg. 20,252, 20,254 (Apr. 15, 2026). Forward-driving miles say little about the probability that a stopped-vehicle warning will fail. Relevant exposure includes the number and duration of activations; approaching vehicles; darkness and weather; road geometry and line of sight; passing speeds; evasive maneuvers and near misses; faults, power failures, and delayed activations. The public numbers disclose no denominator from which a reliable failure rate for the substituted function can be inferred.

Finally, email identification does not resolve carrier variability. The 2024 denial treated unspecified carriers, equipment, vehicles, and operations as obstacles to a safety finding. Waiver No. 4 sets minimum beacon characteristics, but a new entrant's email does not evaluate its ADS, sensing and fallback logic, activation integration, fleet scale, operational design domain, or real-world reliability. The agency's assertion that identification "cures" the class problem addresses who, not whether that carrier's system works. By failing to connect the evidence to the actual open class and the full substitute-warning function, FMCSA failed to

examine important aspects of the problem and articulate a rational connection between facts and result. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983).

6. FMCSA's own stated objective confirms that Waiver No. 4 does not address a temporary "unique event." The order declares that continued relief will "promote innovation and enable commercial deployment" of ADS-equipped CMVs. Commercial deployment is an ongoing industry objective, not a discrete event capable of completion within three months as 49 C.F.R. § 381.205(a) requires. And 49 U.S.C. § 31315(d) gives every waiver express preemptive force against inconsistent state law, magnifying the consequence of using serial waivers to establish a continuing national operational standard. FMCSA therefore used a temporary, person-specific mechanism to sustain commercial operations and impose a preemptive regulatory baseline without the exemption, pilot-program, or rulemaking procedures Congress prescribed. The agency cannot convert an avowed program of continuing commercial deployment into a succession of "unique events" by issuing a new letter every ninety days.

## II. Petitioner has a concrete roadway interest and faces irreparable harm.

Petitioner's interest is personal, not ideological. He is an Illinois interstate freight driver operating a 2024 Ram ProMaster 2500 light commercial cargo van.

His spot-market work repeatedly takes him onto Texas corridors where Aurora operates driverless Class 8 trucks. During Waiver No. 4, he completed at least six trips involving Dallas, Houston, Austin, Laredo, and El Paso, including Dallas-Houston travel; his records also document Chicago-area, Oklahoma City, and Dallas routes. Giannoulias Decl. ¶¶ 2–7.

Aurora publicly identifies driverless commercial service on Dallas-Houston, Fort Worth-El Paso, and Dallas-Laredo routes, including nighttime operations. Petitioner drives at night and intends in his ordinary business to accept a suitable Chicago-Dallas-Houston or comparable Texas load before October 9. He has preserved supporting records and can provide route-and-date evidence with private commercial information redacted. Id. ¶¶ 4–11.

Petitioner's commercial operations require him to travel I-45, I-10, and overlapping Texas corridors used by waiver-covered Level 4 CMVs. Waiver No. 4 authorizes covered carriers to dispense with the spatially separated warning devices required by 49 C.F.R. § 392.22(b), including placement 100 to 500 feet from a stopped vehicle located within 500 feet of a curve, hillcrest, or other obstruction to view—conditions that recur on Petitioner's routes. It thereby exposes Petitioner's light-duty vehicle to inadequately demarcated, stopped 80,000-pound CMVs at highway speeds. FMCSA itself identified adverse response scenarios, inconclusive rear visibility, and the absence of an end-to-end autonomous

activation test. Those facts establish a concrete interest in the warning-device rule and a substantial risk of physical harm, not a generalized objection to AV policy.

Future injury must be certainly impending or present a substantial risk; allegations cannot rest on a speculative chain. *Clapper v. Amnesty International USA*, 568 U.S. 398, 409, 414 n.5 (2013); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Petitioner satisfies that standard as strongly as this nonpublic program permits: completed recent trips, repeat corridors, night driving, announced driverless routes, an operative order, current opt-in authority, and a sworn intent grounded in ordinary commerce. If the Court needs the number of covered trucks, current carriers, route deployments, or beacon activations to assess probability, FMCSA possesses those jurisdictional facts and should disclose them promptly rather than benefit from a discretionary participant list.

His routes and records predate suit, and he will accept suitable freight under ordinary criteria. He faces an occupational choice: continue working under the altered safety baseline or surrender commercially valuable opportunities. That economic consequence corroborates his personal stake; it does not substitute for roadway exposure.

The procedural injury is equally tied to that concrete interest. If the relief is a class exemption or pilot in substance, Congress gave affected members of the public a right to notice, access to the safety basis, and an opportunity to comment

before operations. Petitioner would have submitted his corridor exposure, nighttime concern, recognition evidence, autonomous-activation gap, and denominator problem. To the extent FMCSA attempts to cure its procedural bypass by pointing to the pending exemption application (Docket No. FMCSA-2026-0958), that public portal was fundamentally broken. The regulations.gov system suffered catastrophic Server 500 errors, displayed "Closed For Comments" prior to the submission deadline, rendering it unavailable for 7 to 8 days of the 30-day comment period. Petitioner possesses F12 network logs, video evidence, and GSA Zendesk confirmation proving this outage. Petitioner was deprived of a functional public forum and was not legally required to wait for a broken portal to be fixed while unlawful waivers actively governed his commercial routes. A person with a concrete interest may enforce a procedural protection without proving the agency would ultimately reach a different substantive result. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). A stay and remand would restore that opportunity and the compliant warning baseline in the meantime.

Physical injury or death cannot be repaired after judgment. Nor can a later merits decision restore the weeks in which Petitioner either drove under the challenged order or declined ordinary work while the government's sovereign immunity foreclosed damages. The risk is time-bound but recurring: No. 4 expires October 9 and promises another order. Without interim relief, the order may

accomplish its full effect before the Court can determine which forum has jurisdiction. That is irreparable harm.

### III. The equities and public interest favor a stay.

A stay would not prohibit autonomous-truck development or decide that beacons can never provide equivalent safety. It would restore generally applicable warning-device rules while FMCSA uses a valid exemption or pilot pathway. Covered carriers may operate with a person able to deploy compliant devices or seek properly supported relief. Their inconvenience is temporary; Petitioner's asserted injury is catastrophic and irreversible.

The public interest favors highway safety, transparent class-wide change, meaningful evaluation, and obedience to Congress's limits. The triangles are the existing baseline; a stay preserves rather than invents regulation. Alternatively, the Court could bar new opt-ins and reissuance, compel participant identification, and preserve compliant warning devices during expedited review. No bond should be required from a pro se individual seeking public-law relief.

## CONCLUSION

The Court should enter an immediate administrative stay, then stay Waiver No. 4 pending review, establish an expedited record and merits-briefing schedule,

require the limited record and participant information described above, waive bond, and grant the alternative relief requested.

Respectfully submitted,

______________________________

/s/Kostas Giannoulias, Petitioner pro se
3851 Mission Hills Rd, Unit 210
Northbrook, Illinois 60062
kostas@haasefreightsystems.com
708-772-6738
Signed/Filing Date: September 8, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | |
|---|---|
| **KOSTAS GIANNOULIAS,**<br>*Petitioner,*<br>v.<br>**FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,**<br>*Respondent.* | **No. 26-____**<br>*(to be assigned)* |

**DECLARATION OF KOSTAS GIANNOULIAS**

I, Kostas Giannoulias, declare as follows:

1. I am an adult resident of Illinois and Petitioner in this matter. I make this declaration from personal knowledge.

2. I am an interstate commercial freight driver. In that work, I personally operate a 2024 Ram ProMaster 2500 cargo van on interstate routes, including corridors described below. I submit this declaration solely in my individual capacity.

3. I obtain loads in the spot market. My routes vary according to available freight, timing, compensation, and customer requirements. I frequently drive at night and share interstate highways with loaded Class 8 tractor-trailers.

4. During July and August 2026, I completed at least six freight trips involving Dallas, Houston, Austin, Laredo, and El Paso. Those trips included travel between Dallas and Houston. My records also document routes connecting the

Chicago area, Oklahoma City, and Dallas, including at least one Dallas-Oklahoma City movement.

5. Every trip described above occurred during Waiver No. 4's July 10-October 9, 2026 effective period. I have bills of lading, rate confirmations, proofs of delivery, and related business records documenting routes and dates.

6. The business records contain private shipper, broker, consignee, address, commodity, and pricing information. I can submit copies limited to route and date information, with private commercial information redacted, if the Court requires additional corroboration.

7. Dallas-Houston, the Dallas region, Oklahoma City, Austin, Laredo, and El Paso are actual or recurring freight destinations in my ordinary business. The Chicago-Dallas-Houston work has paid well. I genuinely intend to accept a commercially suitable Chicago-Dallas-Houston load or comparable Texas-corridor freight before October 9, 2026 if offered under my ordinary business criteria.

8. Aurora has publicly announced driverless commercial operations between Dallas and Houston, nighttime driverless operations, a driverless route between Fort Worth and El Paso, and a broader network including Dallas-Laredo. Those operations overlap corridors and destinations documented in my business records.

9. Because I operate in the spot market, refusing all freight that may place me on those corridors would restrict commercially valuable work opportunities. I do not wish to abandon routes I ordinarily travel in order to avoid a federal waiver issued without public participation.

10. A collision between my cargo van and a loaded tractor-trailer could cause catastrophic injury. I am particularly concerned about nighttime travel and a stopped tractor-trailer whose rearward warning consists only of cab-mounted beacons rather than the spatially separated warning devices ordinarily required by 49 C.F.R. § 392.22(b).

11. On September 3, 2026, at 12:50 p.m. CDT, I emailed FMCSA the attached Emergency Request for Immediate Administrative Stay and Rescission/Revocation of Waiver No. 4 to MCPSV@dot.gov. I also mailed a signed paper copy that afternoon to FMCSA's Office of the Chief Counsel by USPS Priority Mail Express, tracking no. 9581 7137 0201 6246 3948 68. I requested a response within 48 hours because of the impending filing deadline but did not claim a statutory right to that response time.

12. As of 11:00 a.m. CDT on September 8, 2026, the 48-hour period requested had expired and FMCSA had not responded to my request or afforded any relief. The agency request, sent-email record, and USPS receipt and tracking proof are attached to this filing.

13. My agency submission presented the serial-waiver, class, pilot-like data collection, report-lag, procedural, safety-record, standing, and public-interest grounds in detail. I asked to participate as an interested adversely affected person in any reconsideration, rescission, or successor-waiver process.

14. I reviewed FMCSA's public waiver pages and Docket No. FMCSA-2026-0958. I found the April 2026 application for a five-year exemption. I did not find a separate public application requesting Waiver No. 2, No. 3, or No. 4, or a separate public staff recommendation for those waivers. I understand that FMCSA may possess nonpublic materials I cannot access.

15. The facts stated in this declaration are true and correct to the best of my personal knowledge. Where I describe future work, I state my present, genuine intent based on my ordinary spot-market business.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on September 8, 2026 in Northbrook, Illinois.

/s/Kostas Giannoulias

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | |
|---|---|
| **KOSTAS GIANNOULIAS,**<br>*Petitioner,*<br>v.<br>**FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,**<br>*Respondent.* | **No. 26-____**<br>*(to be assigned)* |

## CERTIFICATE OF COMPLIANCE

This motion complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,071 words, excluding the accompanying declaration and documents authorized by Rules 18(a)(2)(B) and 27(a)(2)(B), and the items excluded by Rule 32(f). It complies with Rules 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using a proportionally spaced 14-point Times New Roman typeface.

Dated: September 8, 2026

______________________________
/s/Kostas Giannoulias, Petitioner pro se

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2026, I served the foregoing document and accompanying materials by the methods and at the addresses stated below. Paper copies were deposited with the United States Postal Service, postage prepaid, using Certified Mail. Courtesy copies were also sent by email, if email is listed below.

1. Federal Motor Carrier Safety Administration, Office of the Chief Counsel, 1200 New Jersey Avenue SE, Washington, DC 20590; courtesy email: MCPSV@dot.gov.

2. Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001.

3. Aurora Operations, Inc., Attn: Shelley Webb, Chief Legal Officer, 280 N. Bernardo Avenue, Mountain View, CA 94043; courtesy email: legal@aurora.tech.

4. Kodiak Robotics, Inc., Attn: Jordan Coleman, 1049 Terra Bella Avenue, Mountain View, CA 94043; courtesy email: jordan@kodiak.ai.

5. Waabi Logistics Inc., Attn: Joonsik Maing, 3005 W. Wintergreen Road, Lancaster, TX 75134; courtesy email: jmaing@waabi.ai.

Dated: September 8, 2026

______________________________

/s/Kostas Giannoulias, Petitioner pro se

**INDEX OF ACCOMPANYING MATERIALS**

Exhibit 1 — Waiver No. 4 cover letter and Terms and Conditions (July 9, 2026).

Exhibit 2 — Petitioner's Emergency Request for Administrative Stay and Revocation, Reconsideration, Rescission, or Termination (September 3, 2026).

Exhibit 3 — Proof of transmission of the agency request: sent-email record and USPS Priority Mail Express receipt and tracking proof.

Exhibit 4 — Waiver Nos. 1, 2, and 3, including their respective cover letters and Terms and Conditions.

Exhibit 5 — FMCSA's December 2024 exemption denial, 89 Fed. Reg. 105,675 (December 27, 2024).

Exhibit 6 — Aurora's April 2026 exemption materials, 91 Fed. Reg. 20,252 (April 15, 2026).

Exhibit 7 — Kodiak AI, Inc. comment, Docket No. FMCSA-2026-0958-0281 (May 4, 2026).

Exhibit 8 — Focused regulations.gov outage evidence described in the motion and declaration.

U.S. Department
of Transportation

Federal Motor Carrier
Safety Administration

Administrator

1200 New Jersey Ave, SE
Washington, DC 20590

July 9, 2026

Shelley Webb
Chief Legal Officer
Aurora Operations, Inc.
280 N. Bernardo Ave.
Mountain View, CA 94043

Dear Ms. Webb:

The Federal Motor Carrier Safety Administration (FMCSA) grants a limited waiver, subject to the attached terms and conditions, to Aurora Operations, Inc. (Aurora) from compliance with the warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f), to allow Aurora to use cab-mounted warning beacons in lieu of the warning devices required by 49 CFR § 393.95(f). This waiver is effective from 12:00 a.m. on July 10, 2026, through 11:59 p.m. on October 9, 2026.

This waiver covers Aurora's operation of Level 4 Automated Driving System (ADS) commercial motor vehicles (CMVs) subject to the Federal Motor Carrier Safety Regulations. This waiver also permits any other motor carrier to operate under the waiver, provided that it first notifies FMCSA in writing, certifying that it currently has cab-mounted warning beacons, the ability to comply with all terms and conditions of this waiver, and that it will comply with all terms and conditions of the waiver. FMCSA may publish on its website a copy of the waiver and a list of motor carriers operating under the waiver. Kodiak Robotics, Inc., USDOT No. 3172855, and Waabi Logistics Inc., USDOT No. 3906293, have provided written notification to FMCSA that they are also operating under the waiver.

Under 49 U.S.C. §§ 31136(e) and 31315(a), FMCSA may grant a waiver if it determines that it is in the public interest to grant the waiver and that the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver. FMCSA may grant a waiver for nonemergency and unique events, limited in scope and circumstances, for a period not in excess of three months. Although FMCSA previously denied Aurora's request for an exemption (89 FR 105675, December 27, 2024), FMCSA has now determined that it is in the public interest to issue a waiver, limited in scope and circumstances, that is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver.

FMCSA reviewed information provided by Aurora in support of its request for exemption. FMCSA has determined that the attached waiver is narrower in scope than the broad exemption request from Waymo LLC and Aurora that FMCSA previously denied. In this regard, the exemption request sought industry-wide regulatory relief whereby any motor carrier operating Level 4 ADS-equipped CMVs could operate under the waiver without any prior notice to FMCSA. In denying the exemption, FMCSA found that the applicants' request to "exempt a class of unspecified carriers using unspecified equipment on unspecified vehicles only further undermines the claimed likely equivalent level of safety." This waiver cures that deficiency, as it would apply to Aurora, and would not apply to other motor carriers operating Level 4 ADS-equipped CMVs unless they provide written notification to FMCSA and certify compliance with the waiver's terms and conditions.

Further, the waiver is narrower than the exemption request because it requires that operations occur primarily on the U.S. Interstate Highway System. In denying the exemption, FMCSA noted that "road curvatures or elevations may affect visibility of a beacon located in a fixed position on the cab." This waiver limits operations "primarily [to] the U.S. Interstate Highway System," where standardized road geometry minimizes the frequency of sharp curves and crests that could obstruct visibility. Moreover, the waiver's scope prohibits operations that would require a commercial driver's license endorsement (*e.g.*, tank vehicles, double/triple trailers) if a driver were present, as well as the transportation of passengers or hazardous materials.

In addition, the waiver includes technical specifications to resolve potential ambiguity. In denying the exemption, FMCSA stated that the application did not "provide sufficient details about the proposed alternative devices," particularly with the vague allowance for "any configuration of similar effectiveness." In contrast, Section III.B of the waiver mandates specific mounting, location, and photometric performance standards (SAE J595). The waiver also imposes additional requirements for when the beacons must activate and how long they must remain flashing. Further, the waiver does not allow for configuration flexibility outside the terms and conditions set forth in the waiver. Moreover, Section III.B.6 of the waiver requires that the beacons "be designed and installed with redundant power sources to prevent failure due to a single-point power failure," which FMCSA previously noted as a deficiency with the exemption application.

In denying the exemption, FMCSA also stated that Aurora's naturalistic study submitted in support of the application showed that a lower percentage of drivers responded to the beacons than to warning triangles in five of eight scenarios presented: daytime tests at left curve and straight locations, and nighttime tests at crest, right curve, and straight locations. However, under the waiver, the curve and crest scenarios would be present to a much more limited degree, since operations must occur primarily on the U.S. Interstate Highway System, and the differences in driver response at straight locations were immaterial (*i.e.*, less than four-tenths of one percent), according to the study. Moreover, as FMCSA noted, Aurora's study concluded that a warning beacon elicited a higher percentage of responses than warning triangles overall. FMCSA has noted in a research context "the historically unresolved questions of whether the use of such [warning] devices improves traffic safety and, if so, how and to what extent." (90 FR 1591, January 8, 2025). Without information on the level of safety the current regulatory requirements provide, the two studies submitted in support of Aurora's application reasonably

support a determination that motorists detect and respond to the beacons at a similar rate as existing warning devices under the terms and conditions imposed by this waiver.

Finally, the waiver addresses concerns about the lack of monitoring controls by requiring specific, detailed reporting requirements to allow FMCSA to monitor the safety performance of motor carriers operating under the waiver. In denying the exemption, FMCSA concluded that the application “lacks necessary monitoring controls to ensure highway safety.” Section IV of this waiver implements these exact controls by requiring detailed crash and term reporting. Specifically, under Section IV.B, Aurora, and any other motor carriers operating under the waiver, must provide FMCSA with aggregate data on beacon activation events, reports on the performance and reliability of the beacon systems—including malfunctions—and the specific mounting locations used (within the terms and conditions set forth in the waiver). This will allow FMCSA to oversee the safety performance of the alternative technology continuously and to gather critical data, while monitoring activities under the waiver. Finally, Aurora, and any other motor carriers operating under the waiver, are required to meet with FMCSA upon request to provide information about the beacons’ performance.

For these reasons, FMCSA finds the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver. In addition, FMCSA finds that it is in the public interest to grant the waiver to promote innovation and to enable commercial deployment of ADS CMVs to enhance safety and mobility for the American public. Finally, FMCSA finds that deployment of cab-mounted warning beacons in Level 4 ADS-equipped CMVs is a unique and nonemergency event because the operation of a CMV without a driver who can place warning devices on the roadway has never occurred previously.

Sincerely,

Derek D. Barrs
Administrator

Attachment

CC: Jordan Coleman, Kodiak Robotics, Inc. (jordan@kodiak.ai)
Joonsik Maing, Waabi Logistics Inc. (jmaing@waabi.ai)

**Waiver of Warning Device Requirements**

**TERMS AND CONDITIONS OF THE WAIVER**

## I. PERIOD OF THE WAIVER

This waiver from the warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f), is approved for the three-month period from 12:00 a.m. on July 10, 2026, through 11:59 p.m. on October 9, 2026. Thereafter, absent violation of the terms and conditions of this waiver, or a notification under section IV.D. below, or a determination by the Federal Motor Carrier Safety Administration (FMCSA) of a safety deficiency under 49 U.S.C. 31315(a), this waiver will be reissued.

## II. EXTENT OF THE WAIVER

**A. Applicability to Aurora Operations, Inc**

This waiver applies to Aurora Operations, Inc. (Aurora) for its operation of commercial motor vehicles (CMVs) equipped with a Level 4[1] Automated Driving System (ADS). This waiver also extends to any other motor carrier operating CMVs with a Level 4 ADS, provided such motor carrier provides written notification to FMCSA that includes the certifications specified in Section II(B).

