**No. 26-2838**

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

KOSTAS GIANNOULIAS,

Petitioner,

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,

Respondent.

On Petition for Review from the Federal Motor Carrier Safety Administration

## RESPONSE TO EMERGENCY MOTION FOR IMMEDIATE ADMINISTRATIVE STAY, STAY PENDING REVIEW, AND EXPEDITED PROCEEDINGS


BRETT A. SHUMATE
*Assistant Attorney General*

STEVEN A. MYERS
BENJAMIN T. TAKEMOTO
*Attorneys, Appellate Staff*
*Civil Division, Room 7258*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4252*

## TABLE OF CONTENTS


**Page**

INTRODUCTION ........................................................................ 1

BACKGROUND ........................................................................ 3

A. Statutory Background ........................................................ 3

B. Aurora's Exemption Requests and Waivers ........................ 5

C. This Petition ........................................................................ 10

ARGUMENT ........................................................................ 12

I. Giannoulias Fails To Demonstrate Irreparable Harm. ................ 13

II. Giannoulias Is Unlikely To Succeed On The Merits. .................... 19

A. Giannoulias Lacks Standing ................................................ 19

B. Giannoulias Cannot Proceed Under The Hobbs Act. ........... 19

C. Giannoulias's Claims Fail On The Merits. ........................... 21

III. The Remaining Equities Favor FMCSA. ...................................... 27

CONCLUSION ........................................................................ 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## INTRODUCTION

When commercial motor vehicles (CMVs) become disabled, regulations issued by the Federal Motor Carrier Safety Administration (FMCSA) generally require that their drivers place fusees or reflective triangles around the vehicle to warn other drivers of the potential hazard. *See generally* 49 C.F.R. § 392.22. Autonomous vehicles, however, cannot comply with that requirement without human intervention. FMCSA has therefore exercised its statutory authority to issue a waiver permitting certain operators to use cab-mounted warning beacons on their vehicles if they become disabled.

The most recent such waiver issued on July 9, 2026, and it expires in less than 18 days. After waiting the full 60 days to seek relief, *see* 28 U.S.C. § 2344, Kostas Giannoulias filed a petition for review of the waiver and a motion demanding an emergency stay. Giannoulias's theory is that he might encounter a truck covered by the waiver during his occasional trips to Texas, that the truck might be disabled, and that the purported safety difference between beacons and fusees/triangles could cause an accident. That speculative theory does not suffice for

standing—let alone the irreparable harm that Giannoulias must prove to obtain a stay.

Even if Giannoulias could overcome those hurdles, he is unlikely to succeed on the merits. First, he cannot seek judicial review under the Hobbs Act because he was not a party to the waiver process and is thus not a party aggrieved under the statute. Even if he had a right to participate, his reconsideration motion remains pending before FMCSA and renders the challenged decision nonfinal as to him.

Second, federal law authorizes FMCSA to issue waivers, *see* 49 U.S.C. § 31315(a), and the challenged waiver is not materially different from waivers that FMCSA has previously issued. As with all waivers, FMCSA explained how this time- and scope-limited waiver "is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver." *Id.* In fact, one study concluded that drivers respond better to beacons than triangles under circumstances similar to where the waiver applies.

Finally, the remaining equitable factors favor FMCSA because the attenuated and speculative harms that Giannoulias alleges pale in

comparison to the government's interest in authorizing warning beacons. The Court should deny Giannoulias's motion.

## BACKGROUND

### A. Statutory Background

The Motor Carrier Safety Act authorizes the Secretary of Transportation to "prescribe regulations on commercial motor vehicle safety." 49 U.S.C. § 31136(a). The Secretary has delegated that authority to FMCSA, which has required that when a CMV becomes disabled, the driver must place warning devices a certain distance in front of and behind the vehicle. 49 C.F.R. § 392.22(b)(1). Those warning devices must include at a minimum either "[t]hree bidirectional emergency reflective triangles" or "[a]t least 6 fusees." *Id.* § 393.95(f)(1)–(2). Any fusees "shall be steady-burning" subject to certain exceptions. *Id.* § 393.25(e).