**B. Applicability to Other Motor Carriers**

Any other motor carrier intending to operate CMVs under the terms and conditions of this waiver must notify FMCSA in writing prior to commencing operations covered by this waiver and must not commence operations until FMCSA acknowledges receipt of the notification, or the expiration of one business day after delivery, whichever occurs sooner. A motor carrier that previously sent FMCSA a written notification certifying the information below need not send an additional notification. The notification must be sent to FMCSA via email to MCPSV@dot.gov certifying the following:

1. The motor carrier's legal name, USDOT number, and principal place of business, and point of contact of the motor carrier.
2. A statement that adequately demonstrates the motor carrier currently has cab-mounted warning beacons and the ability to comply with all terms and conditions of this waiver.
3. A statement affirming the motor carrier will comply with all terms and conditions of this waiver.
4. In accordance with 28 U.S.C. 1746, the statements required under this Section must include language in substantially the following form, "I, [Name], certify under penalty of perjury that the foregoing is true and correct. Executed on [Date], [Signature]."

---

[1] As used in this waiver, the term "Level 4" has the same meaning as Level 4 High Driving Automation set forth in SAE J3016.

**C. Use of Cab-Mounted Warning Beacons**

Aurora and any other motor carrier operating under the terms and conditions of this waiver (hereinafter "each motor carrier operating under this waiver") pursuant to either Section II(A) or (B) may use cab-mounted warning beacons subject to the conditions in Sections III and IV, below, in lieu of warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f).

## III. CONDITIONS

This waiver is contingent upon each of the following conditions.

**A. Operations**

1. Each motor carrier operating under this waiver, may operate its eligible Level 4 ADS-equipped CMVs under this waiver.
2. Operations under this waiver shall primarily occur on the U.S. Interstate Highway System. Operations on other public roads are permitted when operationally necessary to complete movements or access operational facilities, provided such roads are part of the validated Operational Design Domain for the specific ADS-equipped CMV.
3. Operations under this waiver are prohibited if operations would otherwise require a "N", "H", "X", "P", "S", or "T" endorsement under 49 CFR 383.93—if a human driver were present.
4. Each motor carrier operating under this waiver is prohibited from operating as a for-hire passenger carrier or private passenger carrier, or transporting hazardous materials as defined in 49 CFR § 383.5, while utilizing this waiver.

**B. Cab-Mounted Warning Beacon Specifications**

1. The cab-mounted warning beacons, a safety device, used under this waiver must consist of forward- and rearward-facing flashing lights.
2. <u>Mounting.</u> At least one rearward-facing light must be mounted on each side of the cab, and at least one forward-facing light mounted on the front of the cab. The mountings must provide stable support for the beacons. The total width of the vehicle, inclusive of mountings and lights, may not exceed 122 inches.
3. <u>Location.</u> All lights must be mounted at least 100 inches from the ground and located at or above the upper edge of the sideview mirrors but below the top edge of the cab.
4. <u>Performance.</u> The cab-mounted warning beacons must be amber in color and meet the Class 1 photometric performance requirements of SAE J595.
5. <u>Flash Pattern.</u> The activation of the warning system must cause the beacons to flash at a rate different from the vehicle's standard hazard warning signal flashers required under 49 CFR § 392.22(a).

6. Power. The beacons must be designed and installed with redundant power sources to prevent failure due to a single-point power failure.

**C. Activation and Operation:**

1. The beacons must activate as soon as possible, but in any event within 10 minutes, whenever the CMV is stopped on the traveled portion or the shoulder of a highway for any cause other than necessary traffic stops (i.e., whenever 49 CFR § 392.22(b) would otherwise apply).
2. The beacons must remain flashing for the entire duration of the stop, from the initial stop until the vehicle reinitiates movement or the vehicle is recovered.
3. Standard hazard warning signal flashers must also activate as required by 49 CFR § 392.22(a) and must continue flashing for the entire duration of the stop.

**D. Other**

1. Each motor carrier operating under this waiver, must comply with all other applicable Federal Motor Carrier Safety Regulations (49 CFR parts 350-399).
2. Each motor carrier operating under this waiver, shall, at FMCSA's request, meet with FMCSA to answer questions regarding data and information required to be provided under this waiver.
3. Each motor carrier operating under this waiver, may also apply for an exemption under 49 U.S.C. 31315(b)(3).

## IV. REPORTING REQUIREMENTS

**A. Crash Reporting**

Each motor carrier operating under this waiver, must notify FMCSA via email to MCPSV@dot.gov not later than 5 calendar days of any crash involving a CMV while the cab-mounted warning beacons are activated or should have been activated per the conditions of this waiver. For the purposes of this waiver, the term "crash" shall have the same meaning as defined in the National Highway Traffic Safety Administration's (NHTSA) Third Amended Standing General Order (SGO) 2021-01.[2]

Notification must include all available information regarding the circumstances of the crash, including the following information:

1. Identifier of the Waiver ("Waiver of Warning Device Requirements").
2. Date and time of the crash.
3. City or town, and State, in which the crash occurred, or closest to the crash scene, and geolocation information.

[2] Under NHTSA's Third Amended SGO 2021-01, "'Crash' means any physical impact between a vehicle and another road user (vehicle, pedestrian, cyclist, etc.) or property that results or allegedly results in any property damage, injury, or fatality. A subject vehicle is involved in a crash if it physically impacts another road user or if it contributes or is alleged to contribute (by steering, braking, acceleration, or other operational performance) to another vehicle's physical impact with another road user or property involved in that crash." The SGO is available at: https://www.nhtsa.gov/sites/nhtsa.gov/files/2025-04/third-amended-SGO-2021-01_2025.pdf.

4. Vehicle Identification Number (VIN).
5. Description of any property damage.
6. Number of individuals suffering physical injury.
7. Number of fatalities.
8. The police-reported narrative of the crash (if available at the time of the report or provided upon its completion).

**B. Waiver Term Report**

Each motor carrier operating under this waiver, must submit a report to FMCSA via email to MCPSV@dot.gov not later than 30 calendar days of the end of this waiver's term (or not later than 30 calendar days of ceasing operations under this waiver, if sooner). This report must include the following information covering the entire period of operation under this waiver:

1. Total number of its CMVs that operated under the waiver.
2. Total vehicle miles traveled by its CMVs under the waiver.
3. Aggregate data on the frequency, duration, location (including road type: Interstate, state highway, local road, etc.), and reason for cab-mounted warning beacon activation events for its CMVs.
4. A summary of the overall performance and reliability of the cab-mounted warning beacons and their activation systems on its CMVs, including any malfunctions or power issues experienced.
5. The specific mounting locations of all cab-mounted warning beacons used on its CMVs.
6. Whether any variations in cab-mounted warning beacon types, mounting, or flash patterns were used across its fleet when operating under the waiver. If variations were used, any performance differences among the beacons.

**C. Request to Treat Information as Confidential Business Information (CBI)**

Nonpublic information submitted by a motor carrier under Section IV(A) or (B) above will be treated as CBI, which is defined as commercial or financial information that is both customarily and actually treated as private by its owner,[3] if designated as such by the submitting motor carrier. FMCSA will withhold CBI from public disclosure to the greatest extent possible consistent with the Freedom of Information Act (5 U.S.C. 552), and DOT's implementing regulations at 49 CFR Part 7.

**D. Safety Notification to FMCSA**

Each motor carrier operating under this waiver, must notify FMCSA via email to MCPSV@dot.gov not later than 5 calendar days after it becomes aware, or otherwise determines, that the continued use of cab-mounted beacons covered by this waiver is no longer likely to maintain a level of safety that is at least equivalent to the level that would be achieved absent this waiver.

[3] *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019).

## V. PREEMPTION

In accordance with 49 U.S.C. 31315(d), as implemented by 49 CFR § 381.600, during the period this waiver is in effect, no State shall enforce any law or regulation applicable to interstate commerce that conflicts with or is inconsistent with this waiver with respect to a firm or person operating under the waiver. States may, but are not required to, adopt the same waiver with respect to operations in intrastate commerce.

## VI. TERMINATION

FMCSA will terminate this waiver with respect to any specific motor carrier if: (1) that motor carrier fails to comply with the terms and conditions of this waiver; (2) that motor carrier's operation under the waiver results in a lower level of safety than was maintained before it was granted; or (3) continuation of the waiver for that motor carrier would not be consistent with the goals and objectives of 49 U.S.C. 31136(e) and 31315(a).

**BEFORE THE UNITED STATES DEPARTMENT OF TRANSPORTATION**
**FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION**

| In the Matter of | Related public docket |
|---|---|
| **Waiver of Warning Device Requirements** | **FMCSA-2026-0958** |
| Issued July 9, 2026; effective July 10–October 9, 2026 | *FRAP 18(a)(1) agency stay request* |

# EMERGENCY REQUEST FOR ADMINISTRATIVE STAY AND FOR RECONSIDERATION, RESCISSION, OR TERMINATION OF WAIVER NO. 4

*Submitted individually and pro se by Kostas Giannoulias*

**EMERGENCY ACTION REQUESTED**

**Immediate interim suspension; written decision within 48 hours after confirmed receipt**

**To Administrator Derek D. Barrs:**

Kostas Giannoulias, acting individually and pro se, asks the Federal Motor Carrier Safety Administration (FMCSA) to suspend immediately and then rescind, revoke, or terminate the July 9, 2026 Waiver of Warning Device Requirements (Waiver No. 4). This submission is the initial agency stay request contemplated by Federal Rule of Appellate Procedure 18(a)(1). The challenged waiver remains effective, the safety exposure is ongoing, and the sixty-day period for judicial review is about to expire.

Waiver No. 4 is unlawful on its face. Congress and FMCSA reserved a waiver for a person confronting a unique, nonemergency event that will take no more than three months to complete. FMCSA instead continued one uninterrupted commercial program for a fourth three-month term, promised another reissuance in advance, and opened the relief to every qualifying Level 4 motor carrier through a one-business-day email opt-in. That mechanism creates renewable class relief - the function Congress assigned to the exemption and pilot processes - not a waiver for one person and one short-lived event.

## I. RELIEF REQUESTED

FMCSA should issue an immediate written administrative order that:

1. stays or suspends the operative effect of Waiver No. 4 in full while FMCSA resolves this request and during any ensuing judicial review;
2. halts new carrier opt-ins, acknowledgments, expansions, and any work on a successor waiver while the stay is pending;
3. reconsiders and rescinds, revokes, or terminates Waiver No. 4 because it exceeds 49 U.S.C. § 31315(a) and 49 C.F.R. Part 381;
4. in the alternative, strikes the prospective statement that the waiver "will be reissued" and commits that no successor relief will issue except through the exemption or pilot-program procedures Congress prescribed;

5. dockets this request in the administrative record for Waiver No. 4 and, as appropriate, in related Docket No. FMCSA-2026-0958; recognizes him as an interested, adverse participant; and serves every disposition on him;
6. identifies every motor carrier that submitted an opt-in notice or operated under any of Waivers Nos. 1-4, the date of each notice, and the waiver term or terms invoked, or states expressly that no carrier other than Aurora, Kodiak, and Waabi did so;
7. preserves the complete administrative record, including requests, staff recommendations, Administrator briefing materials, term reports, interim data, all carrier opt-in submissions and acknowledgments, drafts and communications concerning reissuance, MCSAC-related materials, and delegation or decisional-authority records; and
8. provides a reasoned written decision within 48 hours after confirmed receipt. If relief is denied in whole or part, the decision should identify each ground and the materials considered, as required by 5 U.S.C. § 555(e).

The 48-hour period is requested because of ongoing roadway exposure and the imminent judicial-review deadline; it is not asserted as a statutory response period. If FMCSA has not ruled within that period, the request will remain unresolved for purposes of emergency judicial relief. Silence will not be characterized as a merits denial.

## II. PETITIONER AND CONCRETE ROADWAY EXPOSURE

Giannoulias is an Illinois professional interstate freight driver. He owns and drives a 2024 Ram ProMaster 2500 with a gross-vehicle-weight rating below 10,001 pounds. He operates through Haase FS Enterprises LLC (USDOT No. 4192791; MC No. 1616146), but he submits this request in his own name and on his own behalf. The company is identified only to document his occupation and routes.

During July and August 2026, his contemporaneous business records document at least six freight trips involving Dallas, Houston, Austin, Laredo, and El Paso. His records also document routes connecting the Chicago area, Oklahoma City, and Dallas, including at least one Dallas-Oklahoma City leg. The records include bills of lading, rate confirmations, dispatch confirmations, and related business records. These trips occurred while Waiver No. 4 was in force. His records include travel between Dallas and Houston, where Aurora publicly operates driverless Class 8 trucks, and travel toward El Paso on a corridor Aurora publicly added to its driverless network. He did not travel in New Mexico or Arizona during Waiver No. 4 and does not rely on those States for present exposure.

Giannoulias works in the spot market, frequently drives at night, and presently intends to seek and accept commercially suitable Texas-corridor freight, including Dallas–Houston work, before Waiver No. 4 expires. He will document any such booking in the ordinary course of business. His past routes, ongoing occupation, and concrete business plan place him repeatedly on the same interstate corridors on which waiver-covered trucks operate.

The asserted injury is waiver-specific. If a covered, substantially heavier Class 8 truck stops on a travel lane or shoulder, Waiver No. 4 removes the distributed roadside warning zone that 49 C.F.R. § 392.22(b) ordinarily requires and substitutes fixed lights mounted on the tractor cab. Giannoulias approaches those hazards in a far lighter vehicle. A collision or evasive maneuver presents a risk of catastrophic physical injury that cannot be repaired by money after the fact. Avoiding productive routes to reduce that risk would itself impose occupational and economic harm.

The supporting declaration is included as Exhibit A. Giannoulias is preserving the underlying BOLs and rate confirmations. They are not appended to this public submission because they contain customer, shipper, consignee, address, commodity, and pricing information. FMCSA may request a redacted or properly designated confidential submission if genuinely necessary.

## III. UNDISPUTED ORDER CHRONOLOGY

FMCSA divided one continuous operation into four consecutive orders covering 365 uninterrupted days:

| Order | Effective period | Successor signed | Waiver Term report due |
|---|---|---|---|
| **No. 1** | Oct. 10, 2025–Jan. 9, 2026 | No. 2: Jan. 8 | Feb. 8, 2026 |
| **No. 2** | Jan. 10–Apr. 9, 2026 | No. 3: Apr. 8 | May 9, 2026 |
| **No. 3** | Apr. 10–July 9, 2026 | No. 4: July 9 | Aug. 8, 2026 |
| **No. 4** | July 10–Oct. 9, 2026 | "will be reissued" | Nov. 8, 2026 |

Waiver No. 4 states that it "will be reissued" after October 9 unless specified disqualifying conditions arise. It applies to Aurora and "any other motor carrier" operating Level 4 ADS-equipped CMVs after an email certification to MCPSV@dot.gov and either agency acknowledgment or one business day. Kodiak Robotics and Waabi Logistics had already entered through that mechanism when FMCSA issued Waiver No. 4.

FMCSA's July 9 cover letter says the agency "may publish" a list of carriers operating under the waiver. It names Kodiak and Waabi, but the operative terms allow relief to take effect one business day after delivery of an opt-in email even without an agency acknowledgment. The public documents therefore do not establish that the named carriers are the complete membership of the opt-in class. Giannoulias does not assume additional carriers exist; he asks FMCSA to identify the complete roster.

The required full report for each term is due thirty days after that term ends. Each successor was therefore signed before the immediately preceding complete report was due. Waiver No. 4 was signed on July 9; the full Waiver No. 3 report was not due until August 8. Whatever interim information FMCSA possessed, the agency chose a structure in which it continued the program first and received the latest standardized term report later.

## IV. WAIVER NO. 4 EXCEEDS THE WAIVER AUTHORITY

### A. The actual event did not, and was never expected to, finish within three months

Section 31315(a) permits a waiver only for a period no longer than three months, only when limited in scope and circumstances, and only for a nonemergency and unique event. FMCSA's controlling regulation is even more explicit: the event itself must be one "that will take no more than three months to complete." 49 C.F.R. § 381.205(a). A waiver is temporary relief "given to a person" for that short event. Id. § 381.200(a)–(c).

The public orders establish a single continuing event. The same commercial deployment continued without interruption; the same regulations were displaced; materially the same equipment and conditions applied; additional carriers entered; reporting accumulated; and the terms promised future reissuance. No event ended and no new, independently arising event began at the artificial quarterly boundaries. The program had already operated for nine months when Waiver No. 4 issued and was

expressly expected to continue. It therefore fails the threshold condition in § 381.205(a). FMCSA cannot enlarge a three-month authority by relabeling one year-long program as four paper events.

### B. The email opt-in creates a class without a mandatory public roster

Congress drew an express line inside the same statute. A waiver under § 31315(a) relieves "a person." An exemption under § 31315(b) may relieve "a person or class of persons," may last up to five years, and carries public-notice, comment, record-access, safety-analysis, and Federal Register decision requirements. FMCSA repeated the distinction in 49 C.F.R. §§ 381.200 and 381.300–.315.

Waiver No. 4 creates the class in its operative text: every motor carrier operating a Level 4 ADS-equipped CMV with conforming cab-mounted beacons may enter by certification. Eligibility arises from membership in that pre-defined category, not from a new request, a carrier-specific safety analysis, a staff recommendation, or an Administrator-signed waiver decision. Agency silence for one business day activates the relief. Kodiak and Waabi's participation confirms that the provision operates as class relief in practice, not merely in theory.

The Dictionary Act does not erase this distinction. Its singular/plural convention applies only "unless the context indicates otherwise." 1 U.S.C. § 1. The adjacent contrast between "a person" in § 31315(a) and "a person or class of persons" in § 31315(b), coupled with the different duration and public safeguards Congress attached to class relief, is the controlling context. Reading "a person" to authorize a standing opt-in class would delete "or class of persons" from subsection (b) and permit FMCSA to bypass every class-exemption safeguard.

FMCSA's own July 9 cover letter makes the defect explicit. It quotes the 2024 denial's objection to an "unspecified class of carriers" and claims that advance notice and self-certification "cure" the defect. They do not. Identifying a class member after the class has already received relief is not an individualized waiver decision. Aurora established the equipment and operational baseline; competitors join that regulatory baseline by email. That is the very class mechanism the exemption channel governs.

The disclosure structure confirms rather than cures the class defect. FMCSA says it may publish a list of participating carriers; it does not commit that it shall do so. Because a carrier's authority activates after one business day even if FMCSA has not acknowledged the email, class membership can expand without a new public order or mandatory contemporaneous public identification. Naming Kodiak and Waabi does not establish that they are the only additional beneficiaries.

### C. Predetermined reissuance replaces the required affirmative decision

Section 31315(a) requires FMCSA affirmatively to determine that a waiver is in the public interest and is likely to achieve equivalent or greater safety. Waiver No. 4 reverses that burden. It declares that relief "will be reissued" unless a violation, carrier notification, or agency-identified safety deficiency occurs. The absence of disqualifying information is not a fresh affirmative finding based on a completed record. Congress expressly made exemptions renewable; it did not give waivers a self-renewing structure.

### D. The decision sequence excluded the most recent complete report

Waiver No. 4 requires a report covering the entire term, but makes it due thirty days after expiration. The successor takes effect the next day. That design guaranteed that the full report for Waiver No. 3 was unavailable when Waiver No. 4 was signed. Interim reports cannot change this chronology, and a later report cannot supply a contemporaneous rationale the Administrator did not have. The preset

reissuance language and built-in data lag reinforce that FMCSA maintained one continuing program rather than deciding a new short event on a complete record.

### E. The public safety rationale does not justify bypassing the proper channel

FMCSA's July 9 letter acknowledges that motorists responded less effectively to beacons than to warning triangles in five of eight tested scenarios, including nighttime crest, right-curve, and straight-road scenarios. It discounts some differences and relies on primarily-Interstate operations, yet it also states that continued waivers will let the agency "gather critical data." Congress created pilot-program procedures for evaluating an innovative alternative through planned data collection, comparison, oversight, and public reporting. An agency may not use the relief being tested as the vehicle for generating the evidence needed to justify continued relief while avoiding the procedures assigned to that experiment.

The same 2024 denial recorded that, among respondents who answered which device better signaled a stopped truck, eight out of ten selected warning triangles over beacons. 89 Fed. Reg. 105,675 (Dec. 27, 2024). The agency also observed that unfamiliarity with the warning beacons may have affected motorist behavior. Familiarity is not a collateral preference: a roadside warning functions only if approaching motorists recognize what it signifies.

More fundamentally, FMCSA's denial found that neither study demonstrated that a Level 4 CMV would itself stop and engage the flashers and beacons. The Waymo study apparently began with the CMV already stopped; in the Aurora study a human driver apparently stopped the vehicle; and in both studies humans apparently activated the devices. The July 9 cover letter identifies no new public test resolving that end-to-end sequence. A condition requiring activation within ten minutes is not evidence that a driverless vehicle can reliably execute the stop-and-activation sequence. The contemporaneous record should disclose any new evidence the agency actually relied upon.

General mileage does not answer the device-substitution question. Aurora reported more than 500,000 miles during the first waiver but only nearly ten hours in which the beacons were activated. The relevant exposure is the stopped-vehicle event in which the beacons must replace a distributed warning zone, including roadway geometry, sight distance, darkness, traffic, approaching vehicles, evasive actions, and near misses. A small number of activation hours cannot be converted into equivalent-safety proof by citing ordinary driving miles.