The Act authorizes the Secretary to "grant a waiver that relieves a person from compliance in whole or in part with a regulation issued under [the Act] if the Secretary determines that it is in the public interest to grant the waiver and that the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety

that would be obtained in the absence of the waiver." 49 U.S.C. § 31315(a). Such waivers must be "for a period not in excess of 3 months," "limited in scope and circumstances," and "for nonemergency and unique events"; they also may be "subject to such conditions as the Secretary may impose." *Id.*

The Secretary may also "grant to a person or class of persons an exemption from a regulation" for a five-year period, 49 U.S.C. § 31315(b)(1)–(2), or "conduct pilot programs to evaluate alternatives to regulations relating to, or innovative approaches to, motor carrier, commercial motor vehicle, and driver safety," which "may include exemptions from a regulation," *id.* § 31315(c)(1). Like waivers, exemptions may be issued only "if the Secretary finds such exemption would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption." *Id.* § 31315(b)(1). Unlike waivers, however, exemptions must be requested through prescribed procedures, *id.* § 31315(b)(5), and must undergo notice and comment, *id.* § 31315(b)(6). Pilot programs likewise must undergo notice and comment. *Id.* § 31315(c)(1).

### B. Aurora's Exemption Requests and Waivers

**1.** In 2023, Aurora Operations, Inc., and Waymo LLC requested a five-year exemption "on behalf of themselves and 'similarly situated companies' from [the] requirements of 49 CFR 392.22(b), 393.25(e), and 393.95(f)." Denial of Exemption, 89 Fed. Reg. 105675, 105676 (Dec. 27, 2024). They requested that "CMVs operated by a Level 4 [Automated Driving System (ADS)] be permitted to use 'Cab-Mounted Warning Beacons' … when the vehicles are operating either without a human on board, or with a human on board when testing the warning beacons." *Id.*[1]

FMCSA denied the request. It noted that "the application and public comments suggest promise for alternative warning devices in some circumstances" and "encourage[d] continued innovation and analyses in this area." Denial, 89 Fed. Reg. 105678. But "given the scope of the exemption sought," FMCSA concluded that "granting the exemption will [not] likely achieve a level of safety that is equivalent to,

---

[1] Level 4 ADS, which is the second highest level of automated driving, "is fully responsible for driving tasks within limited service areas while occupants act only as passengers and do not need to be engaged." NHTSA, *Automated Vehicle Safety*, https://perma.cc/9DHS-PZNX.

or greater than, the level of safety that would be achieved absent the exemption." *Id.* FMCSA noted, however, "that this decision does not preclude Applicants or others from seeking an[other] exemption." *Id.*[2]

**2.** Although FMCSA has not issued an exemption, it has issued four three-month waivers that "allow Aurora to use cab-mounted warning beacons in lieu of the warning devices required by 49 CFR § 393.95(f)." *See* Letter from Jesse Elison, Chief Couns., FMCSA, to Shelley Webb, Chief Legal Officer, Aurora (Oct. 9, 2025) (October Waiver); Letter from Derek D. Barrs, Adm'r, FMCSA, to Shelley Webb, Chief Legal Officer, Aurora (Jan. 8, 2026); Letter from Derek D. Barrs, Adm'r, FMCSA, to Shelley Webb, Chief Legal Officer, Aurora (Apr. 8, 2026); Letter from Derek D. Barrs, Administrator, FMCSA, to Shelley Webb, Chief Legal Officer, Aurora (July 9, 2026) (July Waiver); *see also* Application, 91 Fed. Reg. at 20253 (describing waivers).[3] These waivers

[2] Several months later, FMCSA issued a notice for public comment on a similar exemption request, this time from only Aurora. Application, 91 Fed. Reg. at 20252. The comment period ended on May 15, 2026. *Id.* To date, this request for an exemption remains pending before FMCSA.

[3] The letters, terms and conditions, emails, administrative stay application, and declarations are all attached to Giannoulias's motion.

extend to other motor carriers, provided that they notify FMCSA in writing and certify that they will comply with the waiver's terms and conditions, which govern warning beacon specifications, operating conditions, and reports to FMCSA. *See* FMCSA, *Waiver of Warning Device Requirements: Terms and Conditions of the Waiver* (July 9, 2026).