## V. AN IMMEDIATE STAY IS REQUIRED

FMCSA may suspend its own action when justice so requires under 5 U.S.C. § 705 and possesses inherent authority to reconsider an administrative decision within a reasonable time absent a contrary statutory limitation. See Glass, Molders, Pottery, Plastics & Allied Workers International Union v. Excelsior Foundry Co., 56 F.3d 844, 847 (7th Cir. 1995). This request arrives while Waiver No. 4 remains operative and before its stated expiration. Each traditional stay consideration favors relief.

- Merits. The statutory and regulatory defect appears in the orders themselves: one uninterrupted 365-day program, advance reissuance, and a pre-defined opt-in class are incompatible with a unique event that will take no more than three months to complete.
- Irreparable harm. A professional driver's repeated exposure to diminished advance warning from a stopped Class 8 truck presents a risk of severe bodily injury. No later damages award can restore life or health, and route avoidance would burden Giannoulias's occupation.

- Balance. A stay restores the generally applicable warning-device rules. It does not impose a novel obligation; it requires waiver beneficiaries to comply with the same baseline that governs other motor carriers unless and until FMCSA lawfully grants different relief.
- Public interest. The public interest lies in roadway safety and observance of the limits Congress imposed. If FMCSA concludes longer-term or class relief is warranted, the exemption and pilot channels remain available with their prescribed safeguards.

## VI. REQUESTED DISPOSITION, RECORD TREATMENT, AND RESERVATION OF RIGHTS

Please acknowledge receipt by return email on the day received; identify the official responsible for deciding this request; and issue the immediate interim stay and final written disposition requested above within 48 hours. If FMCSA believes any other office must act, please transmit the request immediately rather than requiring refiling and confirm the transmission in writing.

Please include this request, its transmission email, all acknowledgments, and the disposition in the administrative record for Waiver No. 4. Please also preserve and identify the materials that were before the decisionmaker on July 9, including the exact data cut-off, any Waiver No. 3 interim information, every § 381.215 staff recommendation, the requests underlying Waivers Nos. 1-4, and every delegation or decisional-authority record relevant to those orders.

The public copy of Waiver No. 1 appears to have been executed by then-Chief Counsel Jesse Elison rather than the Administrator. Because 49 C.F.R. § 381.215 assigns the final waiver decision to the Administrator, please identify and preserve any delegation, acting-authority designation, or other instrument authorizing that signature. This request does not assert that no delegation exists; it asks FMCSA to identify the authority if it does.

Please identify and preserve all records reflecting any referral to, consultation with, presentation to, consideration by, advice from, or recommendation of the Motor Carrier Safety Advisory Committee (MCSAC) concerning Aurora's requests, Waivers Nos. 1-4, the pending exemption application, the opt-in mechanism, or the warning-device substitution. This includes task statements, agendas, meeting notices, minutes, transcripts, briefing materials, correspondence, and recommendations. If no such records exist, please state that fact expressly. This request does not treat MCSAC consultation as a statutory precondition; it seeks a complete account of any safety consultation.

Please also identify every carrier application, opt-in notice, certification, technical attachment, acknowledgment, and agency determination concerning publication of the participating-carrier list. If no carrier other than Aurora, Kodiak, and Waabi submitted a notice or operated under the waivers, please state that fact expressly. These identification and preservation requests do not ask FMCSA to delay the emergency decision while processing broader record production.

This filing does not concede that reconsideration is required to exhaust administrative remedies; waive any jurisdictional, standing, procedural, or merits argument; or extend, toll, restart, or surrender the sixty-day period in 28 U.S.C. § 2344. Giannoulias intends to preserve timely judicial review of Waiver No. 4. He requests that FMCSA promptly notify Aurora, Kodiak, Waabi, and any other beneficiary as the agency considers appropriate.

## CONCLUSION

Waiver No. 4 is not a permissible three-month waiver. It is the fourth segment of one continuing commercial program, it prospectively renews itself, and it grants relief to a pre-defined class through email opt-in without requiring a complete public roster. Its public rationale also identifies no new test showing that a driverless CMV can execute the full stop-and-activation sequence that the waiver assumes. FMCSA should suspend it immediately and rescind, revoke, or terminate it. A reasoned written decision is requested within 48 hours after confirmed receipt.

*Respectfully submitted,*

**/s/ Kostas Giannoulias**

Kostas Giannoulias, individually and pro se
Owner-driver, Haase FS Enterprises LLC
USDOT 4192791 | MC 1616146

**Contact for service:**

kostas@haasefreightsystems.com
708-772-6738
Service of all acknowledgements and agency dispositions by email is requested and consented to at the address above.

**Dated: September 3, 2026**

### EXHIBIT A

## DECLARATION OF KOSTAS GIANNOULIAS

I, Kostas Giannoulias, declare as follows:

**1.** I am over eighteen years old, competent to testify, and make this declaration from personal knowledge.

**2.** I reside in Illinois and work as a professional interstate freight driver. I own and drive a 2024 Ram ProMaster 2500 with a gross-vehicle-weight rating below 10,001 pounds.

**3.** I conduct freight operations through Haase FS Enterprises LLC, USDOT No. 4192791 and MC No. 1616146. I submit the accompanying emergency request in my individual capacity. I am not purporting to represent the LLC in court.

**4.** I obtain much of my work through the freight spot market. My routes vary with customer demand, price, and availability. I regularly return to commercially productive routes and corridors.

**5.** During July and August 2026, my contemporaneous records document at least six freight trips involving Dallas, Houston, Austin, Laredo, and El Paso. Those records include Dallas-Houston freight and an El Paso movement. My records also document routes connecting the Chicago area, Oklahoma City, and Dallas, including at least one Dallas-Oklahoma City leg. These trips occurred while Waiver No. 4 was effective.

**6.** I have preserved the bills of lading, rate confirmations, dispatch confirmations, and related records for those trips. They are records made or received in the regular course of my freight business. I have not attached them to the public agency request because they contain nonpublic customer, address, shipment, and pricing information. I can provide properly redacted copies or a confidential submission if required.

**7.** I did not travel in New Mexico or Arizona during Waiver No. 4. My present exposure rests on my documented Texas travel, including Dallas–Houston and travel toward El Paso, and on my continuing plans to work those corridors.

**8.** I frequently drive at night. My commercial driving places me for long periods on Interstate highways alongside Class 8 tractor-trailers that are substantially heavier than my vehicle.

**9.** I presently intend, in the ordinary course of my spot-market business, to seek and accept a commercially suitable Chicago–Dallas–Houston load or comparable Texas-corridor freight before Waiver No. 4 expires on October 9, 2026. The Chicago–Dallas–Houston work has paid well in my experience. I will retain the ordinary business documentation for any booking.

**10.** Aurora has publicly announced driverless commercial operations between Dallas and Houston and a driverless route between Fort Worth and El Paso. Those operations overlap corridors I have used and expect to use. Waiver No. 4 also permits eligible participating carriers to operate primarily throughout the Interstate Highway System rather than limiting them to one published route.

**11.** My concern is not an abstract objection to autonomous vehicles. It is the specific loss of roadside warning triangles or other distributed warning devices when a waiver-covered truck is stopped on a travel lane or shoulder. The ordinary rule provides approaching traffic with advance warning at locations away from the stopped vehicle; the waiver substitutes fixed lights mounted on the tractor cab.

**12.** If I encounter a stopped Class 8 truck without the ordinarily required warning devices, delayed detection may force abrupt braking or an evasive maneuver. Because I drive a vehicle below 10,001 pounds near much heavier commercial trucks, the foreseeable physical consequences of a collision are grave. Avoiding the relevant routes would reduce access to ordinary freight work.

**13.** I respectfully request immediate suspension and rescission of Waiver No. 4. I will preserve my route records and supplement this declaration if my ordinary business produces an additional relevant booking before the agency or court acts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on September 3, 2026, at **Northbrook, Illinois**.

**Kostas Giannoulias**

Gmail

Kostas Giannoulias <kostas@haasefreightsystems.com>

## URGENT-FRAP 18(a)(1) Agency Stay Request-FMCSA Waiver No.4-Waiver of Warning Device Requirements

**Haase Freight** <kostas@haasefreightsystems.com> Thu, Sep 3, 2026 at 12:50 PM
To: "mcpsv@dot.gov" <mcpsv@dot.gov>
Bcc: Kostas Giannoulias <KGiannoulias@gmail.com>

Mr. Nagabhushana:

Attached is my signed Emergency Request for Administrative Stay and for Reconsideration, Rescission, or Termination of FMCSA Waiver No. 4-Waiver of Warning Devices Requirements, submitted individually and pro se under Federal Rule of Appellate Procedure 18(a)(1).

Please confirm receipt by return email today, immediately route the request to Administrator Derek D. Barrs and the Office of the Chief Counsel, and identify the official responsible for deciding it. The request seeks an immediate interim suspension and a reasoned written disposition within 48 hours after confirmed receipt.

Please include this email, its attachment, all acknowledgments, and any disposition in the complete administrative record for Waiver No. 4 and, as appropriate, related Docket No. FMCSA-2026-0958.

A tracked paper copy is also being sent. Please do not delay consideration pending its arrival.

Respectfully,

Kostas Giannoulias
Individually and pro se

Owner-driver, Haase FS Enterprises LLC

USDOT No. 4192791 | MC No. 1616146

708-772-6738
--

**KG FMCSA Waiver 4 Agency Stay Request 2026 09 03.pdf**
5142K

UNITED STATES POSTAL SERVICE.

NORTHBROOK
2460 DUNDEE RD
NORTHBROOK, IL 60062-2620
www.usps.com
09/03/2026 05:28 PM

TRACKING NUMBERS
9581 7137 0201 6246 3948 68

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)

TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

PURCHASE DETAILS

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| PM Express Flat Rate Env | 1 | | $35.90 |
| Washington, DC 20590 | | | |
| Flat Rate | | | |
| Signature Requested | | | |
| Scheduled Delivery Date Sat 09/05/2026 06:00 PM | | | |
| Money Back Guarantee | | | |
| Tracking #: 9581 7137 0201 6246 3948 68 | | | |
| Insurance | | | $0.00 |
| Up to $100.00 included | | | |
| Total | | | $35.90 |

Grand Total: $35.90

Credit Card Remit $35.90
Card Name: AMEX
Account #: XXXXXXXXXXX2015
Approval #: 881931
Transaction #: 835
AID: A000000025010801 Chip
AL: AMERICAN EXPRESS
PIN: Not Required

TO REPORT AN ISSUE
Visit https://emailus.usps.com

All hazardous labels/markings on reused boxes MUST be completely removed/obliterated if they no longer match the contents.

In a hurry? Self-service kiosks offer quick and easy check-out. Any Retail Associate can show you how.

TO FILE AN INSURANCE CLAIM
Visit https://www.usps.com/help/claims.htm

PREVIEW YOUR MAIL AND PACKAGES
Sign up for FREE at
https://informeddelivery.usps.com

Looking for a new opportunity? Join a team that delivers! The Postal Service is actively hiring for full and part-time positions. To learn more visit us at www.usps.com/careers

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Customer Service
1-800-ASK-USPS
(1-800-275-8777)
Agents do not have any additional information other than what is provided on USPS.com.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device,

or call 1-800-410-7420.

UFN: 165730-0062
Receipt #: 840-56000038-1-10371766-2
Clerk: 11

Waiver #1

EXHIBIT 4

U.S. Department of Transportation

Federal Motor Carrier Safety Administration

1200 New Jersey Avenue, SE
Washington, D.C. 20590

Office of the Chief Counsel

October 9, 2025

Shelley Webb
Chief Legal Officer
Aurora Operations, Inc.
280 N. Bernardo Ave.
Mountain View, CA 94043

Dear Ms. Webb:

The Federal Motor Carrier Safety Administration (FMCSA) grants a limited waiver, subject to the attached terms and conditions, to Aurora Operations, Inc. (Aurora) from compliance with the warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f), to allow Aurora to use cab-mounted warning beacons in lieu of the warning devices required by 49 CFR § 393.95(f). This waiver is effective from 12:01 a.m. on October 10, 2025, through 11:59 p.m. on January 9, 2026.

This waiver covers Aurora's operation of Level 4 Automated Driving System (ADS) commercial motor vehicles (CMVs) subject to the Federal Motor Carrier Safety Regulations. This waiver also permits any other motor carrier to operate under the waiver, provided that it first notifies FMCSA in writing, certifying that it currently has cab-mounted warning beacons, the ability to comply with all terms and conditions of this waiver, and that it will comply with all terms and conditions of the waiver. FMCSA may publish on its website a copy of the waiver and a list of motor carriers operating under the waiver.

Under 49 U.S.C. §§ 31136(e) and 31315(a), FMCSA may grant a waiver if it determines that it is in the public interest to grant the waiver and that the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver. FMCSA may grant a waiver for nonemergency and unique events, limited in scope and circumstances, for a period not in excess of three months. Although FMCSA previously denied Aurora's request for an exemption (89 FR 105675, December 27, 2024), FMCSA has now determined that it is in the public interest to issue a waiver, limited in scope and circumstances, that is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver.

FMCSA reviewed information provided by Aurora in support of its request for exemption. FMCSA has determined that the attached waiver is narrower in scope than the broad exemption

request from Waymo LLC and Aurora that FMCSA previously denied. In this regard, the exemption request sought industry-wide regulatory relief whereby any motor carrier operating Level 4 ADS-equipped CMVs could operate under the waiver without any prior notice to FMCSA. In denying the exemption, FMCSA found that the applicants' request to "exempt a class of unspecified carriers using unspecified equipment on unspecified vehicles only further undermines the claimed likely equivalent level of safety." This waiver cures that deficiency, as it would apply to Aurora, and would not apply to other motor carriers operating Level 4 ADS-equipped CMVs unless they provide written notification to FMCSA and certify compliance with the waiver's terms and conditions.

Further, the waiver is narrower than the exemption request because it requires that operations occur primarily on the U.S. Interstate Highway System. In denying the exemption, FMCSA noted that "road curvatures or elevations may affect visibility of a beacon located in a fixed position on the cab." This waiver limits operations "primarily [to] the U.S. Interstate Highway System," where standardized road geometry minimizes the frequency of sharp curves and crests that could obstruct visibility. Moreover, the waiver's scope prohibits operations that would require a commercial driver's license endorsement (*e.g.*, tank vehicles, double/triple trailers) if a driver were present, as well as the transportation of passengers or hazardous materials.

In addition, the waiver includes technical specifications to resolve potential ambiguity. In denying the exemption, FMCSA stated that the application did not "provide sufficient details about the proposed alternative devices," particularly with the vague allowance for "any configuration of similar effectiveness." In contrast, Section III.B of the waiver mandates specific mounting, location, and photometric performance standards (SAE J595). The waiver also imposes additional requirements for when the beacons must activate and how long they must remain flashing. Further, the waiver does not allow for configuration flexibility outside the terms and conditions set forth in the waiver. Moreover, Section III.B.6 of the waiver requires that the beacons "be designed and installed with redundant power sources to prevent failure due to a single-point power failure," which FMCSA previously noted as a deficiency with the exemption application.

In denying the exemption, FMCSA also stated that Aurora's naturalistic study submitted in support of the application showed that a lower percentage of drivers responded to the beacons than to warning triangles in five of eight scenarios presented: daytime tests at left curve and straight locations, and nighttime tests at crest, right curve, and straight locations. However, under the waiver, the curve and crest scenarios would be present to a much more limited degree, since operations must occur primarily on the U.S. Interstate Highway System, and the differences in driver response at straight locations were immaterial (*i.e.*, less than four-tenths of one percent), according to the study. Moreover, as FMCSA noted, Aurora's study concluded that a warning beacon elicited a higher percentage of responses than warning triangles overall. FMCSA has noted in a research context "the historically unresolved questions of whether the use of such [warning] devices improves traffic safety and, if so, how and to what extent." (90 FR 1591, January 8, 2025). Without information on the level of safety the current regulatory requirements provide, the two studies submitted in support of Aurora's application reasonably support a determination that motorists detect and respond to the beacons at a similar rate as existing warning devices under the terms and conditions imposed by this waiver.

Finally, the waiver addresses concerns about the lack of monitoring controls by requiring specific, detailed reporting requirements to allow FMCSA to monitor the safety performance of motor carriers operating under the waiver. In denying the exemption, FMCSA concluded that the application "lacks necessary monitoring controls to ensure highway safety." Section IV of this waiver implements these exact controls by requiring detailed crash and term reporting. Specifically, under Section IV.B, Aurora, and any other motor carriers operating under the waiver, must provide FMCSA with aggregate data on beacon activation events, reports on the performance and reliability of the beacon systems—including malfunctions—and the specific mounting locations used (within the terms and conditions set forth in the waiver). This will allow FMCSA to oversee the safety performance of the alternative technology continuously and to gather critical data, while monitoring activities under the waiver. Finally, Aurora, and any other motor carriers operating under the waiver, are required to meet with FMCSA upon request to provide information about the beacons' performance.

For these reasons, FMCSA finds the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver. In addition, FMCSA finds that it is in the public interest to grant the waiver to promote innovation and to enable commercial deployment of ADS CMVs to enhance safety and mobility for the American public. Finally, FMCSA finds that deployment of cab-mounted warning beacons in Level 4 ADS-equipped CMVs is a unique and nonemergency event because the operation of a CMV without a driver who can place warning devices on the roadway has never occurred previously.

Sincerely,

Jesse Elison
Chief Counsel

Attachment

EXHIBIT

**Waiver of Warning Device Requirements**

**TERMS AND CONDITIONS OF THE WAIVER**

## I. PERIOD OF THE WAIVER

This waiver from the warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f), is approved for the three-month period from 12:01 a.m. on October 10, 2025, through 11:59 p.m. on January 9, 2026. Thereafter, absent violation of the terms and conditions of this waiver, or a notification under section IV.D. below, or a determination by the Federal Motor Carrier Safety Administration (FMCSA) of a safety deficiency under 49 U.S.C. 31315(a), this waiver will be reissued.

## II. EXTENT OF THE WAIVER

**A. Applicability to Aurora Operations, Inc**

This waiver applies to Aurora Operations, Inc. (Aurora) for its operation of commercial motor vehicles (CMVs) equipped with a Level 4[1] Automated Driving System (ADS). This waiver also extends to any other motor carrier operating CMVs with a Level 4 ADS, provided such motor carrier provides written notification to FMCSA that includes the certifications specified in Section II(B).

**B. Applicability to Other Motor Carriers**

Any other motor carrier intending to operate CMVs under the terms and conditions of this waiver must notify FMCSA in writing prior to commencing operations covered by this waiver and must not commence operations until FMCSA acknowledges receipt of the notification, or the expiration of one business day after delivery, whichever occurs sooner. The notification must be sent to FMCSA via email to MCPSV@dot.gov certifying the following:

1. The motor carrier's legal name, USDOT number, and principal place of business, and point of contact of the motor carrier.
2. A statement that adequately demonstrates the motor carrier currently has cab-mounted warning beacons and the ability to comply with all terms and conditions of this waiver.
3. A statement affirming the motor carrier will comply with all terms and conditions of this waiver.
4. In accordance with 28 U.S.C. 1746, the statements required under this Section must include language in substantially the following form, "I, [Name], certify under penalty of perjury that the foregoing is true and correct. Executed on [Date], [Signature]."

---

[1] As used in this waiver, the term "Level 4" has the same meaning as Level 4 High Driving Automation set forth in SAE J3016.

**C. Use of Cab-Mounted Warning Beacons**

Aurora and any other motor carrier operating under the terms and conditions of this waiver (hereinafter "each motor carrier operating under this waiver") pursuant to either Section II(A) or (B) may use cab-mounted warning beacons subject to the conditions in Sections III and IV, below, in lieu of warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f).

## III. CONDITIONS

This waiver is contingent upon each of the following conditions.

**A. Operations**

1. Each motor carrier operating under this waiver, may operate its eligible Level 4 ADS-equipped CMVs under this waiver.
2. Operations under this waiver shall primarily occur on the U.S. Interstate Highway System. Operations on other public roads are permitted when operationally necessary to complete movements or access operational facilities, provided such roads are part of the validated Operational Design Domain for the specific ADS-equipped CMV.
3. Operations under this waiver are prohibited if operations would otherwise require a "N", "H", "X", "P", "S", or "T" endorsement under 49 CFR 383.93—if a human driver were present.
4. Each motor carrier operating under this waiver is prohibited from operating as a for-hire or private passenger carrier, or transporting hazardous materials as defined in 49 CFR § 383.5, while utilizing this waiver.

**B. Cab-Mounted Warning Beacon Specifications**

1. The cab-mounted warning beacons, a safety device, used under this waiver must consist of forward- and rearward-facing flashing lights.
2. Mounting. At least one rearward-facing light must be mounted on each side of the cab, and at least one forward-facing light mounted on the front of the cab. The mountings must provide stable support for the beacons. The total width of the vehicle, inclusive of mountings and lights, may not exceed 122 inches.
3. Location. All lights must be mounted at least 100 inches from the ground and located at or above the upper edge of the sideview mirrors but below the top edge of the cab.
4. Performance. The cab-mounted warning beacons must be amber in color and meet the Class 1 photometric performance requirements of SAE J595.
5. Flash Pattern. The activation of the warning system must cause the beacons to flash at a rate different from the vehicle's standard hazard warning signal flashers required under 49 CFR § 392.22(a).
6. Power. The beacons must be designed and installed with redundant power sources to prevent failure due to a single-point power failure.