FMCSA explained that the waivers are "narrower in scope than the broad exemption request from Waymo LLC and Aurora that FMCSA previously denied." July Waiver 2. Whereas "the exemption request sought industry-wide regulatory relief whereby any motor carrier operating Level 4 ADS-equipped CMVs could operate under the waiver without any prior notice to FMCSA," these waivers "apply to Aurora, and [do] not apply to other motor carriers operating Level 4 ADS-equipped CMVs unless they provide written notification to FMCSA and certify compliance with the waiver's terms and conditions." *Id.* To date, three other companies—Kodiak Robotics, Waabi Logistics, and Stack AV—have availed themselves of the waiver. July Waiver 3

(cc'ing Kodiak and Waabi).[4] As of March 10, 2026, Kodiak deployed 20 driverless trucks, Press Release, Kodiak, *Kodiak AI Announces Fourth Quarter and Full Year 2025 Results* (Mar. 10, 2026), https://perma.cc/W89X-SY7F. As of July 31, 2026, Waabi and Stack AV have not deployed any. *See* New Mkt. Pitch, *Autonomous Trucks: Which Startup Is Ahead?* (July 31, 2026), https://perma.cc/X9JT-RESG; Waabi, *From Closed Course to Public Roads: The Path to Driverless* (Dec. 19, 2025), https://perma.cc/53EC-P2WE. Aurora indicated that it "expects to have more than 200 Level 4 ADS-equipped CMVs by the end of calendar year 2026," Notice of Application for Exemption, 91 Fed. Reg. 20252, 20253 (Apr. 15, 2026), 20 to 25 of which it expects to be in operation by the end of the third quarter 2026, *see* Aurora, Second Quarter 2026 Shareholder Letter 11, (July 29, 2026), https://perma.cc/H4LR-HY8H.

The waivers address other concerns related to the exemption application. The waivers "require[] that operations occur primarily on the U.S. Interstate Highway System … where standardized road

---

[4] Stack AV provided written notification to FMCSA after the July Waiver was issued.

geometry minimizes the frequency of sharp curves and crests that could obstruct visibility," addressing the concern that "road curvatures or elevations may affect visibility of a beacon located in a fixed position on the cab." July Waiver 2 (quotation omitted). FMCSA considered this alongside one of the study's findings "that a warning beacon elicited a higher percentage of responses [from drivers] than warning triangles overall" and concluded that applying the waiver primarily in the highway context "support[s] a determination that motorists detect and respond to the beacons at a similar rate as existing warning devices under the terms and conditions imposed by this waiver." *Id.* at 2–3.

The waivers also "mandate[] specific mounting, location, and photometric performance standards," addressing the exemption application's failure to "provide sufficient details about the proposed alternative devices." July Waiver 2 (quotation omitted). And "the waiver[s] require[] that the beacons 'be designed and installed with redundant power sources to prevent failure due to a single-point power failure,' which FMCSA previously noted as a deficiency with the exemption application." *Id.*

"Finally, the waiver[s] address[] concerns about the lack of monitoring controls by requiring specific, detailed reporting requirements to allow FMCSA to monitor the safety performance of motor carriers operating under the waiver." July Waiver 3. Waiver recipients "must provide FMCSA with aggregate data on beacon activation events, reports on the performance and reliability of the beacon systems—including malfunctions—and the specific mounting locations used (within the terms and conditions set forth in the waiver)" as well as "detailed crash and term reporting." *Id.*

### C. This Petition

Giannoulias is an Illinois resident who drives a "cargo van on interstate routes." Giannoulias Decl. ¶¶ 1–2. Those "routes vary," but "[d]uring July and August 2026, [he] completed at least six freight trips involving Dallas, Houston, Austin, Laredo, and El Paso." *Id.* ¶¶ 3–4. He further states that he "intend[s] to accept a commercially suitable Chicago-Dallas-Houston load or comparable Texas-corridor freight before October 9, 2026 if offered under [his] ordinary business criteria." *Id.* ¶ 7.

According to Giannoulias, Aurora has "announced driverless commercial operations between Dallas and Houston, nighttime driverless operations, a driverless route between Fort Worth and El Paso, and a broader network including Dallas-Laredo." Giannoulias Decl. ¶ 8. He is "concerned about nighttime travel and a stopped tractor-trailer whose rearward warning consists only of cab-mounted beacons rather than the spatially separated warning devices ordinarily required by 49 C.F.R. § 392.22(b)." *Id.* ¶ 10.