**C. Activation and Operation:**

1. The beacons must activate as soon as possible, but in any event within 10 minutes, whenever the CMV is stopped on the traveled portion or the shoulder of a highway for any cause other than necessary traffic stops (i.e., whenever 49 CFR § 392.22(b) would otherwise apply).
2. The beacons must remain flashing for the entire duration of the stop, from the initial stop until the vehicle reinitiates movement or the vehicle is recovered.
3. Standard hazard warning signal flashers must also activate as required by 49 CFR § 392.22(a) and must continue flashing for the entire duration of the stop.

**C. Other**

4. Each motor carrier operating under this waiver, must comply with all other applicable Federal Motor Carrier Safety Regulations (49 CFR parts 350-399).
5. Each motor carrier operating under this waiver, shall, at FMCSA's request, meet with FMCSA to answer questions regarding data and information required to be provided under this waiver.
6. Each motor carrier operating under this waiver, may also apply for an exemption under 49 U.S.C. 31315(b)(3).

## IV. REPORTING REQUIREMENTS

**A. Crash Reporting**

Each motor carrier operating under this waiver, must notify FMCSA via email to MCPSV@dot.gov not later than 5 calendar days of any crash involving a CMV while the cab-mounted warning beacons are activated or should have been activated per the conditions of this waiver. For the purposes of this waiver, the term "crash" shall have the same meaning as defined in the National Highway Traffic Safety Administration's (NHTSA) Third Amended Standing General Order (SGO) 2021-01.[2]

Notification must include all available information regarding the circumstances of the crash, including the following information:

1. Identifier of the Waiver ("Waiver of Warning Device Requirements").
2. Date and time of the crash.
3. City or town, and State, in which the crash occurred, or closest to the crash scene, and geolocation information.
4. Vehicle Identification Number (VIN).
5. Description of any property damage.
6. Number of individuals suffering physical injury.
7. Number of fatalities.

[2] Under NHTSA's Third Amended SGO 2021-01, "'Crash' means any physical impact between a vehicle and another road user (vehicle, pedestrian, cyclist, etc.) or property that results or allegedly results in any property damage, injury, or fatality. A subject vehicle is involved in a crash if it physically impacts another road user or if it contributes or is alleged to contribute (by steering, braking, acceleration, or other operational performance) to another vehicle's physical impact with another road user or property involved in that crash." The SGO is available at: https://www.nhtsa.gov/sites/nhtsa.gov/files/2025-04/third-amended-SGO-2021-01_2025.pdf.

8. The police-reported narrative of the crash (if available at the time of the report or provided upon its completion).

**B. Waiver Term Report**

Each motor carrier operating under this waiver, must submit a report to FMCSA via email to MCPSV@dot.gov not later than 30 calendar days of the end of this waiver's term (or not later than 30 calendar days of ceasing operations under this waiver, if sooner). This report must include the following information covering the entire period of operation under this waiver:

1. Total number of its CMVs that operated under the waiver.
2. Total vehicle miles traveled by its CMVs under the waiver.
3. Aggregate data on the frequency, duration, location (including road type: Interstate, state highway, local road, etc.), and reason for cab-mounted warning beacon activation events for its CMVs.
4. A summary of the overall performance and reliability of the cab-mounted warning beacons and their activation systems on its CMVs, including any malfunctions or power issues experienced.
5. The specific mounting locations of all cab-mounted warning beacons used on its CMVs.
6. Whether any variations in cab-mounted warning beacon types, mounting, or flash patterns were used across its fleet when operating under the waiver. If variations were used, any performance differences among the beacons.

**C. Request to Treat Information as Confidential Business Information (CBI)**

Nonpublic information submitted by a motor carrier under Section IV(A) or (B) above will be treated as CBI, which is defined as commercial or financial information that is both customarily and actually treated as private by its owner,[3] if designated as such by the submitting motor carrier. FMCSA will withhold CBI from public disclosure to the greatest extent possible consistent with the Freedom of Information Act (5 U.S.C. 552), and DOT's implementing regulations at 49 CFR Part 7.

**D. Safety Notification to FMCSA**

Each motor carrier operating under this waiver, must notify FMCSA via email to MCPSV@dot.gov not later than 5 calendar days after it becomes aware, or otherwise determines, that the continued use of cab-mounted beacons covered by this waiver is no longer likely to maintain a level of safety that is at least equivalent to the level that would be achieved absent this waiver.

## V. PREEMPTION

In accordance with 49 U.S.C. 31315(d), as implemented by 49 CFR § 381.600, during the period this waiver is in effect, no State shall enforce any law or regulation applicable to interstate commerce that conflicts with or is inconsistent with this waiver with respect to a firm or person

[3] *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019).

operating under the waiver. States may, but are not required to, adopt the same waiver with respect to operations in intrastate commerce.

## VI. TERMINATION

FMCSA will terminate this waiver with respect to any specific motor carrier if: (1) that motor carrier fails to comply with the terms and conditions of this waiver; (2) that motor carrier's operation under the waiver results in a lower level of safety than was maintained before it was granted; or (3) continuation of the waiver for that motor carrier would not be consistent with the goals and objectives of 49 U.S.C. 31136(e) and 31315(a).

# Waiver #2

EXHIBIT

tabbies

U.S. Department of Transportation

Federal Motor Carrier Safety Administration

Administrator

1200 New Jersey Ave, SE
Washington, DC 20590

January 8, 2026

Shelley Webb
Chief Legal Officer
Aurora Operations, Inc.
280 N. Bernardo Ave.
Mountain View, CA 94043

Dear Ms. Webb:

The Federal Motor Carrier Safety Administration (FMCSA) grants a limited waiver, subject to the attached terms and conditions, to Aurora Operations, Inc. (Aurora) from compliance with the warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f), to allow Aurora to use cab-mounted warning beacons in lieu of the warning devices required by 49 CFR § 393.95(f). This waiver is effective from 12:01 a.m. on January 10, 2026, through 11:59 p.m. on April 9, 2026.

This waiver covers Aurora's operation of Level 4 Automated Driving System (ADS) commercial motor vehicles (CMVs) subject to the Federal Motor Carrier Safety Regulations. This waiver also permits any other motor carrier to operate under the waiver, provided that it first notifies FMCSA in writing, certifying that it currently has cab-mounted warning beacons, the ability to comply with all terms and conditions of this waiver, and that it will comply with all terms and conditions of the waiver. FMCSA may publish on its website a copy of the waiver and a list of motor carriers operating under the waiver. As of the date of this letter, Kodiak Robotics, Inc., USDOT No. 3172855, has provided written notification to FMCSA that it is also operating under the waiver.

Under 49 U.S.C. §§ 31136(e) and 31315(a), FMCSA may grant a waiver if it determines that it is in the public interest to grant the waiver and that the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver. FMCSA may grant a waiver for nonemergency and unique events, limited in scope and circumstances, for a period not in excess of three months. Although FMCSA previously denied Aurora's request for an exemption (89 FR 105675, December 27, 2024), FMCSA has now determined that it is in the public interest to issue a waiver, limited in scope and circumstances, that is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver.

FMCSA reviewed information provided by Aurora in support of its request for exemption. FMCSA has determined that the attached waiver is narrower in scope than the broad exemption request from Waymo LLC and Aurora that FMCSA previously denied. In this regard, the exemption request sought industry-wide regulatory relief whereby any motor carrier operating Level 4 ADS-equipped CMVs could operate under the waiver without any prior notice to FMCSA. In denying the exemption, FMCSA found that the applicants' request to "exempt a class of unspecified carriers using unspecified equipment on unspecified vehicles only further undermines the claimed likely equivalent level of safety." This waiver cures that deficiency, as it would apply to Aurora, and would not apply to other motor carriers operating Level 4 ADS-equipped CMVs unless they provide written notification to FMCSA and certify compliance with the waiver's terms and conditions.

Further, the waiver is narrower than the exemption request because it requires that operations occur primarily on the U.S. Interstate Highway System. In denying the exemption, FMCSA noted that "road curvatures or elevations may affect visibility of a beacon located in a fixed position on the cab." This waiver limits operations "primarily [to] the U.S. Interstate Highway System," where standardized road geometry minimizes the frequency of sharp curves and crests that could obstruct visibility. Moreover, the waiver's scope prohibits operations that would require a commercial driver's license endorsement (*e.g.*, tank vehicles, double/triple trailers) if a driver were present, as well as the transportation of passengers or hazardous materials.

In addition, the waiver includes technical specifications to resolve potential ambiguity. In denying the exemption, FMCSA stated that the application did not "provide sufficient details about the proposed alternative devices," particularly with the vague allowance for "any configuration of similar effectiveness." In contrast, Section III.B of the waiver mandates specific mounting, location, and photometric performance standards (SAE J595). The waiver also imposes additional requirements for when the beacons must activate and how long they must remain flashing. Further, the waiver does not allow for configuration flexibility outside the terms and conditions set forth in the waiver. Moreover, Section III.B.6 of the waiver requires that the beacons "be designed and installed with redundant power sources to prevent failure due to a single-point power failure," which FMCSA previously noted as a deficiency with the exemption application.

In denying the exemption, FMCSA also stated that Aurora's naturalistic study submitted in support of the application showed that a lower percentage of drivers responded to the beacons than to warning triangles in five of eight scenarios presented: daytime tests at left curve and straight locations, and nighttime tests at crest, right curve, and straight locations. However, under the waiver, the curve and crest scenarios would be present to a much more limited degree, since operations must occur primarily on the U.S. Interstate Highway System, and the differences in driver response at straight locations were immaterial (*i.e.*, less than four-tenths of one percent), according to the study. Moreover, as FMCSA noted, Aurora's study concluded that a warning beacon elicited a higher percentage of responses than warning triangles overall. FMCSA has noted in a research context "the historically unresolved questions of whether the use of such [warning] devices improves traffic safety and, if so, how and to what extent." (90 FR 1591, January 8, 2025). Without information on the level of safety the current regulatory requirements provide, the two studies submitted in support of Aurora's application reasonably

support a determination that motorists detect and respond to the beacons at a similar rate as existing warning devices under the terms and conditions imposed by this waiver.

Finally, the waiver addresses concerns about the lack of monitoring controls by requiring specific, detailed reporting requirements to allow FMCSA to monitor the safety performance of motor carriers operating under the waiver. In denying the exemption, FMCSA concluded that the application "lacks necessary monitoring controls to ensure highway safety." Section IV of this waiver implements these exact controls by requiring detailed crash and term reporting. Specifically, under Section IV.B, Aurora, and any other motor carriers operating under the waiver, must provide FMCSA with aggregate data on beacon activation events, reports on the performance and reliability of the beacon systems—including malfunctions—and the specific mounting locations used (within the terms and conditions set forth in the waiver). This will allow FMCSA to oversee the safety performance of the alternative technology continuously and to gather critical data, while monitoring activities under the waiver. Finally, Aurora, and any other motor carriers operating under the waiver, are required to meet with FMCSA upon request to provide information about the beacons' performance.

For these reasons, FMCSA finds the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver. In addition, FMCSA finds that it is in the public interest to grant the waiver to promote innovation and to enable commercial deployment of ADS CMVs to enhance safety and mobility for the American public. Finally, FMCSA finds that deployment of cab-mounted warning beacons in Level 4 ADS-equipped CMVs is a unique and nonemergency event because the operation of a CMV without a driver who can place warning devices on the roadway has never occurred previously.

Sincerely,

Derek D. Barrs
Administrator

Attachment

CC: Jordan Coleman, Kodiak Robotics, Inc. (jordan@kodiak.ai)

Waiver #2

TERMS & CONDITIONS OF THE WAIVER

EXHIBIT

**Waiver of Warning Device Requirements**

**TERMS AND CONDITIONS OF THE WAIVER**

## I. PERIOD OF THE WAIVER

This waiver from the warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f), is approved for the three-month period from 12:01 a.m. on January 10, 2026, through 11:59 p.m. on April 9, 2026. Thereafter, absent violation of the terms and conditions of this waiver, or a notification under section IV.D. below, or a determination by the Federal Motor Carrier Safety Administration (FMCSA) of a safety deficiency under 49 U.S.C. 31315(a), this waiver will be reissued.

## II. EXTENT OF THE WAIVER

**A. Applicability to Aurora Operations, Inc**

This waiver applies to Aurora Operations, Inc. (Aurora) for its operation of commercial motor vehicles (CMVs) equipped with a Level 4[1] Automated Driving System (ADS). This waiver also extends to any other motor carrier operating CMVs with a Level 4 ADS, provided such motor carrier provides written notification to FMCSA that includes the certifications specified in Section II(B).

**B. Applicability to Other Motor Carriers**

Any other motor carrier intending to operate CMVs under the terms and conditions of this waiver must notify FMCSA in writing prior to commencing operations covered by this waiver and must not commence operations until FMCSA acknowledges receipt of the notification, or the expiration of one business day after delivery, whichever occurs sooner. A motor carrier that previously sent FMCSA a written notification certifying the information below need not send an additional notification. The notification must be sent to FMCSA via email to MCPSV@dot.gov certifying the following:

1. The motor carrier's legal name, USDOT number, and principal place of business, and point of contact of the motor carrier.
2. A statement that adequately demonstrates the motor carrier currently has cab-mounted warning beacons and the ability to comply with all terms and conditions of this waiver.
3. A statement affirming the motor carrier will comply with all terms and conditions of this waiver.
4. In accordance with 28 U.S.C. 1746, the statements required under this Section must include language in substantially the following form, "I, [Name], certify under penalty of perjury that the foregoing is true and correct. Executed on [Date], [Signature]."

---

[1] As used in this waiver, the term "Level 4" has the same meaning as Level 4 High Driving Automation set forth in SAE J3016.

**C. Use of Cab-Mounted Warning Beacons**

Aurora and any other motor carrier operating under the terms and conditions of this waiver (hereinafter "each motor carrier operating under this waiver") pursuant to either Section II(A) or (B) may use cab-mounted warning beacons subject to the conditions in Sections III and IV, below, in lieu of warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f).

## III. CONDITIONS

This waiver is contingent upon each of the following conditions.

**A. Operations**

1. Each motor carrier operating under this waiver, may operate its eligible Level 4 ADS-equipped CMVs under this waiver.
2. Operations under this waiver shall primarily occur on the U.S. Interstate Highway System. Operations on other public roads are permitted when operationally necessary to complete movements or access operational facilities, provided such roads are part of the validated Operational Design Domain for the specific ADS-equipped CMV.
3. Operations under this waiver are prohibited if operations would otherwise require a "N", "H", "X", "P", "S", or "T" endorsement under 49 CFR 383.93—if a human driver were present.
4. Each motor carrier operating under this waiver is prohibited from operating as a for-hire passenger carrier or private passenger carrier, or transporting hazardous materials as defined in 49 CFR § 383.5, while utilizing this waiver.

**B. Cab-Mounted Warning Beacon Specifications**

1. The cab-mounted warning beacons, a safety device, used under this waiver must consist of forward- and rearward-facing flashing lights.
2. Mounting. At least one rearward-facing light must be mounted on each side of the cab, and at least one forward-facing light mounted on the front of the cab. The mountings must provide stable support for the beacons. The total width of the vehicle, inclusive of mountings and lights, may not exceed 122 inches.
3. Location. All lights must be mounted at least 100 inches from the ground and located at or above the upper edge of the sideview mirrors but below the top edge of the cab.
4. Performance. The cab-mounted warning beacons must be amber in color and meet the Class 1 photometric performance requirements of SAE J595.
5. Flash Pattern. The activation of the warning system must cause the beacons to flash at a rate different from the vehicle's standard hazard warning signal flashers required under 49 CFR § 392.22(a).

6. Power. The beacons must be designed and installed with redundant power sources to prevent failure due to a single-point power failure.

**C. Activation and Operation:**

1. The beacons must activate as soon as possible, but in any event within 10 minutes, whenever the CMV is stopped on the traveled portion or the shoulder of a highway for any cause other than necessary traffic stops (i.e., whenever 49 CFR § 392.22(b) would otherwise apply).
2. The beacons must remain flashing for the entire duration of the stop, from the initial stop until the vehicle reinitiates movement or the vehicle is recovered.
3. Standard hazard warning signal flashers must also activate as required by 49 CFR § 392.22(a) and must continue flashing for the entire duration of the stop.

**C. Other**

4. Each motor carrier operating under this waiver, must comply with all other applicable Federal Motor Carrier Safety Regulations (49 CFR parts 350-399).
5. Each motor carrier operating under this waiver, shall, at FMCSA's request, meet with FMCSA to answer questions regarding data and information required to be provided under this waiver.
6. Each motor carrier operating under this waiver, may also apply for an exemption under 49 U.S.C. 31315(b)(3).

## IV. REPORTING REQUIREMENTS

**A. Crash Reporting**

Each motor carrier operating under this waiver, must notify FMCSA via email to MCPSV@dot.gov not later than 5 calendar days of any crash involving a CMV while the cab-mounted warning beacons are activated or should have been activated per the conditions of this waiver. For the purposes of this waiver, the term "crash" shall have the same meaning as defined in the National Highway Traffic Safety Administration's (NHTSA) Third Amended Standing General Order (SGO) 2021-01.[2]

Notification must include all available information regarding the circumstances of the crash, including the following information:

1. Identifier of the Waiver ("Waiver of Warning Device Requirements").
2. Date and time of the crash.
3. City or town, and State, in which the crash occurred, or closest to the crash scene, and geolocation information.

---

[2] Under NHTSA's Third Amended SGO 2021-01, "'Crash' means any physical impact between a vehicle and another road user (vehicle, pedestrian, cyclist, etc.) or property that results or allegedly results in any property damage, injury, or fatality. A subject vehicle is involved in a crash if it physically impacts another road user or if it contributes or is alleged to contribute (by steering, braking, acceleration, or other operational performance) to another vehicle's physical impact with another road user or property involved in that crash." The SGO is available at: https://www.nhtsa.gov/sites/nhtsa.gov/files/2025-04/third-amended-SGO-2021-01_2025.pdf.

4. Vehicle Identification Number (VIN).
5. Description of any property damage.
6. Number of individuals suffering physical injury.
7. Number of fatalities.
8. The police-reported narrative of the crash (if available at the time of the report or provided upon its completion).

**B. Waiver Term Report**

Each motor carrier operating under this waiver, must submit a report to FMCSA via email to MCPSV@dot.gov not later than 30 calendar days of the end of this waiver's term (or not later than 30 calendar days of ceasing operations under this waiver, if sooner). This report must include the following information covering the entire period of operation under this waiver:

1. Total number of its CMVs that operated under the waiver.
2. Total vehicle miles traveled by its CMVs under the waiver.
3. Aggregate data on the frequency, duration, location (including road type: Interstate, state highway, local road, etc.), and reason for cab-mounted warning beacon activation events for its CMVs.
4. A summary of the overall performance and reliability of the cab-mounted warning beacons and their activation systems on its CMVs, including any malfunctions or power issues experienced.
5. The specific mounting locations of all cab-mounted warning beacons used on its CMVs.
6. Whether any variations in cab-mounted warning beacon types, mounting, or flash patterns were used across its fleet when operating under the waiver. If variations were used, any performance differences among the beacons.

**C. Request to Treat Information as Confidential Business Information (CBI)**

Nonpublic information submitted by a motor carrier under Section IV(A) or (B) above will be treated as CBI, which is defined as commercial or financial information that is both customarily and actually treated as private by its owner,[3] if designated as such by the submitting motor carrier. FMCSA will withhold CBI from public disclosure to the greatest extent possible consistent with the Freedom of Information Act (5 U.S.C. 552), and DOT's implementing regulations at 49 CFR Part 7.

**D. Safety Notification to FMCSA**

Each motor carrier operating under this waiver, must notify FMCSA via email to MCPSV@dot.gov not later than 5 calendar days after it becomes aware, or otherwise determines, that the continued use of cab-mounted beacons covered by this waiver is no longer likely to maintain a level of safety that is at least equivalent to the level that would be achieved absent this waiver.

---

[3] *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019).

## V. PREEMPTION

In accordance with 49 U.S.C. 31315(d), as implemented by 49 CFR § 381.600, during the period this waiver is in effect, no State shall enforce any law or regulation applicable to interstate commerce that conflicts with or is inconsistent with this waiver with respect to a firm or person operating under the waiver. States may, but are not required to, adopt the same waiver with respect to operations in intrastate commerce.

## VI. TERMINATION

FMCSA will terminate this waiver with respect to any specific motor carrier if: (1) that motor carrier fails to comply with the terms and conditions of this waiver; (2) that motor carrier's operation under the waiver results in a lower level of safety than was maintained before it was granted; or (3) continuation of the waiver for that motor carrier would not be consistent with the goals and objectives of 49 U.S.C. 31136(e) and 31315(a).