On September 3, 2026, Giannoulias emailed FMCSA an "Emergency Request for Administrative Stay and for Reconsideration, Rescission, or Termination of FMCSA Waiver No. 4." Email from Kostas Giannoulias, to Vinay Nagabhushana, Acting Chief, Vehicle and Roadside Operations Division, Office of Carrier, Driver, and Vehicle Safety, FMCSA (Sep. 3, 2026). Before receiving a response, on September 8, 2026, he filed this petition, asserting that the July Waiver exceeded FMCSA's statutory authority and was arbitrary and capricious. Pet. 3, Dkt. 1-1. On the same day, he filed an "Emergency Motion for Immediate Administrative Stay, Stay Pending Review, and Expedited Proceedings," in which he seeks an administrative stay, a

stay pending review, expedited briefing and record production, as well as an order to "preserve the underlying warning-device rules and prohibit additional opt-ins or successor waivers." Mot. 1–2. FMCSA has not yet responded to the administrative request.

## ARGUMENT

"Because the FMCSA is a part of the Department of Transportation, … the Hobbs Act … supplies [this Court's] jurisdiction." *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 656 F.3d 580, 585 (7th Cir. 2011). Under the Hobbs Act, if "irreparable damage would otherwise result to the petitioner, the court of appeals may, on hearing … order a temporary stay or suspension, in whole or in part, of the operation of the order of the agency." 28 U.S.C. § 2349(b); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) (requiring that a stay applicant demonstrate likelihood of success, irreparable harm, and that the balance of the equities favors a stay). Giannoulias does not make any of these showings—let alone all of them. He is therefore not entitled to the "extraordinary remedy" of a stay pending review. *See Nken*, 556 U.S. at 434 (quotation omitted).

## I. Giannoulias Fails To Demonstrate Irreparable Harm.

To substantiate irreparable harm, one "must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quotation omitted). "An injunction is an equitable remedy that does not issue as a matter of course, but rather a remedy that courts may grant at their discretion in the extraordinary situations where legal remedies such as monetary damages are inadequate." *Bedrossian v. Northwestern Mem'l Hosp.*, 409 F.3d 840, 842 (7th Cir. 2005). If "the asserted irreparable injury is merely speculative … injunctive relief is not warranted." *International Union, Allied Indus. Workers of Am. v. Local Union* No. 589, 693 F.2d 666, 674 (7th Cir. 1982) (per curiam).

Giannoulias has failed entirely to establish that he will be irreparably harmed if the waiver remains in effect pending ordinary judicial review. That is an entirely sufficient basis to deny a stay. *See International Union, Allied Indus. Workers of Am.*, 693 F.2d at 674; *DM*

*Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022) (noting that irreparable harm is a "threshold requirement" for injunctive relief).

**A.** Giannoulias asserts (at 20–24) that immediate relief is required because from now until October 9, 2026, when the July Waiver expires, (1) he *might* travel from Illinois to Texas and encounter a truck covered by the July Waiver, (2) the truck *might* be disabled, (3) he *might* crash into the truck, (4) and the accident *might* be attributable to a relevant safety difference between beacons and fusees/triangles. Such attenuated "speculation does not rise to the level of irreparable harm that would justify the intervention of a federal court." *Stroman Realty, Inc. v. Martinez*, 505 F.3d 658, 664 (7th Cir. 2007).

Indeed, this sort of speculation does not even clear the bar for Article III standing—let alone the higher threshold of irreparable harm. That is because a plaintiff who "allege[s] an increased risk of death, physical injury, or property damage from *future car accidents* that it says [the agency action] will fail to prevent" lacks standing because such "'increased-risk-of-harm' claims … fail to meet the constitutional requirement that a plaintiff demonstrate harm that is 'actual or

imminent, not conjectural or hypothetical.'" *Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1293–94 (D.C. Cir. 2007).

In the standing context, "unregulated parties" like Giannoulias "often … have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 382 (2024). "The causation requirement precludes" both "*speculative* links … , where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to [the] plaintiffs," and "*attenuated* links … , where the government action is" too "far removed from its distant (even if predictable) ripple effects." *Id.* at 383 (emphases added). "[T]o thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *Id.* (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)).