# Waiver #3

EXHIBIT

U.S. Department of Transportation

Federal Motor Carrier Safety Administration

Administrator

1200 New Jersey Ave, SE
Washington, DC 20590

April 8, 2026

Shelley Webb
Chief Legal Officer
Aurora Operations, Inc.
280 N. Bernardo Ave.
Mountain View, CA 94043

Dear Ms. Webb:

The Federal Motor Carrier Safety Administration (FMCSA) grants a limited waiver, subject to the attached terms and conditions, to Aurora Operations, Inc. (Aurora) from compliance with the warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f), to allow Aurora to use cab-mounted warning beacons in lieu of the warning devices required by 49 CFR § 393.95(f). This waiver is effective from 12:00 a.m. on April 10, 2026, through 11:59 p.m. on July 9, 2026.

This waiver covers Aurora's operation of Level 4 Automated Driving System (ADS) commercial motor vehicles (CMVs) subject to the Federal Motor Carrier Safety Regulations. This waiver also permits any other motor carrier to operate under the waiver, provided that it first notifies FMCSA in writing, certifying that it currently has cab-mounted warning beacons, the ability to comply with all terms and conditions of this waiver, and that it will comply with all terms and conditions of the waiver. FMCSA may publish on its website a copy of the waiver and a list of motor carriers operating under the waiver. As of the date of this letter, Kodiak Robotics, Inc., USDOT No. 3172855, has provided written notification to FMCSA that it is also operating under the waiver.

Under 49 U.S.C. §§ 31136(e) and 31315(a), FMCSA may grant a waiver if it determines that it is in the public interest to grant the waiver and that the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver. FMCSA may grant a waiver for nonemergency and unique events, limited in scope and circumstances, for a period not in excess of three months. Although FMCSA previously denied Aurora's request for an exemption (89 FR 105675, December 27, 2024), FMCSA has now determined that it is in the public interest to issue a waiver, limited in scope and circumstances, that is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver.

FMCSA reviewed information provided by Aurora in support of its request for exemption. FMCSA has determined that the attached waiver is narrower in scope than the broad exemption request from Waymo LLC and Aurora that FMCSA previously denied. In this regard, the exemption request sought industry-wide regulatory relief whereby any motor carrier operating Level 4 ADS-equipped CMVs could operate under the waiver without any prior notice to FMCSA. In denying the exemption, FMCSA found that the applicants' request to "exempt a class of unspecified carriers using unspecified equipment on unspecified vehicles only further undermines the claimed likely equivalent level of safety." This waiver cures that deficiency, as it would apply to Aurora, and would not apply to other motor carriers operating Level 4 ADS-equipped CMVs unless they provide written notification to FMCSA and certify compliance with the waiver's terms and conditions.

Further, the waiver is narrower than the exemption request because it requires that operations occur primarily on the U.S. Interstate Highway System. In denying the exemption, FMCSA noted that "road curvatures or elevations may affect visibility of a beacon located in a fixed position on the cab." This waiver limits operations "primarily [to] the U.S. Interstate Highway System," where standardized road geometry minimizes the frequency of sharp curves and crests that could obstruct visibility. Moreover, the waiver's scope prohibits operations that would require a commercial driver's license endorsement (*e.g.*, tank vehicles, double/triple trailers) if a driver were present, as well as the transportation of passengers or hazardous materials.

In addition, the waiver includes technical specifications to resolve potential ambiguity. In denying the exemption, FMCSA stated that the application did not "provide sufficient details about the proposed alternative devices," particularly with the vague allowance for "any configuration of similar effectiveness." In contrast, Section III.B of the waiver mandates specific mounting, location, and photometric performance standards (SAE J595). The waiver also imposes additional requirements for when the beacons must activate and how long they must remain flashing. Further, the waiver does not allow for configuration flexibility outside the terms and conditions set forth in the waiver. Moreover, Section III.B.6 of the waiver requires that the beacons "be designed and installed with redundant power sources to prevent failure due to a single-point power failure," which FMCSA previously noted as a deficiency with the exemption application.

In denying the exemption, FMCSA also stated that Aurora's naturalistic study submitted in support of the application showed that a lower percentage of drivers responded to the beacons than to warning triangles in five of eight scenarios presented: daytime tests at left curve and straight locations, and nighttime tests at crest, right curve, and straight locations. However, under the waiver, the curve and crest scenarios would be present to a much more limited degree, since operations must occur primarily on the U.S. Interstate Highway System, and the differences in driver response at straight locations were immaterial (*i.e.*, less than four-tenths of one percent), according to the study. Moreover, as FMCSA noted, Aurora's study concluded that a warning beacon elicited a higher percentage of responses than warning triangles overall. FMCSA has noted in a research context "the historically unresolved questions of whether the use of such [warning] devices improves traffic safety and, if so, how and to what extent." (90 FR 1591, January 8, 2025). Without information on the level of safety the current regulatory requirements provide, the two studies submitted in support of Aurora's application reasonably

support a determination that motorists detect and respond to the beacons at a similar rate as existing warning devices under the terms and conditions imposed by this waiver.

Finally, the waiver addresses concerns about the lack of monitoring controls by requiring specific, detailed reporting requirements to allow FMCSA to monitor the safety performance of motor carriers operating under the waiver. In denying the exemption, FMCSA concluded that the application "lacks necessary monitoring controls to ensure highway safety." Section IV of this waiver implements these exact controls by requiring detailed crash and term reporting. Specifically, under Section IV.B, Aurora, and any other motor carriers operating under the waiver, must provide FMCSA with aggregate data on beacon activation events, reports on the performance and reliability of the beacon systems—including malfunctions—and the specific mounting locations used (within the terms and conditions set forth in the waiver). This will allow FMCSA to oversee the safety performance of the alternative technology continuously and to gather critical data, while monitoring activities under the waiver. Finally, Aurora, and any other motor carriers operating under the waiver, are required to meet with FMCSA upon request to provide information about the beacons' performance.

For these reasons, FMCSA finds the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver. In addition, FMCSA finds that it is in the public interest to grant the waiver to promote innovation and to enable commercial deployment of ADS CMVs to enhance safety and mobility for the American public. Finally, FMCSA finds that deployment of cab-mounted warning beacons in Level 4 ADS-equipped CMVs is a unique and nonemergency event because the operation of a CMV without a driver who can place warning devices on the roadway has never occurred previously.

Sincerely,

Derek D. Barrs
Administrator

Attachment

CC: Jordan Coleman, Kodiak Robotics, Inc. (jordan@kodiak.ai)

Waiver #3

TERMS & CONDITIONS OF THE WAIVER

EXHIBIT

**Waiver of Warning Device Requirements**

**TERMS AND CONDITIONS OF THE WAIVER**

## I. PERIOD OF THE WAIVER

This waiver from the warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f), is approved for the three-month period from 12:00 a.m. on April 10, 2026, through 11:59 p.m. on July 9, 2026. Thereafter, absent violation of the terms and conditions of this waiver, or a notification under section IV.D. below, or a determination by the Federal Motor Carrier Safety Administration (FMCSA) of a safety deficiency under 49 U.S.C. 31315(a), this waiver will be reissued.

## II. EXTENT OF THE WAIVER

**A. Applicability to Aurora Operations, Inc**

This waiver applies to Aurora Operations, Inc. (Aurora) for its operation of commercial motor vehicles (CMVs) equipped with a Level 4[1] Automated Driving System (ADS). This waiver also extends to any other motor carrier operating CMVs with a Level 4 ADS, provided such motor carrier provides written notification to FMCSA that includes the certifications specified in Section II(B).

**B. Applicability to Other Motor Carriers**

Any other motor carrier intending to operate CMVs under the terms and conditions of this waiver must notify FMCSA in writing prior to commencing operations covered by this waiver and must not commence operations until FMCSA acknowledges receipt of the notification, or the expiration of one business day after delivery, whichever occurs sooner. A motor carrier that previously sent FMCSA a written notification certifying the information below need not send an additional notification. The notification must be sent to FMCSA via email to MCPSV@dot.gov certifying the following:

1. The motor carrier's legal name, USDOT number, and principal place of business, and point of contact of the motor carrier.
2. A statement that adequately demonstrates the motor carrier currently has cab-mounted warning beacons and the ability to comply with all terms and conditions of this waiver.
3. A statement affirming the motor carrier will comply with all terms and conditions of this waiver.
4. In accordance with 28 U.S.C. 1746, the statements required under this Section must include language in substantially the following form, "I, [Name], certify under penalty of perjury that the foregoing is true and correct. Executed on [Date], [Signature]."

---

[1] As used in this waiver, the term "Level 4" has the same meaning as Level 4 High Driving Automation set forth in SAE J3016.

**C. Use of Cab-Mounted Warning Beacons**

Aurora and any other motor carrier operating under the terms and conditions of this waiver (hereinafter "each motor carrier operating under this waiver") pursuant to either Section II(A) or (B) may use cab-mounted warning beacons subject to the conditions in Sections III and IV, below, in lieu of warning device placement requirements in 49 CFR § 392.22(b), the steady-burning lamp requirement in 49 CFR § 393.25(e), and the requirements for the types and number of warning devices in 49 CFR § 393.95(f).

## III. CONDITIONS

This waiver is contingent upon each of the following conditions.

**A. Operations**

1. Each motor carrier operating under this waiver, may operate its eligible Level 4 ADS-equipped CMVs under this waiver.
2. Operations under this waiver shall primarily occur on the U.S. Interstate Highway System. Operations on other public roads are permitted when operationally necessary to complete movements or access operational facilities, provided such roads are part of the validated Operational Design Domain for the specific ADS-equipped CMV.
3. Operations under this waiver are prohibited if operations would otherwise require a "N", "H", "X", "P", "S", or "T" endorsement under 49 CFR 383.93—if a human driver were present.
4. Each motor carrier operating under this waiver is prohibited from operating as a for-hire passenger carrier or private passenger carrier, or transporting hazardous materials as defined in 49 CFR § 383.5, while utilizing this waiver.

**B. Cab-Mounted Warning Beacon Specifications**

1. The cab-mounted warning beacons, a safety device, used under this waiver must consist of forward- and rearward-facing flashing lights.
2. Mounting. At least one rearward-facing light must be mounted on each side of the cab, and at least one forward-facing light mounted on the front of the cab. The mountings must provide stable support for the beacons. The total width of the vehicle, inclusive of mountings and lights, may not exceed 122 inches.
3. Location. All lights must be mounted at least 100 inches from the ground and located at or above the upper edge of the sideview mirrors but below the top edge of the cab.
4. Performance. The cab-mounted warning beacons must be amber in color and meet the Class 1 photometric performance requirements of SAE J595.
5. Flash Pattern. The activation of the warning system must cause the beacons to flash at a rate different from the vehicle's standard hazard warning signal flashers required under 49 CFR § 392.22(a).

6. Power. The beacons must be designed and installed with redundant power sources to prevent failure due to a single-point power failure.

**C. Activation and Operation:**

1. The beacons must activate as soon as possible, but in any event within 10 minutes, whenever the CMV is stopped on the traveled portion or the shoulder of a highway for any cause other than necessary traffic stops (i.e., whenever 49 CFR § 392.22(b) would otherwise apply).
2. The beacons must remain flashing for the entire duration of the stop, from the initial stop until the vehicle reinitiates movement or the vehicle is recovered.
3. Standard hazard warning signal flashers must also activate as required by 49 CFR § 392.22(a) and must continue flashing for the entire duration of the stop.

**D. Other**

1. Each motor carrier operating under this waiver, must comply with all other applicable Federal Motor Carrier Safety Regulations (49 CFR parts 350-399).
2. Each motor carrier operating under this waiver, shall, at FMCSA's request, meet with FMCSA to answer questions regarding data and information required to be provided under this waiver.
3. Each motor carrier operating under this waiver, may also apply for an exemption under 49 U.S.C. 31315(b)(3).

## IV. REPORTING REQUIREMENTS

**A. Crash Reporting**

Each motor carrier operating under this waiver, must notify FMCSA via email to MCPSV@dot.gov not later than 5 calendar days of any crash involving a CMV while the cab-mounted warning beacons are activated or should have been activated per the conditions of this waiver. For the purposes of this waiver, the term "crash" shall have the same meaning as defined in the National Highway Traffic Safety Administration's (NHTSA) Third Amended Standing General Order (SGO) 2021-01.[2]

Notification must include all available information regarding the circumstances of the crash, including the following information:

1. Identifier of the Waiver ("Waiver of Warning Device Requirements").
2. Date and time of the crash.
3. City or town, and State, in which the crash occurred, or closest to the crash scene, and geolocation information.

[2] Under NHTSA's Third Amended SGO 2021-01, "'Crash' means any physical impact between a vehicle and another road user (vehicle, pedestrian, cyclist, etc.) or property that results or allegedly results in any property damage, injury, or fatality. A subject vehicle is involved in a crash if it physically impacts another road user or if it contributes or is alleged to contribute (by steering, braking, acceleration, or other operational performance) to another vehicle's physical impact with another road user or property involved in that crash." The SGO is available at: https://www.nhtsa.gov/sites/nhtsa.gov/files/2025-04/third-amended-SGO-2021-01_2025.pdf.

4. Vehicle Identification Number (VIN).
5. Description of any property damage.
6. Number of individuals suffering physical injury.
7. Number of fatalities.
8. The police-reported narrative of the crash (if available at the time of the report or provided upon its completion).

**B. Waiver Term Report**

Each motor carrier operating under this waiver, must submit a report to FMCSA via email to MCPSV@dot.gov not later than 30 calendar days of the end of this waiver's term (or not later than 30 calendar days of ceasing operations under this waiver, if sooner). This report must include the following information covering the entire period of operation under this waiver:

1. Total number of its CMVs that operated under the waiver.
2. Total vehicle miles traveled by its CMVs under the waiver.
3. Aggregate data on the frequency, duration, location (including road type: Interstate, state highway, local road, etc.), and reason for cab-mounted warning beacon activation events for its CMVs.
4. A summary of the overall performance and reliability of the cab-mounted warning beacons and their activation systems on its CMVs, including any malfunctions or power issues experienced.
5. The specific mounting locations of all cab-mounted warning beacons used on its CMVs.
6. Whether any variations in cab-mounted warning beacon types, mounting, or flash patterns were used across its fleet when operating under the waiver. If variations were used, any performance differences among the beacons.

**C. Request to Treat Information as Confidential Business Information (CBI)**

Nonpublic information submitted by a motor carrier under Section IV(A) or (B) above will be treated as CBI, which is defined as commercial or financial information that is both customarily and actually treated as private by its owner,[3] if designated as such by the submitting motor carrier. FMCSA will withhold CBI from public disclosure to the greatest extent possible consistent with the Freedom of Information Act (5 U.S.C. 552), and DOT's implementing regulations at 49 CFR Part 7.

**D. Safety Notification to FMCSA**

Each motor carrier operating under this waiver, must notify FMCSA via email to MCPSV@dot.gov not later than 5 calendar days after it becomes aware, or otherwise determines, that the continued use of cab-mounted beacons covered by this waiver is no longer likely to maintain a level of safety that is at least equivalent to the level that would be achieved absent this waiver.

[3] *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019).

## V. PREEMPTION

In accordance with 49 U.S.C. 31315(d), as implemented by 49 CFR § 381.600, during the period this waiver is in effect, no State shall enforce any law or regulation applicable to interstate commerce that conflicts with or is inconsistent with this waiver with respect to a firm or person operating under the waiver. States may, but are not required to, adopt the same waiver with respect to operations in intrastate commerce.

## VI. TERMINATION

FMCSA will terminate this waiver with respect to any specific motor carrier if: (1) that motor carrier fails to comply with the terms and conditions of this waiver; (2) that motor carrier's operation under the waiver results in a lower level of safety than was maintained before it was granted; or (3) continuation of the waiver for that motor carrier would not be consistent with the goals and objectives of 49 U.S.C. 31136(e) and 31315(a).

**FOR FURTHER INFORMATION CONTACT:** Reed Liriano, Program Coordinator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 523 of December 22, 2021.

**Nicole L. Elkon,**

*Deputy Assistant Secretary for Professional and Cultural Exchanges, Bureau of Educational and Cultural Affairs, Department of State.*

[FR Doc. 2024–30946 Filed 12–26–24; 8:45 am]

**BILLING CODE 4710–05–P**

## DEPARTMENT OF TRANSPORTATION

### Federal Motor Carrier Safety Administration

**[Docket No. FMCSA–2023–0071]**

### Parts and Accessories Necessary for Safe Operation; Application for an Exemption From Waymo LLC (USDOT #3000336) and Aurora Operations, Inc. (USDOT #3441156)

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), Department of Transportation (DOT).

**ACTION:** Notice of final disposition; denial of exemption.

**SUMMARY:** The Federal Motor Carrier Safety Administration (FMCSA or the Agency) publishes its decision to deny an application from Waymo LLC (Waymo, USDOT #3000336) and Aurora Operations, Inc. (Aurora, USDOT #3441156) (together, Applicants), requesting an exemption from certain Federal Motor Carrier Safety Regulations (FMCSRs) related to requirements to place specific types of warning devices at prescribed locations around commercial motor vehicles (CMVs) stopped on the traveled portion or shoulder of a highway for any cause other than necessary traffic stops and requirements that lamps on CMVs be steady burning. Applicants requested that they and ''other similarly situated companies'' be permitted to instead use ''Cab-Mounted Warning Beacons'' (including ''variants'' and ''any configuration of similar effectiveness'') when the CMV is operated by a Level 4 Automated Driving System (ADS) either without a human on board or with a human on board when testing the warning beacons. Safety is FMCSA's highest priority. The Agency embraces USDOT's Innovation Principles, including adapting as technology changes and supporting technologies that further our policy goals. While the application and the public comments show promise for alternative warning devices to provide safety benefits for warning motorists of a stopped CMV under certain conditions, the present application does not demonstrate how Applicants or other proposed exempted parties would ensure an equivalent or greater level of safety than would be achieved absent the exemption. The application does not provide sufficient details about proposed alternative devices, and the limited data presented does not support a likely equivalent level of safety for a national, industry-wide exemption for all companies operating autonomous CMVs. If Applicants can reasonably address the reasons for the denial, Applicants may resubmit an exemption application.

**FOR FURTHER INFORMATION CONTACT:** Mr. David Sutula, Vehicle and Roadside Operations Division, Office of Carrier, Driver, and Vehicle Safety, FMCSA; 1200 New Jersey Avenue SE, Washington, DC 20590–0001; (202) 366–9209; *MCPSV@dot.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Viewing Comments and Documents

To view comments, go to *www.regulations.gov,* insert the docket number ''FMCSA–2023–0071'' in the keyword box, and click ''Search.'' Next, sort the results by ''Posted (Newer-Older),'' choose the first notice listed, click ''Browse Comments.''

To view documents mentioned in this notice as being available in the docket, go to *www.regulations.gov,* insert the docket number ''FMCSA–2023–0071'' in the keyword box, click ''Search,'' and choose the document to review.

If you do not have access to the internet, you may view the docket online by visiting Dockets Operations on the ground floor of the DOT West Building, 1200 New Jersey Avenue SE, Washington, DC 20590, between 9 a.m. and 5 p.m. ET, Monday through Friday, except Federal holidays. To be sure someone is there to help you, please call (202) 366–9317 or (202) 366–9826 before visiting Dockets Operations.

### II. Legal Basis

FMCSA has authority to grant exemptions from FMCSRs where the Agency finds that ''such exemption would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption.'' 49 U.S.C. 31136(e); 49 U.S.C. 31315(b)(1).

An exemption application must provide specific information relevant to the scope of the exemption sought including, but not limited to, the provisions from which the person requests exemption, the reason the exemption is needed, the time period during which the requested exemption would apply, an analysis of the safety impacts the requested exemption may cause, and the specific countermeasures the person would undertake to ensure an equivalent or greater measure of safety than would be achieved absent the requested exemption. 49 U.S.C. 31315(b)(5); 49 CFR 381.310.

Upon receipt of an exemption request, FMCSA must publish a notice of the request in the **Federal Register** and provide the public an opportunity to inspect the applicant's safety analysis and any other relevant information known to the Agency, and to comment on the request. See 49 U.S.C. 31315(b)(6)(A); 49 CFR 381.315(a). The Agency reviews the application and any public comments submitted and determines whether to grant or deny the request. 49 CFR 381.315(b). The Agency must publish its decision in the **Federal Register**. Id. If the request is granted, the decision will identify the name of the person or class of persons granted the exemption, the provisions from which the person is exempt, the effective period, and the terms and conditions of the exemption. 49 U.S.C. 31315(b)(6)(B); 49 CFR 381.315(c)(1). If the request is denied, the Agency will publish the name of the person denied the exemption and the reasons for such denial. 49 U.S.C. 31315(b)(6)(C); 49 CFR 381.315(c)(2). A granted exemption may be renewed, upon request, for subsequent 5-year periods. 49 U.S.C. 31315(b)(2); 49 CFR 381.300(b). If an exemption request is denied, and the applicant can reasonably address the reason for the denial, the Agency may allow the applicant to resubmit the application. 49 U.S.C. 31315(b)(3); 49 CFR 381.317.

## III. Background

### *A. Current Regulatory Requirements Under the FMCSRs*

Applicants request an exemption from certain FMCSRs related to requirements for placing warning devices around a stopped CMV, requirements that exterior lamps be steady burning, and requirements that specific types of warning devices be used.