Giannoulias's speculation is inadequate. First, it is doubtful that he will even encounter a truck covered by the waiver before October 9, 2026. He resides in Illinois, not Texas, and may not even take a trip on any routes that Aurora operates. *See* Giannoulias Decl. ¶ 7 (stating that

he would take a trip only "if offered under [his] ordinary business criteria"). Even if he travels to Texas, counting both Aurora and Kodiak, there would only be approximately 45 self-driving trucks operating under the waiver. Giannoulias alleges that those trucks operate across the entire state of Texas: from El Paso (at Texas's far west) to Laredo (at its far South) to Dallas (near its Northeast). Texas has more than 3,000 miles of interstate highway, *see* TxDOT Expressway, TxDOT, *Interstate and U.S. Highway Facts* (2026), https://perma.cc/WHJ7-BYNA, and Giannoulias's chances of actually encountering a truck covered by the waiver are vanishingly small. The odds of his encountering such a truck *when it was disabled* are even smaller.

Giannoulias has also failed to demonstrate that there is a meaningful safety difference between the waiver-authorized beacons and fusees/triangles. To the contrary, the evidence demonstrates that "driver response at straight locations" (*i.e.*, interstate highways where the waiver primarily applies) was "immaterial (*i.e.*, less than four-tenths of one percent)." July Waiver 2. If anything, cab-mounted warning beacons may be safer: one study "concluded that a warning beacon elicited a higher percentage of responses than warning triangles

overall." *Id.* Giannoulias has thus entirely failed to provide the Court any reason to believe that *if* he encountered a disabled truck covered by the waiver, he would face any greater risk of injury because cab-mounted warning beacons were used instead of external fusees/triangles.

At bottom, the *number* of "ifs" in this chain preclude any finding that Giannoulias would suffer irreparable harm without a stay. Instead, his concerns are precisely the sort of "ripple effects" of government action that are too "far removed" from the action to establish standing, let alone irreparable harm. *Alliance*, 602 U.S. at 383; *see also Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501, 505–06 (7th Cir. 2024) (no standing where the plaintiffs "relie[d] on a highly attenuated chain of possibilities" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013))). Giannoulias simply has not shown that staying *Aurora*'s waiver is likely to make any difference to him: indeed, since FMCSA began issuing waivers last October, no crashes involving a beacon-activated CMV have been reported at all, let alone crashes attributable to a difference between warning beacons and fusees/triangles. *See* Application, 91 Fed. Reg. at 20253.

At bottom, if the mere fact that Giannoulias occasionally takes his cargo van to Texas means that he faces irreparable harm, then literally anyone who occasionally drives in Texas does too. To state that proposition is to refute it. *See Alliance*, 602 U.S. at 391–92 (observing that this "path would seemingly not end until virtually every citizen had standing to challenge virtually every government action that they do not like").

**B.** Giannoulias's claim of irreparable harm is further belied by how long he waited to seek emergency relief. "Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001).

FMCSA issued its first waiver on October 9, 2025. *See* October Waiver. But Giannoulias waited until September 8, 2026—nearly one year later—to seek emergency relief. Even if the relevant date were the date on which the most recent waiver issued, that was July 9, 2026—61 days before Giannoulias filed this motion. Throughout that time, he continued to "drive at night and share interstate highways with loaded

Class 8 tractor-trailers." Giannoulias Decl. ¶ 3. His delay in seeking judicial relief confirms that he is not facing irreparable harm.

## II. Giannoulias Is Unlikely To Succeed On The Merits.

Giannoulias lacks Article III standing, he cannot proceed under the Hobbs Act, and he is unlikely to succeed on his statutory-authority and arbitrary-and-capricious claims. He is thus exceedingly unlikely to succeed on the merits.

### A. Giannoulias Lacks Standing

For all the reasons noted above, Giannoulias lacks standing. *See supra* § I. The speculative and attenuated chain of causation between allowing a handful of trucks to deploy warning beacons when disabled and Giannoulias crashing into one of those trucks as a result fails to meet Article III requirements. *See Alliance*, 602 U.S. at 383; *Public Citizen, Inc.*, 489 F.3d at 1293; *Parents Protecting Our Child., UA*, 95 F.4th at 505–06.

### B. Giannoulias Cannot Proceed Under The Hobbs Act.

**1.** Giannoulias invokes the Hobbs Act, which permits judicial review only by a "*party* aggrieved," 28 U.S.C. § 2344 (emphasis added)—that is, a person who was a party to the relevant agency decision. *See*

*Water Transp. Ass'n v. Interstate Com. Comm'n*, 819 F.2d 1189, 1192–93 (D.C. Cir. 1987). "The prerequisites to being a 'party' will depend in part on the nature of the agency proceedings." *Matson Navigation Co. v. DOT*, 77 F.4th 1151, 1157 (D.C. Cir. 2023). "In informal proceedings" like this one, "a petitioner may be considered a 'party' after making a 'full presentation of views' before the agency," but not with "de minimis participation." *Id.* (quotation omitted).