The applicable FMCSRs require the driver of a CMV stopped on the traveled portion or the shoulder of a road for any cause other than a necessary traffic stop to activate hazard warning signal flashers and place required warning devices as soon as possible but within ten minutes, at specified locations behind and in front of the stopped CMV. 49 CFR 392.22(b). They also specify placement of warning devices in certain circumstances, such as during daylight hours, or where devices may be obstructed from view (*e.g.,* when stopped within 500 feet of a curve or the crest of a hill). Id.

The FMCSRs also require that all exterior lamps be steady burning, with exceptions not relevant here. 49 CFR 393.25(e).

Finally, the FMCSRs specify the types and number of warning devices to be used for stopped vehicles, namely 3 bidirectional emergency reflective triangles, or at least 6 fusees or 3 liquid-burning flares. Other warning devices may be used in addition to required devices, as long as they do not reduce the effectiveness of required devices. 49 CFR 393.95(f).

### *B. Applicants' Requested Exemption*

Applicants request an exemption on behalf of themselves and ''similarly situated companies'' from requirements of 49 CFR 392.22(b), 393.25(e), and 393.95(f). Application (App.) at 1. They request that CMVs operated by a Level 4 ADS be permitted to use ''Cab-Mounted Warning Beacons'' instead of FMCSR-specified warning devices when the vehicles are operating either without a human on board, or with a human on board when testing the warning beacons. Id.

Applicants define Cab-Mounted Warning Beacons as ''cab-mounted warning devices, consisting of both forward- and rearward-facing amber flashing lights mounted at a height above the upper edge of the sideview mirrors.'' App. at 2. The proposed warning beacons are amber colored and meet certain Society of Automotive Engineers (SAE) requirements. Id. at 7–8. These warning beacons would ''flash at a different rate than the required hazard warning signal flashers to increase conspicuity of the stopped CMV,'' which Applicants contend would not interfere with or impair the effectiveness of hazard warning signal flashers. Id. at 11. Applicants propose that at least one rearward-facing light be mounted on each side of the cab ''at some point on or above the upper edge of the sideview mirrors and below the top edge of the cab,'' and that at least one forward-facing light be mounted ''similarly high'' on the front of the cab. Id. at 9–10. Applicants provide a diagram illustrating areas where the beacons ''could be mounted,'' noting that the description ''purposely allows for flexibility with regard to the mounting location of the beacons so long as the beacons are positioned at a sufficiently high point on the cab.'' Id. at 10 n.19. Applicants propose that ''[t]he exemption, if granted, should permit any configuration of similar effectiveness.'' Id. at 10.

Applicants state that the exemption is needed because compliance with 49 CFR 392.22(b) is ''not feasible for autonomous CMVs without a human on board,'' and because proposed Cab-Mounted Warning Beacons are not steady burning (as required under 49 CFR 393.25(e)) and are not among the approved warning devices under 49 CFR 393.95(f). Applicants posit that if the exemption is not granted, the deployment of autonomous CMVs without a human driver on board will be ''sufficiently impeded,'' and that alternatives to the exemption would be unnecessarily costly. App. at 14–15.

### *C. Research Submitted by Applicants in Support of Proposed Beacons*

To support the asserted equivalent level of safety of Cab-Mounted Warning Beacons, Applicants submitted two reports on testing certain beacon ''variants.'' App. at 9. Waymo sponsored a study by the Virginia Tech Transportation Institute (VTTI) (''Stopped Automated Commercial Motor Vehicle Warning Device Surrogates,'' prepared for Waymo, LLC, by Erin Mabry, Susan Soccolich, Kary Meissner, Josh Radlbeck, and Andy Schaudt, VTTI, August 1, 2022 (the Waymo study)). Aurora conducted what it calls a ''naturalistic study'' (''Naturalistic Study for Warning Device Equivalency,'' prepared by Aurora Operations, Inc., October 2022 (the Aurora study)). Id. at 11, apps. B–C.

The Waymo study evaluated whether drivers detected, recognized, and responded appropriately to certain beacons while traveling on a closed-circuit test track in daylight and nighttime conditions and encountering a stopped CMV at three different locations (on the shoulder, in the lane ahead, and on the right shoulder after a curve). App. at 12. The study compared driver reactions to Cab-Mounted Warning Beacons with driver reactions to warning triangles and concluded that study participants subjectively preferred beacons over triangles for communicating the presence of a stopped CMV. Waymo study at 20. The study was conducted in Virginia with 48 participants (24 daylight, 24 nighttime). Id. at 7–8. The report does not describe the weather conditions.

The Aurora study observed the reactions of over 7,000 passing vehicles to the presence of certain beacons versus warning triangles. App. at 13. The study was conducted on public roads with passing motorists who were unaware of the study and traveling at highway speeds when they encountered a stopped CMV on the right shoulder. Id., Aurora study at 3. Aurora used sensors mounted on the stopped CMV to collect data about motorist responses. Aurora study at 8. Aurora reports that similar proportions of motorists responded to the presence of beacons as they did to warning triangles, and that among those responding, responses occurred at similar distances and motorists increased lateral separation in similar proportions. App. at 13–14. The Aurora study was conducted in Texas on Interstate 45 between Exits 258 and 249. Aurora study at 5. The report does not describe the weather conditions.

Applicants posit that the two reports confirm that the proposed beacons achieve a level of safety equivalent to or greater than the level achieved with FMCSR-specified warning triangles placed at prescribed distances. App. at 14.

## IV. Overview of Public Notice and Comments

FMCSA published in the **Federal Register** on March 9, 2023, notice of the exemption application and the opportunity for public comment. 88 FR 14665. In response, the Agency received 51 public comments.[1]

Twenty-five comments generally supported granting the application, including comments submitted by the Association for Uncrewed Vehicle Systems International (AUVSI); the American Trucking Associations (ATA);

[1] FMCSA considered all comments in the docket received through October 31, 2024. FMCSA notes that it received two comments from the Association for Uncrewed Vehicle Systems International but is treating those submissions as one comment because they are substantively identical. See *https://www.regulations.gov/comment/FMCSA-2023-0071-0020* and *https://www.regulations.gov/comment/FMCSA-2023-0071-0037.*

the Autonomous Vehicle Industry Association (AVIA); the Consumer Technology Association (CTA); Continental Automotive Systems, Inc.; Daimler Trucks of North America (Daimler); Hirschbach Motor Lines, Inc. (Hirschbach); Kodiak Robotics (Kodiak); the Motor and Equipment Manufacturers Association (MEMA); PACCAR Inc.; Stack AV Co. (Stack); TechNet; Uber Freight US, LLC (Uber Freight); the U.S. Chamber of Commerce; Volvo Autonomous Solutions NA, Inc. (VAS); Waabi Innovation US, Inc. (Waabi); Werner Enterprises (Werner); CWK Consulting, LLC; the Texas Trucking Association (TXTA); the Institute for Safer Trucking (IST); Isuzu Motors Limited, Isuzu Technical Center of America, Inc. (Isuzu); the Montana Trucking Association (MTA); the Allegheny Conference on Community Development (Allegheny Conference); the National Fraternal Order of Police (NFOP); and an individual commenter.

One commenter, HAAS Alert, was neutral on the proposal, although it supported updating current standards for hazard warnings and notifications.

Twenty-five comments generally expressed concerns with granting the exemption, including comments submitted by the Amalgamated Transit Union, AFL–CIO (ATU); AWM Associates, LLC; the Motor Vehicle Lighting Supplier Safety Institute (MVLSSI); the Owner Operator Independent Drivers Association (OOIDA); the Towing and Recovery Association of America, Inc. (TRA); the Transportation Trades Department, AFL–CIO (TTD); the Transport Workers Union of America, AFL–CIO (TWU); the Truck Safety Coalition (TSC)/Citizens for Reliable and Safe Highways (CRASH)/Parents Against Tired Truckers (PATT) (joint comment); eleven individual commenters; and six anonymous commenters.

Generally, commenters supporting the exemption cited the need for a warning system that does not require human intervention to place warning devices for ADS-operated CMVs and the need for continued development of automated technologies. AVIA, for example, argued that the exemption application proposes a new safety solution that would avoid the need for human intervention when a Level 4 or 5 ADS-equipped CMV is stopped on the highway. This position was echoed by comments from ATA; AUVSI; CTA; CWK Consulting, LLC; Daimler; Hirschbach; Kodiak; PACCAR Inc.; Stack; TechNet; Uber Freight; the U.S. Chamber of Commerce; VAS; Waabi; and Werner. These commenters stated that the exemption would help address regulatory burdens that they believe are hindering the deployment of ADS-equipped CMVs. AVIA also commented that it believes the proposed beacons not only address needs of ADS-equipped vehicles but also could enhance safety if applied to traditional CMVs by reducing risks to drivers who would otherwise be required to exit their vehicles to place warning devices. IST expressed concern over the ''significant risk'' to truck drivers placing warning triangles (particularly in conditions of poor visibility or adverse weather). Waabi also emphasized that it is ''extremely dangerous'' to require human drivers to ''get out of a CMV, walk into or next to oncoming traffic (including at night and during severe weather events), and proceed 100 feet beyond the vehicle, and then physically deploy a warning triangle or flare.'' ATA and Kodiak commented that the exemption would be a positive step toward improving overall roadway safety. Similar comments from TXTA, Isuzu, MTA, IST, and Allegheny Conference noted that this would be a step toward enhancing or improving ''roadway safety'' for ''autonomous trucks and other road users.'' NFOP stated that granting the exemption would be ''a step toward collecting data that can support a broader rulemaking effort to update FMCSA's current regulation on warning devices for all CMVs.''

Commenters generally opposed to granting the exemption cited concerns about the effectiveness of the proposed beacons and the lack of evidence in Applicants' studies to address certain safety concerns. ATU, for example, commented that there was no data demonstrating how the beacons would perform where there are blind corners blocking the sight lines of oncoming vehicles, where a vehicle is turned on its side, or if there is a fire or electrical problems. Other efficacy concerns included visibility of the beacons due to a single location, or based on roadway topography or alignment of the truck tractor and trailer; electrical failure causing failure of the beacons; and desensitization of the public to flashing beacons or confusion about what beacons mean (ATU, OOIDA, four individual commenters, one anonymous commenter, MVLSSI, and TRA). MVLSSI, OOIDA, TSC/CRASH/PATT, and trade unions (TWU, ATU, and TTD) also commented that Applicants presented insufficient evidence to demonstrate an equivalent level of safety, noting that more testing would be needed, with TSC/CRASH/PATT emphasizing the lack of performance standards for ADS-equipped CMVs.[2]

Two individuals commented that the exemption, if granted, should apply to all CMVs, not just ADS-equipped CMVs. TWU and others called for FMCSA or DOT to consider larger studies on alternative warning devices to potentially update existing standards rather than granting an exemption from the current safety standards, and TTD similarly noted that the Applicants' request would have been more appropriate as a petition for rulemaking. Some commenters believed that the exemption request was too broad, seeking an exemption that would apply to an entire class of CMVs, rather than limited to those CMVs under the control of the applicants (see, *e.g.,* ATU, TWU, and TSC/CRASH/PATT), with some noting that many of these operators currently use different systems and processes. Commenters also noted that the cited testing does not account for the safety case for a broader spectrum of autonomous and non-autonomous CMVs operated by different entities.

Applicants submitted a 2.5-page response to public comments, dated April 19, 2023 (Applicant's Response). They responded to certain commenter concerns regarding curves and hills by stating that the Waymo and Aurora studies evaluated beacons on or after curves, and that Aurora's study assessed beacons beyond the crest of a hill. They argue that warning beacons' positioning high on the cab made them effective. Regarding commenters' concerns about electrical failure, Applicants responded that beacons ''can and should be designed and installed to avoid a single-point power failure'' (such as by establishing two power domains to draw from, although they encouraged FMCSA to remain technology neutral as to how they are designed). They also noted that existing warning devices are not immune from failure. They further contended that the proposed beacons would activate immediately and thereby provide an immediate warning, unlike specified warning devices, which may take up to ten minutes to be placed. Applicants did not submit additional evidence to support these positions.

## V. Exemption Decision

Safety is the Agency's highest priority. The Agency embraces the United States Department of Transportation's Innovation Principles,

[2] Among other FMCSA efforts to promote the safe testing and deployment of ADS-equipped CMVs, a proposed rulemaking, ''Motor Carrier Operation of Automated Driving Systems (ADS)-Equipped Commercial Motor Vehicles'' (RIN 2126–AC17), is currently underway.

Case: 26-2838 Document: 2 Filed: 09/08/2026 Pages: 99

including adapting as technology changes and supporting technologies that further our policy goals. Having carefully evaluated Applicants' exemption application, supporting documentation, the public comments, and the safety implications of Applicants' request, the Agency denies the application. While the application and public comments suggest promise for alternative warning devices in some circumstances—and the Agency encourages continued innovation and analyses in this area—given the scope of the exemption sought, including the proposed flexible standard for Cab-Mounted Warning Beacons and the proposed national and industry-wide exemption for all companies operating autonomous CMVs, FMCSA finds that the application does not demonstrate that granting the exemption will likely achieve a level of safety that is equivalent to, or greater than, the level of safety that would be achieved absent the exemption. As discussed below, the broad exemption is not supported by the data presented and lacks necessary monitoring controls to ensure highway safety. FMCSA notes that this decision does not preclude Applicants or others from seeking an exemption to use better defined warning beacons for specified companies in particular locations, as one of the bases of the Agency's decision here is the broad reach of Applicants' request.

*A. Applicants Do Not Provide Sufficient Details About the Proposed Alternative Devices and Do Not Demonstrate an Equivalent or Greater Level of Safety for Those Devices, Particularly for a Nationwide and Industry-Wide Exemption*

To obtain an exemption from the FMCSRs, an applicant must provide evidence allowing the Agency to conclude that the exemption would ''likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption.'' 49 U.S.C. 31315(b)(1). An applicant likewise must include sufficient details about the specific countermeasures they would take to ensure an equivalent or greater measure of safety. 49 U.S.C. 31315(b)(5); 49 CFR 381.310(c)(5). The present application fails to do so.

1. Applicants Do Not Provide Sufficient Details About the Proposed Alternative Warning Devices

Applicants propose Cab-Mounted Warning Beacons consisting of ''at least one'' rearward-facing light mounted ''at some point on *or* above the upper edge of the sideview mirrors'' and ''at least one'' forward-facing light. App. at 9–10. Applicants provide a diagram of where beacons ''could be mounted,'' proposing that the description ''purposely allows for flexibility with regard to the mounting location.'' Id. at 10 n.19. Applicants further propose that the exemption should ''permit any configuration of similar effectiveness.'' Id. at 10. As several commenters noted, the proposed devices are not specific enough to ensure an equivalent level of safety. The variability of the description also does not readily enable the Agency to monitor the exemption terms and conditions. See 49 U.S.C. 31315(b)(8).

2. Applicants Do Not Demonstrate an Equivalent Level of Safety Supporting the Full Scope of the Exemption Sought

Applicants' submitted studies do not support an equivalent level of safety for Cab-Mounted Warning Beacons for the full scope of the exemption sought.

First, the studies at best address beacons mounted at 110 inches from the ground (Waymo study at 6) and at an undetermined height (Aurora study),[3] and with the particular placement and operational constraints described in the studies. They do not address the visibility of beacons for the full range of the ''flexible'' standard that Applicants propose, or ''any configuration of similar effectiveness.''

Second, while Applicants contend that both studies demonstrated similar overall reactions from highway users driving by a stopped CMV for the proposed Cab-Mounted Warning Beacons compared to warning triangles, the studies provided insufficient data to demonstrate an equivalency in driver responses. For example, as the Waymo study acknowledged, unfamiliarity of the warning beacons may have contributed to motorist behavior. Waymo study at 20. And while Applicants rely on the study to demonstrate that warning beacons were ''easier to see'' or ''preferred'' by drivers, the study also showed that for respondents who answered which device was better for signaling a stopped truck, 8 out of 10 selected warning triangles over beacons. Waymo study at 55. Aurora's study notes that some motorist responses may have occurred wholly outside the sensor range (Aurora study at 8)—an indication that the study may not have captured enough data points to compare whether drivers responded earlier to one warning device over the other.

[3] The Aurora study indicates that one light is temporarily mounted on each side of the cab at ''approximately one foot behind the sideview mirror'' and ''approximately four inches above the top of the sideview mirror.'' Aurora study at 3 n.3.

The studies also failed to fully support whether motorist behavior was causally based on seeing warning beacons rather than a stopped CMV. One distinction between FMCSR-specified warning triangles and the proposed beacons is that warning triangles are placed at the rear of a stopped CMV (in addition to the front), while the proposed beacons are located only at the front of the cab—raising the possibility that drivers see the rear of a stopped CMV before they see the beacons. While Applicants contend that the beacons are visible from behind the vehicle, the evidence was inconclusive. For example, the studies failed to demonstrate through photos or videos the point at which a beacon or warning triangle was visible or recognized by a motorist, or the point at which a stopped CMV came into view. Changes in driver behavior were observed in 11 out of 12 observations with warning beacons (as opposed to 12 out of 12 for triangles) (Waymo study at 16, Table 3); still, the evidence does not clearly demonstrate whether drivers reacted to the CMV or the warning device. For example, neither study establishes a baseline condition that measured driver reaction to a stopped CMV with no warning device deployed, a concern raised by MVLSSI in its comments.

Applicants' contentions of equal or higher overall responses to warning beacons, moreover, fail to acknowledge circumstances where beacons performed worse than triangles. Aurora's study, for example, concluded that a warning beacon elicited a 2.75% higher percentage of responses than warning triangles overall. Aurora study at 24, Table 3.2.1–1. The same table, however, shows a lower percentage responded overall to warning beacons than to warning triangles in five of eight (62.5%) scenarios in the table, including daytime tests at left curve and straight locations, and nighttime tests at crest, right curve, and straight locations. Id. Although the differences in percentage responding were small, the overall worse performance for beacons in the majority of categories does not support Applicants' conclusion that the proposed beacons performed at a level equal to or better than warning triangles.

Another limitation of the studies was the limited data. The Aurora study tested for 8 minutes with warning beacons, replaced the warning beacons with warning triangles, and then tested the next 8 minutes with warning triangles. Aurora study at 5–6. This leads to 16 minutes of total testing time for both warning devices for each roadway geometry (straight, curve left, curve right, and beyond the crest of a

Case: 26-2838 Document: 2 Filed: 09/08/2026 Pages: 99


hill), with the tests repeated in daytime and nighttime lighting conditions. The total test time is just over 2 hours for all devices across all scenarios, with only around 64 minutes of total testing time for the proposed beacons across 8 scenarios. The Waymo study was limited to 48 participants. Waymo study at 7. This limited amount of data does not support an equivalent level of safety, particularly considering the scope of the exemption requested, which is nationwide for all current and future autonomous CMV operators during the exemption period.

Third, the studies do not demonstrate an equivalent level of safety across sufficiently varied circumstances. Many commenters expressed particular concern with the visibility of proposed warning beacons when a CMV is stopped along a curve. For example, TTD stated that the requirement in 49 CFR 392.22(2)(iv) is in place ''to account for the simple geometry of curves, hills, and other obstructions that can make cab lights invisible to oncoming traffic.'' [4] FMCSA agrees that road curvatures or elevations may affect visibility of a beacon located in a fixed position on the cab of a CMV, and that placement of warning devices at FMCSR-prescribed distances away from the CMV allows for improved visibility in such situations. FMCSA notes that, due to the different placement of the devices, the range of the warning provided by a cab-mounted beacon to an approaching motorist would need to be longer than the range of the warning provided by an appropriately placed warning triangle because the source of the warning (the location at which the warning originates) would be farther from the approaching motorist for a cab-mounted beacon than for a warning triangle placed behind a vehicle. FMCSA also expects the radius of the curve could affect the range of the warning beacon in a similar fashion to how curves affect the range of adaptive driving beams, as described in 49 CFR 571.108 (FMVSS No. 108) under Table XXII—Adaptive Driving Beam System Test Matrix.

The studies also gave insufficient information about the nature of the curves in the studies,[5] making it difficult to understand whether the curves were sufficiently representative of the types of curves (*e.g.,* slight vs. truly blind, sharp curves) the beacon-equipped autonomous CMVs would encounter across the United States, and therefore difficult to conclude that there is an equivalent level of safety on curves. Neither study presented photos or videos demonstrating the point of view of an approaching motorist entering or exiting the curve. Moreover, the Waymo study supports that the beacons performed significantly worse than warning triangles at a curve during daytime runs. Specifically, at truck exposure location III (shoulder after curve), 9 out of 12 drivers detected and recognized the truck with the beacon,[6] while 12 out of 12 did so with the warning triangles. This finding is salient to examine, considering that locations with curves would logically present a challenging scenario for fixed beacons versus triangles whose placement can be adjusted based on curves.