Giannoulias did not acquire party status because he did not participate in the waiver process. He responds that *Nuclear Regulatory Commission* "recognized that less than intervention may suffice in certain less-formal adjudications," Mot. 3 (citing 605 U.S. at 677). But even if something less than formal intervention might have sufficed here, in this case there was not even "de minimis participation." *Matson*, 77 F.4th at 1157. He therefore did not become a party to the agency proceeding—and even if the reason he "made no presentation" was that he "was in the dark about the proceedings," he still cannot proceed under the Hobbs Act. *Id.* at 1158.

**2.** While Giannoulias did not try to participate before the waiver issued, he did try to participate after—in particular, his motion

asking FMCSA to stay the waiver pending judicial review also sought reconsideration of the waiver. But to the extent that he had the right to participate at all, the pending reconsideration motion renders the waiver nonfinal to him and presents an independent impediment to judicial review. That is because "the Hobbs Act embrace a tolling rule: The timely filing of a motion to reconsider renders the underlying order nonfinal for purposes of judicial review." *Saban v. DOL*, 509 F.3d 376, 379 (7th Cir. 2007) (quoting *Stone v. INS*, 514 U.S. 386, 392 (1995)). So long as Giannoulias's reconsideration remains pending, he cannot pursue judicial review in this Court.

**C. Giannoulias's Claims Fail On The Merits.**

**1.** The July Waiver is squarely within FMCSA's statutory authority. The plain text of 49 U.S.C. § 31315(a) limits a waiver in only four ways: it must be based on a determination "that it is in the public interest to grant the waiver and that the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver," it must be "for a period not in excess of 3 months," it must be "limited in scope and circumstances," and it must be "for nonemergency and unique events."

*Id.* The waiver complies with all these requirements: the agency made the necessary safety determination, the waiver is limited to three months, the waiver is limited in scope and circumstances (*i.e.*, to certain trucks in Aurora's fleet and other carriers who agree to its terms and conditions), and FMCSA issued the waiver for a nonemergency, unique event: "the operation of a CMV without a driver who can place warning devices on the roadway." July Waiver 3.

Giannoulias principally argues (at 10–11) that the statute prohibits FMCSA from issuing more than one three-month waiver. Such a limitation is missing from the text, and "[i]t is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (quotation omitted). Consistent with that principle, it has been FMCSA's practice—dating back years—to issue sequential waivers when circumstances warrant doing so. *See, e.g.*, FMCSA, *Waiver for States Concerning Third Party CDL Skills Test Examiners in Response to the COVID-19 Emergency* (Aug. 31, 2021), https://perma.cc/GX7A-4PS9 (issued seven consecutive times); FMCSA, *Waiver in Response to the COVID-19 National*

*Emergency—for States, CDL Holders, CLP Holders, and Interstate Drivers Operating Commercial Motor Vehicles* (Aug. 31, 2021), https://perma.cc/KV4D-QYMT (issued seven consecutive times). An emergency stay motion brought by a party who plainly lacks any stake in the case is hardly an appropriate occasion to question FMCSA's longstanding practice.

Giannoulias also suggests (at 11) that the agency cannot repeat the same safety and public interest determination from one waiver to the next. But nothing in the statute limits FMCSA in this way, nor would such a limitation make sense; allowing the limited use of cab-mounted warning beacons is likely to achieve an equivalent or greater level of safety and is in the public interest now for the same reason that it was this spring.

Giannoulias also argues (at 12–14) that the waivers should have been issued as exemptions under 49 U.S.C. § 31315(b) or pilot programs under 49 U.S.C. § 31315(c). But the fact that Congress gave FMCSA numerous and potentially overlapping authorities for excusing compliance with certain regulatory requirements underscores FMCSA's flexibility in choosing among those options: even if Giannoulias is right

that these waivers *could* have been conceived of as exemptions or pilot programs, that does not mean they had to be.