Fourth, while Applicants seek an exemption for CMVs operating in a Level 4 autonomous mode (App. at 9), Applicants did not support that vehicles operating in an autonomous mode will stop and engage flashers and beacons similar to the CMVs in the studies. For example, in the Waymo study, it appears that CMVs began in a stopped position, while in the Aurora study, a human driver apparently stopped the vehicle, and in both studies, a human apparently activated both the hazard warning flashers and the beacon devices. Waymo study at 7, 9; Aurora study at 5–6; App. at 11 n.21. Thus, neither study demonstrated that CMVs operating in Level 4 autonomous mode will effectively engage hazard lamps and/or proposed beacons, or the timing with which they would do so, and how that timing compares to timing required under the FMCSRs. And while Applicants contend that they will be able to address electrical failure, Applicants did not provide evidence regarding how they will do so. Applicants' request to exempt a class of unspecified carriers using unspecified equipment on unspecified vehicles only further undermines the claimed likely equivalent level of safety.

Applicants and some commenters noted potential safety benefits to human drivers. Indeed, in their ''safety impact'' analysis, Applicants state that the exemption would increase safety ''most notably by eliminating the need for a human to enter the roadway to place traditional warning devices'' and that while the application applies to CMVs without a human driver, the safety rationale could apply to conventional CMVs. App. at 9. The exemption request, however, is not directed at such circumstances—Applicants request that the exemption be permitted where there is no human driver or where drivers are used only for testing. App. at 4. Indeed, Applicants contend that no human drivers will be affected. App. at 9. While FMCSA agrees that there is promise for improving safety for CMV drivers if they do not need to leave a vehicle to place warning devices, neither Applicants nor the public comments presented data to allow FMCSA to find an equivalent or higher level of safety when using the proposed beacons for carriers operating CMVs with human drivers, and Applicants did not request an exemption to cover such operations.

Fifth, there are other limitations of the application to support the scope sought. For example, the studies do not address visibility of proposed beacons for vehicle orientations with varying trailer heights, such as (for example) a truck tractor pulling a flatbed trailer versus a van type trailer that is taller than the truck tractor. As certain commenters observed, Applicants did not address how proposed beacons might perform in scenarios such as a CMV on its side. Applicants likewise seek a nationwide exemption based only on limited data from a test track in Virginia and a portion of Interstate 45 in Texas between Exits 258 and 249, and without establishing how warning beacons might perform in different geographical or weather conditions across the country.

Sixth, should Applicants (or future applicants) provide sufficient details about proposed alternative warning devices, FMCSA notes that industry-wide exemptions are not the norm and FMCSA grants them only on a very limited basis. Applicants present little data on the effect such a broad exemption would have on overall safety, particularly considering the unknown group of autonomous CMV operators at

[4] See *https://www.regulations.gov/comment/FMCSA-2023-0071-0036.* See also *https://www.regulations.gov/comment/FMCSA-2023-0071-0038* (comment from HAAS Alert noting that ''all line-of-sight alerting solutions are inherently limited by their relative visibility,'' which can be significantly reduced by weather conditions, road curvature, hills, and other factors).

[5] Appendix C of the Waymo study (Waymo study at 25) includes a map with a star at the curve location that did not appear from the map to be a very sharp curve. In Aurora's study, it was also difficult to determine whether the curves were sharp from the maps. For example, when examining the left curve shown in Appendix A (at coordinates 32.3089, –96.593) in Google maps, it appears this location has a posted speed limit of 75 mph. FMCSA notes a sharp curve would have a lower posted speed limit, depending on the curve's radius.

[6] Table 3 (Waymo study at 16), clearly shows that only 9 out of 12 drivers detected the scenario with the beacon at location III for daytime runs. The driver detection data for nighttime runs at that same location is unclear, however, since Table 17 (Id. at 41) shows non-response for the button press for 2 beacons and 1 triangle, with 2 non-response observations occurring at location III and 1 occurring at location II, making it difficult to determine whether the beacons were missed 16.67% of the time (2 out of 12) or 8.33% of the time (1 out of 12) at the curve.

Case: 26-2838 Document: 2 Filed: 09/08/2026 Pages: 99

issue, the unknown fleet sizes, and potential differences among them in implementation and operations.[7] FMCSA also is concerned that operators will assume that their own similar but varying versions of Cab-Mounted Warning Beacons are a ''configuration of similar effectiveness'' (App. at 10) and therefore are exempted, without such operators applying for and supporting the safety of an exemption. Thus, at this stage, the record before the Agency does not show that Applicants' petition for an industry-wide exemption adequately demonstrates the required threshold, of likely to achieve an equivalent level of safety.

## VI. Conclusion

For the reasons given above, the Agency denies the application for an exemption.

FMCSA notes that the Agency may accept a resubmission of an exemption application that has been denied, provided that the applicant can reasonably address the reason for the denial. 49 U.S.C. 31315(b)(3); 49 CFR 381.317.

**Vincent G. White,**

*Deputy Administrator.*

[FR Doc. 2024–30860 Filed 12–26–24; 8:45 am]

**BILLING CODE 4910–EX–P**

[7] Applicants do not provide the names of motor carriers that would be responsible under the exemptions or the estimates—even for their own operations—of the number of drivers and CMVs that would be operated under the exemption. See 49 CFR 381.310(b) and (c). Such information would assist the Agency in assessing the equivalent level of safety for operations with the proposed alternative devices.

---

# DEPARTMENT OF TRANSPORTATION

## Federal Motor Carrier Safety Administration

**[Docket No. FMCSA–2024–0029]**

## Qualification of Drivers; Exemption Applications; Epilepsy and Seizure Disorders

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), Department of Transportation (DOT).

**ACTION:** Notice of applications for exemption; request for comments.

**SUMMARY:** FMCSA announces receipt of applications from 12 individuals for an exemption from the prohibition in the Federal Motor Carrier Safety Regulations (FMCSRs) against persons with a clinical diagnosis of epilepsy or any other condition that is likely to cause a loss of consciousness or any loss of ability to control a commercial motor vehicle (CMV) to drive in interstate commerce. If granted, the exemptions would enable these individuals who have had one or more seizures and are taking anti-seizure medication to operate CMVs in interstate commerce.

**DATES:** Comments must be received on or before January 27, 2025.

**ADDRESSES:** You may submit comments identified by the Federal Docket Management System Docket No. FMCSA–2024–0029 using any of the following methods:

• *Federal eRulemaking Portal:* Go to *www.regulations.gov/,* insert the docket number (FMCSA–2024–0029) in the keyword box and click ''Search.'' Next, choose the only notice listed, and click on the ''Comment'' button. Follow the online instructions for submitting comments.

• *Mail:* Dockets Operations; U.S. Department of Transportation, 1200 New Jersey Avenue SE, West Building Ground Floor, Washington, DC 20590–0001.

• *Hand Delivery:* West Building Ground Floor, 1200 New Jersey Avenue SE, Washington, DC 20590–0001 between 9 a.m. and 5 p.m. ET Monday through Friday, except Federal Holidays.

• *Fax:* (202) 493–2251.

To avoid duplication, please use only one of these four methods. See the ''Public Participation'' portion of the **SUPPLEMENTARY INFORMATION** section for instructions on submitting comments.

**FOR FURTHER INFORMATION CONTACT:** Ms. Christine A. Hydock, Chief, Medical Programs Division, FMCSA, DOT, 1200 New Jersey Avenue SE, Washington, DC 20590–0001, (202) 366–4001, *fmcsamedical@dot.gov.* Office hours are 8:30 a.m. to 5 p.m. ET Monday through Friday, except Federal holidays. If you have questions regarding viewing or submitting material to the docket, contact Dockets Operations, (202) 366–9826.

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

### *A. Submitting Comments*

If you submit a comment, please include the docket number for this notice (Docket No. FMCSA–2024–0029), indicate the specific section of this document to which each comment applies, and provide a reason for each suggestion or recommendation. You may submit your comments and material online or by fax, mail, or hand delivery, but please use only one of these means. FMCSA recommends that you include your name and a mailing address, an email address, or a phone number in the body of your document so that FMCSA can contact you if there are questions regarding your submission.

To submit your comment online, go to *https://www.regulations.gov/docket/FMCSA-2024-0029.* Next, choose the only notice listed, click the ''Comment'' button, and type your comment into the text box on the following screen. Choose whether you are submitting your comment as an individual or on behalf of a third party and then submit.

If you submit your comments by mail or hand delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing. FMCSA will consider all comments and material received during the comment period.

### *B. Viewing Comments*

To view comments go to *www.regulations.gov.* Insert the docket number (FMCSA–2024–0029) in the keyword box and click ''Search.'' Next, choose the only notice listed, and click ''Browse Comments.'' If you do not have access to the internet, you may view the docket online by visiting Dockets Operations on the ground floor of the DOT West Building, 1200 New Jersey Avenue SE, Washington, DC 20590–0001, between 9 a.m. and 5 p.m. ET Monday through Friday, except Federal holidays. To be sure someone is there to help you, please call (202) 366–9317 or (202) 366–9826 before visiting Dockets Operations.

### *C. Privacy Act*

In accordance with 49 U.S.C. 31315(b)(6), DOT solicits comments from the public on the exemption request. DOT posts these comments, without edit, including any personal information the commenter provides, to *www.regulations.gov.* As described in the system of records notice DOT/ALL 14 (Federal Docket Management System), which can be reviewed at *https://www.transportation.gov/individuals/privacy/privacy-act-system-records-notices,* the comments are searchable by the name of the submitter.

## II. Background

Under 49 U.S.C. 31136(e) and 31315(b), FMCSA may grant an exemption from the FMCSRs for no longer than a 5-year period if it finds such exemption would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption. The statutes also allow the Agency to renew exemptions at the end of the 5-year period. FMCSA grants medical exemptions from the FMCSRs for a 2-

procedures are in accordance with our regulations at 20 CFR 401.65(a).

**NOTIFICATION PROCEDURES:**

Same as record access procedures. These procedures are in accordance with our regulations at 20 CFR 401.40, 401.45, and 401.55.

**EXEMPTIONS PROMULGATED FOR THE SYSTEM:**

None.

**HISTORY:**

85 FR 34477 (June 4, 2020), Electronic Disability Claim File.

89 FR 14554 (February 27, 2024), Electronic Disability Claim File.

[FR Doc. 2026–07300 Filed 4–14–26; 8:45 am]

**BILLING CODE 4191–02–P**

## DEPARTMENT OF TRANSPORTATION

### Federal Motor Carrier Safety Administration

**[Docket No. FMCSA–2026–0958]**

### Parts and Accessories Necessary for Safe Operation; Application for Exemption From Aurora Operations, Inc.

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), Department of Transportation (DOT).

**ACTION:** Notice of application for exemption; request for comments.

**SUMMARY:** FMCSA requests public comment on Aurora Operations, Inc.'s (Aurora) application for a five-year exemption to allow commercial motor vehicles (CMVs) equipped with a Level 4 automated driving system (ADS) to use a set of cab-mounted warning beacons in lieu of placing reflective warning triangles or fusees around the stopped vehicle. The exemption would apply to Aurora and to other motor carriers operating Level 4 ADS-equipped CMVs that notify FMCSA in writing prior to operating under the exemption. FMCSA is required by statute to publish a notice explaining each exemption request, and such notice does not indicate what decision FMCSA will ultimately reach on the request. After reviewing the application, safety analyses, and public comments submitted, FMCSA will grant or deny the exemption.

**DATES:** Comments must be received on or before May 15, 2026.

**ADDRESSES:** You may submit comments identified by Docket Number FMCSA–2026–0958 by any of the following methods:

• *Federal eRulemaking Portal: www.regulations.gov.* See the Public Participation and Request for Comments section below for further information.

• *Mail:* Dockets Operations, U.S. Department of Transportation, 1200 New Jersey Avenue SE, W58–213, West Building, Washington, DC 20590–0001.

• *Hand Delivery or Courier:* 1200 New Jersey Avenue SE, W58–213, West Building, Washington, DC 20590–0001 between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

• *Fax:* (202) 493–2251. Each submission must include the Agency name and the docket number (FMCSA–2026–0958) for this notice. Note that DOT posts all comments received without change to *www.regulations.gov,* including any personal information included in a comment. Please see the Privacy Act heading below.

*Privacy Act:* In accordance with 49 U.S.C. 31315(b), DOT solicits comments from the public to better inform its exemption process. DOT posts these comments, including any personal information the commenter provides, to *www.regulations.gov,* as described in the system of records notice DOT/ALL–14 FDMS (Federal Docket Management System (FDMS)), which can be reviewed at *https://www.transportation.gov/individuals/privacy/privacy-act-system-records-notices.* The comments are posted without edit and are searchable by the name of the submitter.

**FOR FURTHER INFORMATION CONTACT:** Mr. Vinay Nagabhushana, Acting Chief, Vehicle and Roadside Operations Division, Office of Carrier, Driver, and Vehicle Safety; (202) 897–8923 or *MCPSV@dot.gov.* If you have questions on viewing or submitting material to the docket, contact Dockets Operations at (202) 366–9826.

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation and Request for Comments

FMCSA encourages you to participate by submitting comments and related materials.

### *A. Submitting Comments*

If you submit a comment, please include the docket number for this notice (FMCSA–2026–0958), indicate the specific section of this document to which your comment applies, and provide a reason for each suggestion or recommendation. You may submit your comments and material online or by fax, mail, or hand delivery, but please use only one of these means. FMCSA recommends that you include your name and a mailing address, an email address, or a phone number in the body of your document so the Agency can contact you if it has questions regarding your submission.

To submit your comment online, go to *https://www.regulations.gov/docket/FMCSA-2026-0958/document,* click on this notice, click ''Comment,'' and type your comment into the text box on the following screen.

If you submit your comments by mail or hand delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing.

FMCSA will consider all comments and material received during the comment period. Comments received after the comment closing date will be filed in the public docket and will be considered to the extent practicable.

### *B. Confidential Business Information (CBI)*

CBI is commercial or financial information that is both customarily and actually treated as private by its owner. Under the Freedom of Information Act (5 U.S.C. 552), CBI is exempt from public disclosure. If your comments responsive to the notice contain commercial or financial information that is customarily treated as private, that you actually treat as private, and that is relevant or responsive to the notice, it is important that you clearly designate the submitted comments as CBI. Please mark each page of your submission that constitutes CBI as ''PROPIN'' to indicate it contains proprietary information. FMCSA will treat such marked submissions as confidential under the Freedom of Information Act, and they will not be placed in the public docket of the notice. Submissions containing CBI should be sent to Brian Dahlin, Chief, Regulatory Evaluation Division, Office of Policy, FMCSA, 1200 New Jersey Avenue SE, Washington, DC 20590–0001 or via email at *brian.g.dahlin@dot.gov.* At this time, you need not send a duplicate hardcopy of your electronic CBI submissions to FMCSA headquarters. Any comments FMCSA receives not specifically designated as CBI will be placed in the public docket for this notice.

### *C. Viewing Comments and Documents*

To view comments, as well as any documents mentioned in this preamble as being available in the docket, go to *https://www.regulations.gov,* insert FMCSA–2026–0958 in the keyword box, select the document tab and choose the document to review. To view comments, click this notice, then click ''Browse Comments.'' If you do not have access to the internet, you may view the docket by visiting Docket Operations in the room W58–213 of the DOT West Building, 1200 New Jersey Avenue SE,

Washington, DC 20590–0001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. To be sure someone is there to help you, please call (202) 366–9317 or (202) 366–9826 before visiting Dockets Operations.

**II. Legal Basis**

FMCSA has authority under 49 U.S.C. 31136(e) and 31315(b) to grant exemptions from Federal Motor Carrier Safety Regulations (FMCSRs). FMCSA must publish a notice of each exemption request in the **Federal Register** (49 CFR 381.315(a)). The Agency must provide the public an opportunity to inspect the information relevant to the application, including the applicant's safety analysis. The Agency must provide an opportunity for public comment on the request.

The Agency reviews the application, safety analyses, and public comments submitted and determines whether granting the exemption would likely achieve a level of safety equivalent to, or greater than, the level that would be achieved without the exemption, pursuant to the standard set forth in 49 CFR 381.305(a). The Agency must publish its decision in the **Federal Register** (49 CFR 381.315(b)). If granted, the notice will identify the regulatory provision from which the applicant will be exempt, the effective period, and all terms and conditions of the exemption (49 CFR 381.315(c)(1)). If the exemption is denied, the notice will explain the reason for the denial (49 CFR 381.315(c)(2)). The exemption may be renewed (49 CFR 381.300(b)).

**III. Applicant's Request**

*Current Regulatory Requirements*

Aurora requests an exemption from certain FMCSRs related to requirements for placing warning devices around a stopped CMV, requirements that exterior lamps be steady burning, and requirements that specific types of warning devices be used. Section 392.22(b) of the FMCSRs requires the driver of a CMV stopped on the traveled portion or shoulder of a road for any cause other than a necessary traffic stop to activate hazard warning signal flashers and place required warning devices as soon as possible, but within ten minutes, at specified locations behind and in front of the stopped CMV. Section 392.22(b) also specifies placement of warning devices in certain circumstances, such as during daylight hours, or where devices may be obstructed from view (*e.g.,* when stopped within 500 feet of a curve or the crest of a hill).

Section 393.25(e) of the FMCSRs requires that all exterior lamps be steady burning, with exceptions not relevant here.

Section 393.95(f) of the FMCSRs specifies the types and number of warning devices to be used for stopped vehicles, namely 3 bidirectional emergency reflective triangles or at least 6 fusees. The reference to 3 liquid-burning flares was removed by a final rule published on February 19, 2026 (91 FR 7867). Other warning devices may be used in addition to required devices, as long as they do not reduce the effectiveness of required devices.

*Applicant's Request*

Aurora seeks an exemption from 49 CFR 392.22(b), 393.25(e), and 393.95(f) to allow Aurora to operate Level 4 ADS-equipped CMVs, as defined in SAE International, formerly Society of Automotive Engineers (SAE), standard J3016, using a set of cab-mounted beacons in lieu of placing the warning devices otherwise required by the FMCSRs. Aurora requests that the exemption include any other motor carrier operating Level 4 ADS-equipped CMVs, provided that the motor carrier notifies FMCSA in writing prior to operating under the exemption. The cab-mounted warning beacons consist of flashing amber lights that meet class 1 photometric performance requirements described in SAE J595, mounted high on each side of the cab.

Aurora notes that the exemption would apply to Level 4 ADS-equipped CMVs even if there were a human driver present and suggests that FMCSA consider extending the exemption to conventional CMVs operated by human drivers. Aurora states that it currently has 109 Class 8 CMVs and expects to have more than 200 Level 4 ADS-equipped CMVs by the end of calendar year 2026. Aurora projects that its fleet could expand to thousands of CMVs operating under the exemption over the next five years.

*Limited Waiver*

Currently, Aurora is operating under a limited waiver from the warning device placement requirements in 49 CFR 392.22(b), the steady-burning lamp requirement in 49 CFR 393.95(f), and the requirements for the types and number of warning devices in 49 CFR 393.25(e), subject to certain terms and conditions. The waiver allows Aurora to operate Level 4 ADS-equipped CMVs with cab-mounted beacons in lieu of the warning devices otherwise required by the FMCSRs. The waiver also permits other motor carriers operating Level 4 ADS-equipped CMVs to use the waiver, provided that the motor carrier notifies FMCSA in writing and certifying information specified in the waiver. Kodiak Robotics, Inc., provided written notification to FMCSA that it is also operating under the waiver. The waiver also requires each motor carrier operating under the waiver to report any crashes that occurred while the cab-mounted warning beacons are activated or should have been activated, and submit a Waiver Term Report outlining the performance data of the cab-mounted warning beacons. As of the publication date of this notice, no crashes have been reported to FMCSA under the terms and conditions of the waivers. The current waiver will expire on July 9, 2026.

*Applicant's Equivalent Level of Safety*

Aurora states that the exemption will achieve a level of safety equivalent to that of the current regulations because cab-mounted warning beacons are reliable and highly visible, whereas warning triangles can be blown away or toppled over. In addition, cab-mounted warning beacons eliminate the need for a human to exit the CMV onto the shoulder or traffic lane of a road. Aurora states that it successfully used cab-mounted warning beacons under a waiver from October 10, 2025 through January 9, 2026 on 34 CMVs that traveled over 500,000 miles. During that period, the beacons activated for a total duration of nearly 10 hours. Aurora reports that, to the company's knowledge, the beacons were reliable and operated as expected without any faults, malfunctions, or power issues. Aurora's CMVs that operated under the waiver were not involved in, nor contributed to, any roadway collisions while stopped on the roadway and using the beacons.

Aurora also submits two reports that it says support the safety effectiveness of the cab-mounted warning beacons: an August 2022 Waymo-sponsered study titled ''Stopped Automated Commercial Motor Vehicle Warning Device Surrogates'' by the Virginia Tech Transportation Institute (VTTI), and an October 2022 report prepared by Aurora titled ''Naturalistic Study of Warning Device Equivalency.''

Aurora proposes terms and conditions for the exemption similar to the terms and conditions of the waivers that FMCSA has issued to Aurora. Aurora requests that it be allowed to operate double/triple trailers and tank vehicles under the exemption, which is currently not allowed under the waivers. Auorora does not propose that the terms and conditions for the exemption allow for operations which would otherwise

require a ''H'', ''P'', ''S'', or ''X'' endorsement under 49 CFR 383.93—if a human driver were present.

A copy of Aurora's application for exemption with supporting documents, including the waivers FMCSA issued to Aurora and the two 2022 studies, is available for review in the docket for this notice.

### IV. Request for Comments

In accordance with 49 U.S.C. 31315(b), FMCSA requests public comment from all interested persons on Aurora's application for a 5-year exemption from 49 CFR 392.22(b), 49 CFR 393.25(e), and 49 CFR 393.95(f). All comments received before the close of business on the comment closing date will be considered and will be available for examination in the docket at the location listed under the **ADDRESSES** section of this notice.

**Larry W. Minor,**

*Associate Administrator for Policy.*

[FR Doc. 2026–07288 Filed 4–14–26; 8:45 am]

**BILLING CODE 4910–EX–P**

## DEPARTMENT OF TRANSPORTATION

### Pipeline and Hazardous Materials Safety Administration

### Hazardous Materials: Notice of Actions on Special Permits

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA), DOT.

**ACTION:** Notice of actions on special permit applications.

**SUMMARY:** In accordance with the procedures governing the application for, and the processing of, special permits from the Department of Transportation's Hazardous Material Regulations, notice is hereby given that the Office of Hazardous Materials Safety has granted or denied the application described herein.

**DATES:** Comments must be received on or before May 15, 2026.

**ADDRESSES:** Record Center, Pipeline and Hazardous Materials Safety Administration U.S. Department of Transportation, Washington, DC 20590.

Comments should refer to the application number and be submitted in triplicate. If confirmation of receipt of comments is desired, include a self-addressed stamped postcard showing the special permit number.

**FOR FURTHER INFORMATION CONTACT:** Donald Burger, Director, Office of Hazardous Materials Safety Special Permits Program, Pipeline and Hazardous Materials Safety Administration, U.S. Department of Transportation, East Building, PHH–6, 1200 New Jersey Avenue Southeast, Washington, DC 20590–0001, (202) 366–4535.

**SUPPLEMENTARY INFORMATION:** Copies of the applications are available for inspection in the Records Center, East Building, PHH–6, 1200 New Jersey Avenue Southeast, Washington, DC.

This notice of receipt of applications for special permit is published in accordance with part 107 of the Federal hazardous materials transportation law (49 U.S.C. 5117(b); 49 CFR 1.53(b)).

Issued in Washington, DC, on April 1, 2026.

**Donald P. Burger,**

*Director, Special Permits Program.*

| Application No. | Applicant | Regulation(s) affected | Nature of the special permits thereof |
|---|---|---|---|
| | | **Special Permits Data—Granted** | |
| 7694–M | Applied Pressure Vessels, Inc | 173.302a, 175.3 | To modify the special to authorize an additional hazardous material. |
| 11215–M | Northrop Grumman Systems Corporation. | 172.300, 172.400, 172.500, 172.600, 173.62, 175.75. | To modify the special permit to authorize additional hazardous materials. |
| 21552–M | Veolia ES Technical Solutions, LLC. | 172.320, 173.56(b) | To modify the special permit to authorize plain water as an alternative soaking solution. |
| 22010–N | Thales Alenia Space | 172.101(j), 172.300, 172.400, 173.301(f), 173.302a(a)(1), 173.304a(a)(1). | To authorize the transportation in commerce of specially designed non-DOT specification containers (satellite assemblies) for use in specialty cooling applications. |
| 22042–N | Jaguar Land Rover Limited | 172.102(c)(2) | To authorize the transportation in commerce of lithium ion batteries that exceed 35 kg net weight via cargo-only aircraft. |
| 22043–N | Fibro Plastichem (India) Private Limited. | 107.503(b), 107.503(c), 172.102(c)(3), 172.203(a), 173.241(b), 173.242(b), 173.243(b), 178.345–1(a), 178.347–1(a), 178.348–1(a). | To authorize the manufacture, mark, sale and use of non-DOT specification glass fiber reinforced plastics (GFRP) cargo tanks conforming to all regulations applicable to a DOT 407 or DOT 412 cargo tank motor vehicle except as specified in the special permit for the transportation in commerce of the hazardous materials listed in the special permit. |
| 22059–M | The Boeing Company | 173.219(c)(5) | To modify the special permit to authorize the grantee as a carrier under the terms of the special permit. |
| 22064–M | Daicel Safety Systems (Thailand) Company Limited. | 173.301(a)(1), 173.302(a)(1), 178.65(c)(3). | To modify the special permit to authorize an additional packaging design. |
| 22095–N | LG Energy Solution, Ltd | 172.101(j) | To authorize the transportation in commerce of lithium ion batteries each with a mass exceeding 35 kg net weight per package via cargo-only aircraft. |
| 22110–M | Blue Origin, LLC | 172.300(a), 172.400(a), 173.301(f)(1), 173.302(a)(1), 173.56(b), 49 CFR Part 178. | To modify the special permit to authorize an additional packaging which is unapproved for transport and to authorize the transportation of an explosive. |
| 22145–N | Impulse Labs, Inc | 172.101(j), 173.185(a)(1) | To authorize the transportation in commerce of lithium ion batteries each with a mass exceeding 35 kg net weight per package via cargo-only aircraft. |
| 22157–N | Syensqo USA LLC | 172.302(c), 173.32(a)(2), 177.801, 180.605(a). | To authorize the one-time, one-way transportation of UN portable tanks that were filled with hazardous materials after the expiration of the most recent periodic requalification. |

1049 Terra Bella Ave
Mountain View, CA 94043
Kodiak.ai

May 4, 2026

Dockets Operations
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Room W58-213, West Building
Washington, D.C. 20590-0001

RE: Parts and Accessories Necessary for Safe Operation; Application for Exemption from Aurora Operations, Inc. (FMCSA-2026-0958)

Dear Associate Administrator Minor:

Kodiak AI, Inc. ("Kodiak") appreciates the opportunity to respond to the Federal Motor Carrier Safety Administration's ("FMCSA") request for comment regarding Aurora Operations, Inc.'s ("Aurora") application for exemption from certain Federal Motor Carrier Safety Regulations ("FMCSRs"). Aurora's application relates to requirements for the placement of warning devices around a stopped commercial motor vehicle ("CMV"), requirements that exterior lamps be steady burning, and requirements that specific types of warning devices be used. Kodiak strongly supports this application for exemption and urges FMCSA to grant the exemption without delay.

Kodiak is a developer of autonomous vehicle technology currently testing and deploying Level 4 automated driving system-equipped commercial motor vehicles ("ADS-equipped CMVs"). Kodiak-powered ADS-equipped CMVs are meant to enhance safety and efficiency of today's freight movement in both over-the-road and industrial applications.

As referenced in the docket, independent research supports the assertion that the proposed cab-mounted warning beacons achieve a level of safety that is equivalent to, or greater than, the level of safety provided by the requirements of 49 U.S.C. § 31315(b). As you are aware, FMCSA has already taken significant action on this subject by granting a limited waiver that allows the use of cab-mounted warning beacons on ADS-equipped CMVs, which Kodiak has received authorization to utilize.

In addition to the granting of the exemption, Kodiak seeks further clarity regarding the definition and intent of "redundant power sources" currently contained in III(B)(6) of the previously-issued waiver, and in particular would appreciate any clarification regarding the definitions of power *sources* and power *supplies*.

kodiak

Further, Kodiak concurs with Aurora's proposal for the removal of the operational prohibition for certain endorsements under 49 CFR 383.93, particularly the "T" endorsement, which would enable Kodiak to best service its current and future customers. Currently, Kodiak operates single, double, and triple trailers on private roads in the Permian Basin. In certain instances, the need may arise for the movement of double and triple trailers in certain states that permit such trailer types on their roadways subject to compliance with applicable laws. As the industry scales, ADS-equipped CMVs will need to meet the current demands of shippers - which, in certain states, permits the use of double and triple trailers.

Kodiak respectfully urges FMCSA to grant this exemption in order to advance developments in roadway safety. Further, we request FMCSA to consider utilizing its current statutory authority to update the current FMCSRs to advance enhanced safety capabilities for all types of CMVs – regardless of human or Automated Driving System operator – to provide increased regulatory certainty for the trucking industry.

Sincerely,

Daniel Goff
Vice President of External Affairs
Kodiak AI, Inc.
dan@kodiak.ai

# Parts and Accessories Necessary for Safe Operation; Application for an Exemption from Aurora Operations, Inc

Created by the **Federal Motor Carrier Safety Administration**

**Closed for Comments**

Docket Details | Docket Documents 2 | All Comments on Docket 184

**Docket ID**

FMCSA-2026-0958

**Number of Comments Posted to this Docket**

184

Comments are submitted on individual documents in a docket. By clicking on the tab for "Docket Documents", you can access document-specific comments and submit your own comments. By clicking on the tab for "All Comments on Docket", you can have consolidated access to all comments for the docket from one location. In some instances, agencies do not publicly post all comments received. You can only access those comments that are posted to Regulations.gov by the agencies. The number of accessible comments, therefore, may be lower than the total number of comments listed in the card below.

Abstract

Parts and Accessories Necessary for Safe Operation; Application for an Exemption from Aurora Operations, Inc

Give Feedback

Regulations.gov
*Your Voice in Federal Decision Making*

SUPPORT

# We're sorry, an error has occurred

The feature you are attempting to access is currently unavailable.

---

If you believe you should not be getting this error page or the problem persists, please contact the Help Desk .

Give Feedback

NR NONRULEMAKING DOCKET

Subscribe Share

# Parts and Accessories Necessary for Safe Operation; Application for an Exemption from Aurora Operations, Inc

Created by the **Federal Motor Carrier Safety Administration**

**Closed for Comments**

**Docket Details**

**Docket ID**

FMCSA-2026-0958

**Number of Comments Received**

311

This count refers to the total comment/submissions received on this docket, as of 11:59 PM yesterday. For a detailed description on how the displayed comment count is derived, please see the note on the FAQ page. Note: Comments are made on individual documents within the docket. To review all comments from a docket, please click on "All Comments on Docket".

Less Details


Abstract

Parts and Accessories Necessary for Safe Operation; Application for an Exemption from Aurora Operations, Inc


Give Feedback

# We're sorry, an error has occurred

The feature you are attempting to access is currently unavailable.

If you believe you should not be getting this error page or the problem persists, please contact the Help Desk .

An official website of the United States Government.

Regulations.gov
Your Voice in Federal Decision Making

SUPPORT

# We're sorry, an error has occurred

The feature you are attempting to access is currently unavailable.

If you believe you should not be getting this error page or the problem persists, please contact the Help Desk .

Give Feedback

Regulations.gov
Your Voice in Federal Decision Making

Elements Console Sources Network

Preserve log Disable cache No throttling

Filter Invert More filters

All Fetch/XHR Doc CSS JS Font Img Media Manifest Socket Wasm Other

1,000 ms 2,000 ms 3,000 ms 4,000 ms 5,000 ms 6,000 ms

| Name | Status | Type | Initiator | Size | Time |
|---|---|---|---|---|---|
| favicon.ico | 200 | x-icon | Other | (disk c... | 1 ms |
| agencies | 200 | xhr | vendor-1864c9d. | 91.4 kB | 209 ms |
| banner.md | 200 | xhr | vendor-1864c9d. | (disk c... | 0 ms |
| usa-flag_16px-1e69fdaf725e... | 200 | png | vendor-1864c9d. | (memo... | 0 ms |
| regulations_brand_light.svg | 200 | svg+xml | vendor-1864c9d. | 16.3 kB | 73 ms |
| agencies | 200 | xhr | vendor-1864c9d. | 91.4 kB | 324 ms |
| analytics.js | 200 | script | vendor-1864c9d. | (memo... | 0 ms |
| collect?v=1&_v=j102&a=1127... | 200 | xhr | analytics.js:46 | 0.0 kB | 39 ms |
| js?id=G-JGTFN0MKWK&cx=c... | 200 | script | analytics.js:34 | (memo... | 0 ms |
| collect?v=2&tid=G-JGTFN0M... | 204 | fetch | js?id=G-JGTFN0I | 0.0 kB | 30 ms |
| collect?v=2&tid=G-JGTFN0M... | 204 | fetch | js?id=G-JGTFN0I | 0.0 kB | 37 ms |
| collect?v=2&tid=G-CSLL4ZE... | 204 | fetch | js?id=G-CSLL4ZE | 0.0 kB | 29 ms |

22 requests | 202 kB transferred | 7.2 MB resources | Finish: ...60 s | DOMContentLoaded:

Console AI assistance What's new

What's new in DevTools 148

See all new features

Agentic extensions debugging

https://www.regulations.gov/service-down

An official website of the United States Government.

Regulations.gov
Your Voice in Federal Decision Making

SUPPORT

# We're sorry, an error has occurred

The feature you are attempting to access is currently unavailable.

If you believe you should not be getting this error page or the problem persists, please contact the Help Desk .

Give Feedback

Regulations.gov
Your Voice in Federal Decision Making

About | Bulk Data Download | Agencies | Learn | Reports | FAQ | Commenting Guidance

Privacy & Security Notice | User Notice | Accessibility Statement | API Requests | FOIA | Support

Elements Console Sources Network

Preserve log  Disable cache  No throttling

Filter  Invert  More filters

All Fetch/XHR Doc CSS JS Font Img Media Manifest Socket Wasm Other

| Name | Status | Type | Initiator | Size | Time |
|---|---|---|---|---|---|
| service-down | 200 | docume... | Other | 2.3 kB | 92 ms |
| Universal-Federated-Analytics-... | 200 | script | service-down:11 | (memor... | 0 ms |
| vendor-bb6bfc6158a46fd7d6f8... | 200 | stylesheet | service-down:16 | (memor... | 0 ms |
| regs-gov-405cc8c56ee6923fac0... | 200 | stylesheet | service-down:17 | (memor... | 0 ms |
| vendor-1864c9dc3b97c7e0535... | 200 | script | service-down:24 | (memor... | 0 ms |
| chunk.27.a5488a95adbaf3318a... | 200 | script | service-down:25 | (memor... | 0 ms |
| chunk.143.8c77f183d3b2740e7... | 200 | script | service-down:26 | (memor... | 0 ms |
| regs-gov-143bf31b19bd48cf82... | 200 | script | service-down:27 | (memor... | 0 ms |
| local-storage.js | 200 | script | content-script-util | 4.0 kB | 2 ms |
| util.js | 200 | script | google-docs-fte.js | 4.6 kB | 2 ms |
| fte-utils.js | 200 | script | EmbeddedPDFTou | 4.7 kB | 2 ms |
| express-fte.js | 200 | script | ShowOneChild.js:1 | 7.8 kB | 3 ms |
| js?id=G-CSLL4ZEK4L | 200 | script | Universal-Federate | (memor... | 0 ms |
| agencies | 204 | preflight | Preflight | 0.0 kB | 129 ms |
| express-utils.js | 200 | script | express-fte.js:18 | 3.3 kB | 2 ms |
| sidePanelUtil.js | 200 | script | GenAIWebpageElig | 1.6 kB | 7 ms |
| favicon.ico | 200 | x-icon | Other | (disk ca... | 49 ms |
| readability.js | 200 | script | sidePanelUtil.js:18 | 94.0 kB | 48 ms |
| agencies | 200 | xhr | vendor-1864c9d... | 91.4 kB | 261 ms |
| banner.md | 200 | preflight | Preflight | 0.0 kB | 213 ms |
| banner.md | 200 | xhr | vendor-1864c9d... | (disk ca... | 1 ms |
| usa-flag_16px-1e69fdaf725ecab... | 200 | png | vendor-1864c9d... | (memor... | 0 ms |
| regulations_brand_light.svg | 200 | svg+xml | vendor-1864c9d... | 16.4 kB | 130 ms |
| agencies | 200 | xhr | vendor-1864c9d... | 91.4 kB | 257 ms |
| analytics.js | 200 | script | vendor-1864c9d... | (memor... | 0 ms |
| collect?v=1&_v=j102&a=10488... | 200 | xhr | analytics.js:46 | 0.0 kB | 30 ms |
| js?id=G-JGTFN0MKWK&cx=c&... | 200 | script | analytics.js:34 | (memor... | 0 ms |
| collect?v=2&tid=G-JGTFN0MK... | 204 | fetch | js?id=G-JGTFN0M | 0.0 kB | 20 ms |
| collect?v=2&tid=G-JGTFN0MK... | 204 | fetch | js?id=G-JGTFN0M | 0.0 kB | 29 ms |
| collect?v=2&tid=G-CSLL4ZEK4L... | 204 | fetch | js?id=G-CSLL4ZEK | 0.0 kB | 27 ms |
| FloatingActionButton.js | 200 | script | content-script-util | 81.3 kB | 2 ms |
| vendor.js | 200 | script | FloatingActionButt | 135 kB | 2 ms |
| otherVendors.js | 200 | script | FloatingActionButt | 10.9 kB | 1 ms |

33 requests | 549 kB transferred | 7.6 MB resources | Finish: 5.88 s | DOMContentLoaded: 747 m

Console | AI assistance | What's new

What's new in DevTools 147

See all new features

Start AI assistance chats without prior context

Type here to search

49°F Mostly clear  4:35 AM

Case: 26-2838 Document: 2 Filed: 09/08/2026 Pages: 99



NATIONAL ARCHIVES
FEDERAL REGISTER
The Daily Journal of the United States Government

# 500 Server Error

## Something went wrong!

We've been notified about this issue and we'll take a look at it shortly.

NR NONRULEMAKING DOCKET

Subscribe Share

# Parts and Accessories Necessary for Safe Operation; Application for an Exemption from Aurora Operations, Inc

Created by the **Federal Motor Carrier Safety Administration**

Closed for Comments

Docket Details

**Docket ID**
FMCSA-2026-0958

**Number of Comments Received**
311

This count refers to the total comment/submissions received on this docket, as of 11:59 PM yesterday. For a detailed description on how the displayed comment count is derived, please see the note on the FAQ page. Note: Comments are made on individual documents within the docket. To review all comments from a docket, please click on "All Comments on Docket".

Less Details

Abstract

Parts and Accessories Necessary for Safe Operation; Application for an Exemption from Aurora Operations, Inc

Give Feedback

Search Documents
Case: 26-2838 Document: 2 Filed: 09/08/2026 Pages: 99
9:07 5GUC 33

NATIONAL ARCHIVES
FEDERAL REGISTER
The Daily Journal of the United States Government
NATIONAL ARCHIVES AND RECORDS ADMINISTRATION 1985

# 500 Server Error

## Something went wrong!

We've been notified about this issue and we'll take a look at it shortly.



Wed, May 13, 2026 • 9:06 PM
Add a caption...

Case: 26-2838 Document: 2 Filed: 09/08/2026 Pages: 99





# 500 Server Error

## Something went wrong!

We've been notified about this issue and we'll take a look at it shortly.

NR NONRULEMAKING DOCKET

Subscribe Share

# Parts and Accessories Necessary for Safe Operation; Application for an Exemption from Aurora Operations, Inc

Created by the **Federal Motor Carrier Safety Administration**

Closed for Comments

Docket Details

**Docket ID**

FMCSA-2026-0958

**Number of Comments Received**

311

This count refers to the total comment/submissions received on this docket, as of 11:59 PM yesterday. For a detailed description on how the displayed comment count is derived, please see the note on the FAQ page. Note: Comments are made on individual documents within the docket. To review all comments from a docket, please click on "All Comments on Docket".

Less Details

Abstract

Parts and Accessories Necessary for Safe Operation; Application for an Exemption from Aurora Operations, Inc

Give Feedback

Case: 26-2838 Document: 2 Filed: 09/08/2026 Pages: 99

3:47

Federal Register :...
federalregister.gov

Search Documents

NATIONAL ARCHIVES

# FEDERAL REGISTER

The Daily Journal of the United States Government

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION 1985

## 500 Server Error

## Something went wrong!

We've been notified about this issue and we'll take a look at it shortly.

General Services Administration
Acknowlegement of Portal Issues Email
May 11, 2026

Gmail [redacted]

EXHIBIT

## Fw: Ticket #68132: Aurora Exemption docket Has Been Created

1 message

[redacted] [redacted]

Sent from Proton Mail for Android.

-------- Original Message --------
On Monday, 05/11/26 at 06:55 ZenDesk Admin (Help Desk) <support@generalservicesadministration2147.zendesk.com> wrote:

General Services Administration

[R09GVJ-MRJXV]

Hi,

Thank you for submitting your inquiry to Regulations Help Desk.

Ticket #68132: Aurora Exemption docket has been created and a Regulations Help Desk Technician will respond to you shortly.

Kind regards,

Regulations Help Desk Team

Gmail [redacted]

## Fw: [Help Desk] Re: Aurora Exemption docket

1 message

[redacted] [redacted]

Sent from Proton Mail for Android.

-------- Original Message --------
On Monday, 05/11/26 at 08:04 Julio (Help Desk) <support@generalservicesadministration2147.zendesk.com> wrote:

GSA

General Services Administration

[R09GVJ-MRJXV]
Hello,

Thank you for contacting the Regulations.gov Help Desk.

Regulations.gov experienced a temporary service disruption. The issue has since been resolved, and the website is currently back up and running on our end.

We apologize for any inconvenience this may have caused. Please try accessing the website again at your convenience. If you continue to experience issues, please let us know and provide any error message or screenshot you are receiving so we can review further.

For additional information, you may also visit the Regulations.gov FAQ page:
https://www.regulations.gov/faq

Thank you.
Regulations.gov Help Desk