In any event, the waiver at issue here is different from exemptions and pilot programs in significant ways. Unlike exemptions, the waiver does not apply in blanket fashion to an entire class of regulated parties; it applies only to Aurora or another carrier that affirmatively accepts its terms and conditions and notifies FMCSA. The waiver could not be a pilot program either, *contra* Mot. 13–14, because at the time it was granted, the potential participants were unknown and it was unclear whether there would be "[a] reasonable number of participants necessary to yield statistically valid findings," 49 C.F.R. § 381.505.

Finally, Giannoulias argues (at 15–16) that a waiver must be requested, rather than issued *sua sponte*. But the statute does not require a request, and the cited regulation simply describes how someone *can* request a waiver, 49 C.F.R. § 381.210. Neither the statute nor the regulation provides that a waiver may issue *only* on request.

**2**. The July Waiver easily satisfies arbitrary-and-capricious review. "This court reviews agency determinations with great deference, and the court cannot substitute its judgment for that of the agency."

*Smith v. Garland*, 103 F.4th 1244, 1252 (7th Cir. 2024) (citation omitted). Under arbitrary-and-capricious review, agency action may be set aside only if the agency "[r]elied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)); *Sierra Club v. USDA*, 116 F.3d 1482, 1997 WL 295308, at *13 (7th Cir. May 28, 1997) (unpublished opinion) (observing that "deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology" (quotation omitted)).

FMCSA explained why "it is in the public interest to grant the waiver and that the waiver is likely to achieve a level of safety that is equivalent to, or greater than, the level of safety that would be obtained in the absence of the waiver," 49 U.S.C. § 31315(a): it compared the safety of beacons on interstate highways with fusees/triangles and described the "technical specifications" necessary to achieve the

requisite level of safety. *Id.* at 2. FMCSA also explained that the waiver is in the public interest because it "promote[s] innovation and … enable[s] commercial deployment of ADS CMVs to enhance safety and mobility for the American public." *Id.* at 3. Last, the waiver's reporting requirements allow FMCSA to gather critical data.

Giannoulias's counterarguments lack merit. He principally argues (at 15–17) that reporting data may undermine the safety determination, but that is not a reason to question the waiver permitting that data to be collected in the first place. In any event, the data before FMCSA when it issued the July Waiver contradicts his speculation. *See* Application, 91 Fed. Reg. at 20253 (stating that "no crashes have been reported to FMCSA under the terms and conditions of the waivers"). Unlike the circumstances in *Advocates for Highway & Auto Safety v. FHA*, 28 F.3d 1288, 1294 (D.C. Cir. 1994), in which the agency issued a waiver without critical safety evidence, this evidence indicated that beacons likely achieved an equivalent or greater level of safety. July Waiver 2–3. That is the sort of expert judgment that Congress entrusted to FMCSA.

Giannoulias's remaining arguments suggest ways that the evidence in support of FMCSA's safety determination could be improved, such as "test[ing] the full autonomous sequence[s]," considering other "human-factors evidence," more testing on curves, and testing on different types of trucks. *See* Mot. 17–20. But arbitrary-and-capricious review does not require agencies to exhaustively conduct studies; it requires only that the agency identify evidence that "a reasonable mind would find adequate to support [the challenged] conclusion." *Smith*, 103 F.4th at 1252 (quotation omitted). The evidence before FMCSA adequately supports its conclusion.

## III. The Remaining Equities Favor FMCSA.

FMCSA has found, based on the evidence before it, "that it is in the public interest to grant the waiver to promote innovation and to enable commercial deployment of ADS CMVs to enhance safety and mobility for the American public." July Waiver 3. That public interest, which is supported by evidence demonstrating the likely equivalent or greater level of safety of cab-mounted warning beacons relative to fusees/triangles, should not be set aside because of a single driver, who

may never encounter (let alone crash into) a truck equipped with those beacons.

**CONCLUSION**

For the foregoing reasons, the Court should deny Giannoulias's motion.

Respectfully submitted,


BRETT A. SHUMATE
*Assistant Attorney General*

STEVEN A. MYERS

*s/ Benjamin T. Takemoto*

BENJAMIN T. TAKEMOTO
*Attorneys, Appellate Staff*
*Civil Division, Room 7258*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4252*


September 2026

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,146 words. This response also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2026, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by mail at 3851 Mission Hills Road, Unit 210, Northbrook, IL 60062.

*s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO